UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                     \*

DR. ROBERT LEDERER,           \*
        Plaintiff,               \*
                                       \*
v.                                       \*
                                       \*            CIVIL ACTION NO.
                                       \*            04-10284-NG
JOHN SNOW, INC. and       \*
THE JOHN HOPKINS UNIVERSITY/  \*
CENTER FOR COMMUNICATION    \*
PROGRAM,                     \*
        Defendants.           \*
                                         \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANT, JOHNS HOPKINS UNIVERSITY'S, MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

The plaintiff, Dr. Robert Lederer, was hired as a consultant to assist John Snow, Inc. ("John Snow") and the Johns Hopkins University/Center for Communication Program ("Johns Hopkins") in connection with the Women's Reproductive Health Initiative in Romania. According to the unambiguous terms of the written employment contract he signed, the plaintiff received a "short-term appointment" lasting "a maximum of 14 working days." Although Johns Hopkins fully performed its obligations in regard to the written agreement, the plaintiff relies upon extrinsic evidence of the parties' alleged negotiations to claim that the term of the consultancy was intended to extend for many months, and that the defendants breached the contract by limiting his services to the

two-week period set forth in writing. As discussed below, the parol evidence rule precludes the plaintiff's attempt to modify the unambiguous terms of the written contract, and his claim is without merit.

## II. STATEMENT OF UNDISPUTED FACTS

1.  The plaintiff resides in Punta Gorda, Florida. (**Exhibit A**, plaintiff's deposition, vol. I, p. 6).

2.  In October, 2000, the plaintiff traveled to Baltimore, Maryland, to meet with representatives of Johns Hopkins and John Snow. (*Id.*, p. 91).

3.  On November 27, 2000, Johns Hopkins forwarded a two-page agreement (hereinafter the "Agreement") to the plaintiff, which confirmed his "short-term appointment as a consultant." (**Exhibit B**, letter dated 11/27/00, from Alice Payne Merritt to Robert Lederer).

4.  According to the Agreement, the plaintiff's "assignment" was "to assist JHU/CCP and John Snow Inc. (JSI) with the Women's Reproductive Health Initiative in Romania." (*Id.*).

5.  The Agreement called for the plaintiff "to provide professional services in Romania for the period from December 4, 2000 to December 17, 2000 for a maximum of 14 working days ..." (*Id.*).

6.  Under the Agreement, the fee for the plaintiff's services was $470.00 per day, to be paid by Johns Hopkins "upon completion and submission of an acceptable report on the assignment." John Snow was to handle "[a]ll travel and related expenses." (*Id.*).

7.  Although he allegedly believed that they were inconsistent with his prior discussions with the defendants, the plaintiff understood the terms and conditions of the written Agreement. (**Exhibit C**, plaintiff's deposition, vol. II, pp. 107-108, 149-150).

2

8.    He signed the Agreement, under the words "ACCEPTED AND AGREED," on December 1, 2000. (**Exhibit B**; **Exhibit C**, p. 37).

9.    The plaintiff went to Romania pursuant to the Agreement, and prepared a report of his experience there. (**Exhibit D**, report dated 1/2/01).

10.   On January 16, 2001, Johns Hopkins paid the plaintiff $7,520.00 for his services. (**Exhibit E**, check).

## III. ARGUMENT

### A.    THE INTERPRETATION OF THE CONTRACT IS GOVERNED BY MARYLAND LAW.

This action arises out of a contract that was negotiated and drafted in Maryland, forwarded to the plaintiff for signature in Florida, and returned to Maryland upon execution. The contract contemplates the performance of services in Romania. The plaintiff resides in Florida, while the defendants are located in Maryland (Johns Hopkins) and Massachusetts (John Snow). As a preliminary matter, then, a choice of law question is presented, although the resolution of that question is of limited significance, because the substantive law of Massachusetts, Maryland and Florida is consistent with respect to the matters at issue in this motion.

In diversity cases, federal courts must apply the choice of law rules of the state in which the court sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941). "For contract claims, Massachusetts employs a 'functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole' as articulated by the Restatement (Second) of Conflict of Law (1971 & Supp.2004)." *Bergin v. Dartmouth Pharmaceutical Inc.,* 326 F. Supp. 2d 179, 181 (D. Mass. 2004), quoting *Daynard v. Ness, Motley,*

*Loadholt, Richardson & Poole, P.A.,* 188 F. Supp.2d 115, 118 (D. Mass.2002) (quoting *Bushkin Assoc., Inc. v. Raytheon Co.,* 393 Mass. 622, 631, 472 N.E.2d 662, 668(1985)).

The Agreement in this matter relates to the plaintiff's personal services. As such, this court's analysis begins with Restatement (Second) of Conflict of Laws §196. *Bergin, supra* at 81. That section provides:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in ' 6 to the transaction and the parties, in which the event the local law of the other state will be applied.

Despite the fact that the services were to be provided in Romania, Romania does not have a significant relationship to the parties or to the performance of the Agreement. The parties to this matter had a justifiable expectation that United States law would apply. The parties are all based in the United States and compensation was to be in United States currency. The parties were subject to both United States federal income tax and social security taxes. The Agreement was negotiated in the United States, and the Agreement was drafted, sent and signed in the United States. In light of these circumstances, the parties reasonably and justifiably expected to be governed by the laws of the United States, and not Romania.

With regard to the question of whether the law of Massachusetts, Maryland or Florida should be applied, § 6 of the Restatement provides in pertinent part that:

> (2) ... the factors relevant to the choice of the applicable rule of law include
>
> > (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests

4

of those states in the determination of the particular issue, (d) the protection of

justified expectations, (e) the basic policies underlying the particular field of law, (f)

certainty, predictability and uniformity of the result, and (g) ease in determination and

application of the law to be applied.

*Bergin, supra,* at 181-182, quoting Restatement (Second) of Conflict of Laws § 6. Additionally, §

188 provides in relevant part that:

> (2)    ... the contacts to be taken into account in applying the principles of §6 to
> determine the law applicable to an issue include:
>
> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of
> business of the parties.

*Bergin, supra,* at 181-182, quoting Restatement (Second) of Conflict of Laws § 188. Applying these

criteria to the Agreement in question here, it appears that Maryland law should govern.

Of the three, Massachusetts is clearly the state with the least significant relationship to this

transaction, notwithstanding the fact that the plaintiff has elected to litigate the case here. The

Agreement was not negotiated, drafted or executed in Massachusetts, nor was it to be performed

here. Although John Snow, the contractor for the Romania project, is located in Massachusetts, the

plaintiff (a Florida resident) was hired by Johns Hopkins, a subcontractor based in Maryland. When

the plaintiff was hired, the parties would have been "surprised to learn ... that Massachusetts law

governs their relationship." *Daynard, supra,* at 122.

As between Florida and Maryland, the question is somewhat closer. On balance, however,

Maryland's relationship to the transaction is more significant than Florida's. Although the plaintiff

5

resides in Florida, he traveled to Maryland to meet with representatives of Johns Hopkins and John Snow. The terms of the proposed contract were principally negotiated during that meeting in Maryland, and the contract was drafted in Maryland. Because Johns Hopkins is located there, Maryland "has a strong public policy interest in ensuring companies based [there] honor their contractual obligations." *Bergin, supra,* at 182. While Florida has some interest in protecting the contractual rights of its citizens, that interest is diminished where, as here, the plaintiff entered into an employment agreement with an entity located in another state, for services to be performed in another country. Under these circumstances, Maryland's connection to the transaction is more substantial than Florida's, and Maryland law should apply.[1]

**B.    JOHNS HOPKINS FULFILLED ITS OBLIGATIONS UNDER THE UNAMBIGUOUS TERMS OF THE WRITTEN CONTRACT, WHICH CANNOT BE MODIFIED BY PAROL EVIDENCE.**

The plaintiff signed an agreement granting him a "short-term appointment" as a consultant for Johns Hopkins, whereby he would provide professional services from December 4 through December 17, 2000, "for a maximum of 14 working days." (**Exhibit B**). Johns Hopkins agreed to pay a fee of $470 per day, which was "payable upon completion and submission of an acceptable report on the assignment." (*Id.*).[2] Notwithstanding a disagreement regarding the acceptability of the report that he submitted, Johns Hopkins paid the plaintiff in full for the services contemplated by the

---

[1]  As noted above, the substantive law of Massachusetts and Florida is consistent with Maryland law on issues relating to contract interpretation and parol evidence, and no conflict of laws exists. Nevertheless, for the Court's convenience, corresponding Massachusetts and Florida case law citations are included.

[2]  Under the Agreement, reimbursement for travel and related expenses were handled by John Snow. (*Id.*).

6

Agreement.[3]  The plaintiff does not dispute the fact that Johns Hopkins performed under the terms of the written Agreement.  Rather, he maintains that the written Agreement that he signed was inconsistent with his previous discussions with Johns Hopkins representatives, and that the Agreement was intended to extend for the remainder of the Romania project (i.e., until at least October 1, 2001).  (**Exhibit A**, p. 88).

The plaintiff's claim is without merit.  While Johns Hopkins disputes his allegations regarding the anticipated term of the Agreement, the point is moot.  As discussed below, the terms of the written Agreement are clear and unambiguous.  As such, parol evidence regarding the parties' purported discussions or intentions is inadmissible, and cannot provide a valid basis for recovery.

The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law for the court. *Langston v. Langston*, 366 Md. 490, 506, 784 A.2d 1086, 1095 (2001).[4]  Maryland follows the law of objective contract interpretation. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166, 829 A.2d 540, 546 (2003); *Long v. State,* 371 Md. 72, 84, 807 A.2d 1, 8 (2002); *Langston v. Langston*, 366 Md. 490, 506, 784 A.2d 1086, 1095 (2001).[5]  Under the objective test of contract interpretation, "the written language

---

[3]  Johns Hopkins was told to hire the plaintiff by John Snow and did so despite the fact that the plaintiff failed to provide appropriate professional references, failed to provide a telephone number, insulted and alienated the staff in Romania, and produced a cursory, spiteful and self-serving attack on the program which satisfied none of the criteria for the "acceptable" report called for by the Agreement. (Exhibit F, e-mail dated 11/07/00, from Karen Angelici to Abul Hashem; Exhibit G, Karen Angelici's deposition, p. 87).

[4]  Accord *Lexington Ins. Co. v. All Regions Chemical Labs, Inc.*, 419 Mass. 712, 713, 647 N.E.2d 399, 400 (1995); *Emergency Associates of Tampa, P.A., v. Sassano*, 664 So.2d 1000, 1002 (Fla. App. 2d Dist., 1995).

[5]  Accord *Lexington Ins. Co. v. All Regions Chemical Labs, Inc.*, 419 Mass. 712, 713 (1995); *The Florida Bar v. Frederick*, 756 So.2d 79 (Fla.2000).

7

embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Long, supra*, 371 Md. at 84, 807 A.2d at 8, quoting *Slice v. Carozza Prop., Inc.,* 215 Md. 357, 368, 137 A2d 687, 693 (1958). A contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution; rather, "if a written contract is susceptible of a clear, unambiguous and definite understanding ... its construction is for the court to determine." *Langston, supra*, 366 Md. at 507, 784 A.2d at 1095.[6]

The term of the consultancy is unambiguously set out in the Agreement. Indeed, the plaintiff himself testified that he understood the terms and conditions of the written Agreement. (**Exhibit C**, pp. 107-108, 149-150). The Agreement states:

> We are happy to confirm your short-term appointment as a consultant for The Johns Hopkins University/Center for Communication Programs (JHU/CCP).
>
> This assignment is to provide professional services in Romania for the period from December 4, 2000 to December 17, 2000 for a maximum of 14 working days, based on an eight-hour work day, and a six-day work week, excluding travel time.

(**Exhibit B**).

Faced with the unequivocal language of the contract he signed, the plaintiff seeks to modify the terms of the Agreement by resorting to extrinsic evidence of his preliminary discussions with Johns Hopkins personnel, claiming that the parties contemplated that the term of his consultancy would run until the completion of the Romania project in late 2001. His reliance upon such evidence is misplaced. "Maryland law generally requires giving legal effect to the clear terms of a contract and bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict

---

[6] Accord *Schwanbeck v. Federal-Mogul Corp.,* 412 Mass. 703, 706, 592 N.E.2d 1289, 1292 (1992); *Kipp v. Kipp,* 844 So. 2d 691, 694 (Fla. App. 4th Dist., 2003).

a written contractual term." *Calomiris v. Woods*, 353 Md. 425, 432, 727 A.2d 358, 361 (1999).[7]

Thus, any "communications and negotiations leading up to the written contract" are rendered "legally

inoperative," and all prior oral agreements are discharged by the written contract. *Id.,* 353 Md. at

432, 727 A.2d at 361-362.    Absent any ambiguity in the written contract, parol evidence is

inadmissible.[8]

---

[7] Accord *Mass. Mun. Wholesale Elec. Co. v. Danvers,* 411 Mass. 39, 48, 577 N.E.2d 283, 289 (1991) ("As a general principle, a court considers extrinsic evidence to discern intent only when a contract term is ambiguous"); *Lambert v. Berkeley South Condominium Ass'n, Inc.*, 680 So.2d 588, 590-591 (Fla. App. 4th Dist., 1996) ("If the documents, within their four corners, are facially clear, a court must give full force to the plain and clear language of the governing documents and not turn to parol evidence to interpret the language").

[8] The plaintiff has claimed that he was pressured to sign the Agreement, and he may attempt to argue that he did so under "duress." However, duress is deemed sufficient to vitiate a written contract only where the plaintiff can establish "a wrongful act which deprives an individual of the exercise of his free will." *Simko, Inc. v. Graymar Co.*, 55 Md. App. 561, 568, 464 A.2d 1104, 1108 (1983); *Eckstein v. Eckstein*, 38 Md. App. 506, 512, 379 A.2d 757, 762 (1978). Accord *Delaney v. Chief of Police of Wareham*, 27 Mass. App. Ct. 398, 407, 539 N.E.2d 65, 70 (1989) (to establish duress, "[n]ot only must there be a wrongful or improper act or threat, but the act or threat must overcome the party's desire and undermine the agreement"); *City of Miami v. Kory*, 394 So.2d 494, 496 n.3 (Fla. App. 3d Dist., 1981) ("duress is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party so that the act of that party was not of her own volition"). As a matter of law, the mere fact that the plaintiff was urged to sign promptly does not rise to the level of "duress" necessary to undermine the Agreement.

## IV.  CONCLUSION

For the foregoing reasons, the defendant, Johns Hopkins University/Center for Communication Program, respectfully requests that its motion be ALLOWED, and that summary judgment be entered in its favor.

## V.  REQUEST FOR ORAL ARGUMENT

The defendant, Johns Hopkins University/Center for Communication Program believes that an oral argument may assist the Court and respectfully requests the same.

JOHNS HOPKINS UNIVERSITY/CENTER FOR
COMMUNICATION PROGRAMS,
By its attorneys,


_/s/ John F. Rooney, III_
John F. Rooney, III, BBO #426895
Michael R. Byrne, BBO #558899
Robert W. Healy, BBO #630714
MELICK, PORTER & SHEA, LLP
28 State Street
Boston, MA 02109
(617) 523-6200

Date:  8/15/05


### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)

I hereby certify that I conferred with the plaintiff and attempted in good faith to resolve or narrow the issues presented by this motion.

/s/  John F. Rooney, III

10

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                 \*

DR. ROBERT LEDERER,       \*
     Plaintiff,          \*
                                 \*

v.                                  \*
                                 \*       CIVIL ACTION NO.
                                 \*       04-10284-NG

JOHN SNOW, INC. and      \*
THE JOHN HOPKINS UNIVERSITY/  \*
CENTER FOR COMMUNICATION  \*
PROGRAM,                \*
     Defendants.         \*
                                 \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**AFFIDAVIT OF COUNSEL IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

I, John F. Rooney, III, under oath, depose and state the following on personal knowledge:

1.     I am an attorney for the defendant, The Johns Hopkins University/Center for
Communication Program, in the above-captioned matter.

2.     Attached hereto, in support of the defendant's motion for summary judgment are true and
correct copies of the following pleadings, excerpts from deposition transcripts, and
answers to interrogatories:

     Exhibit A:    Excerpts from the transcript of the deposition of Robert Lederer, taken on
                       December 2, 2004.

     Exhibit B:    Letter from Alice Payne Merritt to Robert Lederer, dated November 27,
                       2000.

     Exhibit C:    Excerpts from the transcript of the deposition of Robert Lederer, taken on
                       May 11, 2005.

     Exhibit D:    Report of Robert Lederer, dated January 2, 2001.

     Exhibit E:    Check from Johns Hopkins University, made out to Robert Lederer in the

amount of $7,520.00, dated January 16, 2001.

Exhibit F:    E-mail from Karen Angelici to Abul Hashem, dated November 7, 2000.

Exhibit G:    Excerpts from the transcript of the deposition of Karen Angelici, taken on June 29, 2005.

Signed under the pains and penalties of perjury this 15th day of August, 2005.

*/s/ John F. Rooney, III*
John F. Rooney, III, BBO #426895
MELICK, PORTER & SHEA, LLP
28 State Street
Boston, MA 02109
(617) 523-6200

<u>CERTIFICATE OF SERVICE</u>

I, John F. Rooney, III, hereby certify that on this day, I forwarded notice of the foregoing document(s) by mailing a copy thereof, postage prepaid to the following:

David B. Stein
RUBIN, WEISMAN, COLASANTI,
KAJKO & STEIN, LLP
430 Bedford Street
Lexington, MA 02420

Mr. Andrew F. Caplan
PERKINS, SMITH & COHEN
One Beacon Street, 30th Floor
Boston, MA 02108-3106


<u>/s/ John F. Rooney, III</u>
John F. Rooney, III


Date:  8/15/05

Exhibit A

SHEET 1    PAGE 1

Volume:    I
Pages:    1-120
Exhibits:    1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * *

DR. ROBERT LEDERER,

Plaintiff

Civil Action

VS

No. 04-CV-10284-NG

JOHN SNOW, INC. and
THE JOHNS HOPKINS UNIVERSITY/
CENTER FOR COMMUNICATION
PROGRAMS,

Defendants

* * * * * * * * * * * * * *

DEPOSITION of DR. ROBERT LEDERER, a witness
called on behalf of the Defendants, taken pursuant to
the Massachusetts Rules of Civil Procedure, before
Arlene Boyer, a Professional Court Reporter and Notary
Public, in and for the Commonwealth of Massachusetts,
at the offices of Melick, Porter & Shea, LLP, 28 State
Street, Boston, Massachusetts, 02109, on Thursday,
December 2, 2004, commencing at 12:20 p.m.

---

PAGE 2                                                      2

APPEARANCES

ROBERT W. HEALY, ESQ.
Melick, Porter & Shea, LLP
28 State Street
Boston, Massachusetts 02109
(617) 523-6200
        Counsel for the Defendant,
        The Johns Hopkins University/
        Center for Communication Programs
ANDREW E. CAPLAN, ESQ.
Perkins, Smith & Cohen
One Beacon Street, 30th floor
Boston, Massachusetts 02108-3106
(617) 854-4000
        Counsel for the Defendant,
        John Snow, Inc.
DAVID B. STEIN, ESQ.
Rubin, Weisman, Colasanti,
Kajko & Stein, LLP
430 Bedford Street
Lexington, Massachusetts 02420
(781) 860-9500
        Counsel for the Plaintiff

---

PAGE 3                                                      3

I N D E X
WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
ROBERT LEDERER
(By Mr. Healy)        4
(By Mr. Caplan)        110
        E X H I B I T S

NO.  DESCRIPTION                          PAGE
 1  Mr. Lederer's Curriculum Vitae          15

---

PAGE 4                                                      4

1            S T I P U L A T I O N S
2            It is hereby stipulated and agreed by
3    and between counsel for the respective parties
4    that the deponent shall have thirty (30) days in
5    which to read and sign the transcript, under the
6    pains and penalties of perjury, after which time
7    it shall be deemed to have been signed, and that
8    the certification, filing and sealing of the
9    deposition transcript are waived.
10            It is further stipulated and agreed
11    that all objections, except objections as to the
12    form of the question, and all motions to strike,
13    shall be reserved to the time of trial.
14
15            ROBERT LEDERER, first having been
16    satisfactorily identified and duly sworn, on
17    oath, deposes and says as follows:
18
19            DIRECT EXAMINATION
20
21    BY MR. HEALY:
22    Q  Good afternoon, Mr. Lederer.  I introduced myself
23        to you earlier.  My name is Robert Healy, and I'm
24        here representing Johns Hopkins University.  Just

Lederer v. Snow and Johns Hopkins                    R. Lederer, Vol. I, 12/2/04

---

**SHEET 2   PAGE 5**

5

1   some preliminary instructions. Have you ever had
2   your deposition taken before?
3   A   No.
4   Q   As you can see, everything that I say right now
5   is being taken down, so it's important that you
6   verbalize every one of your responses.
7   Inevitably, I'm sure it will happen at some point
8   today, you might nod your head or give an um-hmm.
9   Unfortunately, you've got to verbalize
10  everything.
11          Secondly, it's also important that you
12  wait until I've completed asking my question.
13  Again, I anticipate at some point during this
14  deposition, you will have anticipated what my
15  question is and perhaps start answering it before
16  I've completed my question. Just so that we all
17  can have a clean record when we get a transcript,
18  if you could just wait until I've completed my
19  question.
20          I guess finally, if at any point in
21  time you need to take a break to go to the
22  bathroom, get a drink of water, please let me
23  know. I believe there's an understanding that
24  we're going to try to go as far as we can this

---

**PAGE 6**

6

1   afternoon, but we're going to have to complete
2   this at a later date.
3          Could you please state your name for
4   the record, sir?
5   A   Robert Lederer.
6   Q   How do you spell your last name?
7   A   L-e-d-e-r-e-r.
8   Q   Do you have a middle name, sir?
9   A   Allen.
10  Q   What is your date of birth?
11  A   2/25/45.
12  Q   Where do you currently reside, sir?
13  A   In Punta Gorda, Florida.
14  Q   Is there a specific address in Punta Gorda,
15  Florida?
16  A   Yes. 2181 Palm Tree Drive.
17  Q   From conversations with your attorney, it's my
18  understanding that you recently had some problems
19  with your home with the recent weather down in
20  Florida; is that correct?
21  A   Yes.
22  Q   Is that the same address where you were
23  experiencing the problems with your home?
24  A   Yes.

---

**PAGE 7**

7

1   Q   Or whatever's left of your home; is that fair to
2   say?
3   A   Yes.
4   Q   Are you currently employed, sir?
5   A   No.
6   Q   When was the last time that you had any type of
7   employment?
8   A   Working for JHUCCP.
9   Q   So the last time you had any type of employment
10  was back in December of 2000; is that fair to
11  say?
12  A   December 2000 or January 2001, yes.
13  Q   Just back to some background information, sir.
14  Where were you born?
15  A   New York.
16  Q   New York City or New York --
17  A   New York, New York.
18  Q   Are you currently married, sir?
19  A   Single.
20  Q   Have you ever been married?
21  A   No.
22  Q   Do you have any children, sir?
23  A   No.
24  Q   Could you just tell me a little bit about your

---

**PAGE 8**

8

1   educational background starting with high school,
2   if you don't mind?
3   A   I've been to high school. I've been to college.
4   Q   What high school did you attend, sir?
5   A   Sleepy Hollow High.
6   Q   Could you spell that, please?
7   A   Sleepy Hollow.
8   Q   What year did you graduate?
9   A   1962, '3.
10  Q   Obviously, you continued your education following
11  high school, correct?
12  A   Yes.
13  Q   What further education did you have, sir?
14  A   College.
15  Q   What college did you attend, sir?
16  A   Davis and Elkins College.
17  Q   Is that in West Virginia, sir?
18          THE WITNESS: He has a copy of my
19  vitae. To go through all --
20          MR. STEIN: That's okay. Just do the
21  best you can.
22  Q   Let me ask you this, sir. I have before me an
23  older version of your curriculum vitae. Do you
24  have a more recent version of that with you

---

SHEET 22    PAGE 85

**85**

1    blast for my time. And also, of course, I was
2    very enthused about the project.
3          So in answer to your question, they
4    were so confused at JHU and were so afraid to
5    approach Joel Lambstein here in Boston with JSI,
6    that I saw this real, real disturbing situation
7    beginning to show a very, very, ugly, ugly mist.
8    Q    For the purposes of my previous question, my
9          question was do you know who was running the
10         project that was ongoing in Romania?
11              MR. STEIN: At that time, did he know?
12              MR. HEALY: At that time.
13   A    You mean an agency or a person?
14   Q    Agency.
15   A    Domestically, at that time -- okay. At that
16         time, a lot of things were unclear.
17   Q    So is your answer you're not sure who was running
18         the project?
19   A    At the time that I was first contacted, right.
20         Sorry. I didn't understand the question.
21   Q    That's fine. We've been going quite some time,
22         and people get tired. If at any point in time
23         you don't understand any of my questions, just
24         let me know. I ask bad questions sometimes. I

PAGE 86

**86**

1          probably ask them more often than not, so just
2          let me know.
3    A    Without a question, I'll even make this response.
4          I know I inquired where the sources of -- where
5          the chain of command and authority positions
6          were, and frequently I was given -- I was given
7          responses like we're making major changes, we're
8          not sure, we'll call you back on this, and so
9          forth.
10   Q    Who did you have discussions with in terms of
11         your potential salary and/or consulting fees
12         prior to your meeting in Baltimore?
13   A    To the best of my recollection, the two that
14         stand out were the go-to person, Abdul Hasheem,
15         who was some director with the JSI, and Karen
16         Angelici, and this individual that I mentioned,
17         Erica Wegner, who I believe worked for Angelici.
18   Q    What was discussed between yourself and these
19         three individuals that you've named?
20   A    Well, they would like to establish some sort of a
21         per diem, which is the way they determined that
22         they were going to pay for a long-term consultant
23         if I would remain a consultant and not be
24         switched over to an employee. So initially, we

PAGE 87

**87**

1    talked about a per diem.
2    Q    So your understanding of the initial discussions
3          were a per diem consulting relationship between
4          yourself and JHU and JSI?
5    A    Slash JSI, yeah, and the per diem was based on
6          long-term with at least six days per week and no
7          holiday exception, and we discussed that at
8          length.
9    Q    You had those discussions in terms of length of
10         time of consulting with these same three
11         individuals?
12   A    Erica Wegner would only respond to I believe
13         information she received from the other two. I'm
14         not saying that she created some information or
15         she was responsible for making the initial --
16         strike that, please. She was responsible -- I'm
17         not supposed to say strike.
18              MR. CAPLAN: Just to be fair, you don't
19         get to strike things. So whatever you say is
20         going to be on the transcript.
21   A    She -- I'm not sure what her position was. I
22         think she was a secretary, but I don't know, and
23         she may have been an assistant to Angelici. And
24         so when she made a call, it was usually because

PAGE 88

**88**

1          Angelici was distracted somewhere else. So the
2          conversations primarily, the ones of major
3          import, were between myself, Hasheem, and
4          Angelici.
5    Q    In terms of the length of time of your potential
6          consulting work and/or employment with respect to
7          the project that was ongoing in Romania involving
8          JHU and JSI, what length of time was discussed
9          between yourself and Hasheem and Miss Angelici?
10   A    Without a doubt, they wanted me over there ASAP,
11         and my work would span the entire period from my
12         departure until the end of the project.
13   Q    Did you ever come to learn when the end of the
14         project was --
15   A    Yeah. Excuse me.
16   Q    Did you ever come to learn during your
17         negotiations with Ms. Angelici and Hasheem how
18         long this project was intended to last?
19   A    Yes. Drawing on memory, I believe it was until
20         October 1.
21   Q    Of what year?
22   A    I'm sorry, of 2001, which would also -- there
23         would also be built-in time for additional
24         project assessment reports and so forth, so it

Lederer v. Snow and Johns Hopkins                    R. Lederer, Vol. I, 12/2/04

SHEET 23    PAGE 89

**89**

1    wouldn't be as if, you know, payday or
2    compensation was necessarily going to halt at
3    that time.
4    Q   Were there ever any discussions between yourself,
5        Mr. Hasheem, and Miss Angelici about a term of
6        consulting for a period of time shorter than
7        eight months?
8    A   No.
9    Q   You never had any discussions or negotiations
10       with either of those two individuals about a
11       position or a consulting position for a period of
12       time of approximately two weeks?
13   A   No.
14   Q   Obviously, you indicated you had some discussions
15       with them about safety, and I'm not concerned
16       about those right at this point. Not that I'm
17       belittling your own safety, sir. Your
18       discussions in terms of the length of your
19       consulting work, did those involve both Miss
20       Angelici and Mr. Hasheem?
21   A   Yes.
22   Q   They both discussed that particular issue with
23       you?
24   A   Yes.

PAGE 90

**90**

1    Q   And they did so prior to you traveling to
2        Baltimore?
3    A   Miss Angelici was, I believe, my primary contact
4        prior to my arrival in Baltimore. I do not want
5        to draw a memory to include him, Hasheem, because
6        my memory doesn't -- I just don't want to rely on
7        my memory. If I have correspondence or something
8        of that nature, I'll be happy to share that with
9        you, or my attorney will.
10           However, I would like to fast forward
11       at some point to the trip, because I can tell you
12       that for sure, Miss Angelici was the point person
13       who was driving this hiring forward. She wasn't
14       the decision-maker. She was the -- in my
15       estimation, she was not the decision-maker. She
16       was a project person in hiring.
17   Q   Prior to you going to Baltimore, did you have to
18       submit anything to Miss Angelici, Mr. Hasheem, or
19       anyone in that regard in terms of a resume or an
20       application or anything along those lines?
21   A   Yes. They had that. There was no -- to my
22       recollection, there was no application. I
23       believe before my flight to Baltimore, they
24       started to send government -- I'm sorry -- forms

PAGE 91

**91**

1    of some nature of payment. I can't recall
2    exactly the forms, but I believe I started to
3    receive correspondence pertaining to the project.
4    However, this is only to the best of my memory.
5    I do know that I can produce forms which were
6    passed along.
7    Q   We're very hopeful that you can.
8        Let's go to the meeting in Baltimore.
9        When did that meeting take place, if you can
10       recall?
11   A   To the best of my knowledge, that was October 22.
12   Q   Did more than one person ask you to come down to
13       Baltimore?
14   A   Well, I was asked by Miss Angelici, and in
15       attendance would be Abdul Hasheem from JSI.
16   Q   Was that over the course of a telephone
17       conversation that you were asked to come down?
18   A   Best of my memory, it was certainly a telephone
19       call.
20   Q   Did you have an understanding of why you were
21       being asked to come down to Baltimore?
22   A   Absolutely.
23   Q   What was your understanding why you were being
24       asked to come down to Baltimore?

PAGE 92

**92**

1    A   They needed to speak to -- we needed to meet face
2        to face, and I had to be -- everything had to be
3        in concurrence with JSI, and he was their man on
4        stage for JSI, Hasheem, and we had to sit down
5        and talk some issues.
6    Q   Where did this meeting take place?
7    A   Initially, I met them at the JHU offices, and we
8        then went to a restaurant to eat.
9    Q   There was yourself --
10   A   Karen Angelici and Hasheem.
11   Q   Tell me what was discussed at the meeting at the
12       restaurant?
13   A   A lot discussed. To the best of my memory, I'll
14       share that. We discussed problems that were
15       occurring on the project.
16   Q   Who was telling you about problems?
17   A   Both of them.
18   Q   What problems were they telling you the project
19       was encountering?
20   A   Well, I was told that the individual who was the
21       director from the healthcare standpoint in the
22       mission in Bucharest was very, very displeased
23       with some of the way in which JSI's -- some of
24       the work being done by a previous consultant

Exhibit B

# JOHNS HOPKINS
U N I V E R S I T Y



## Center for Communication Programs

School of Hygiene and Public Health
111 Market Place - Suite 310
Baltimore, Maryland 21202 USA
Telephone (410) 659-6300 / Fax (410) 659-6266
Telex 240430 JHUPCS UR

November 27, 2000

Dr. Robert Lederer
P.O. Box 110521
Naples, Florida 34108

Reference: CCP Consultancy

Dear Dr. Lederer:

We are happy to confirm your short-term appointment as a consultant for The Johns Hopkins University/Center for Communication Programs (JHU/CCP).

This assignment is to provide professional services in Romania for the period from December 4, 2000 to December 17, 2000 for a maximum of 14 working days, based on an eight-hour day, and a six-day work week, excluding travel time. Please note that John Snow Inc. (JSI) the Contractor does reimburse consultants for travel time.

Please review your scope of work carefully to ensure that you can complete the assignment within the specified time frame(s).

Your assignment is to assist JHU/CCP and John Snow Inc. (JSI) with the Women's Reproductive Health Initiative in Romania:

Specifically, you will:

1. Do a needs assessment of the current service delivery and management systems at family planning clinics in 3 judets.
2. Meet with JSI and USAID Romania to discuss scope of work for year 2001.

Please submit a printed report of your trip to Karen Angelici at JHU/CCP. The report should adhere to the enclosed trip report format instructions. This report should be received two weeks after you return from this assignment, in a form suitable for external distribution.

During your performance of these consulting services, your work will be reviewed by Karen Angelici, Acting Division Chief, E&E Division. Walter Proper, Chief of Party, JSI will be your contact in Romania.

In accepting this assignment, it is expressly understood that:

1.      You are not being compensated or receiving salary from other U.S. government funding sources for the time spent on JHU/CCP business.

2.      You have no conflict of interest that would interfere with the performance of your obligations under this assignment, and that you are not related by blood or marriage to any employee of the United States government

        or other agency who has decision-making authority over the award funding this assignment or over the project for which you will perform consulting services. You agree to notify your JHU/CCP staff contact immediately if you know of any such changes in your circumstances.

3.      You will not use any of the data or materials developed during your consultancy or in connection with the project you are assisting for public presentation or publication without prior written permission from JHU/CCP. Any reports or other materials produced are considered works made for hire with ownership vesting in JHU/CCP.

ED 000081

Dr. Robert Lederer
November 16, 2000

4.      You will assume all tax obligations including declaration and payment thereof.

5.      You are not covered by The Johns Hopkins University Unemployment Insurance or any other Johns Hopkins insurance plans or policies.

This agreement is limited solely to the services specified and does not give you authority to make binding commitments on behalf of JHU/CCP.

Your fee for services will be paid at the rate of US $470 gross per day. This fee is payable upon completion and submission of an acceptable report on the assignment. Enclosed is a "Consultant Fees Support Form," which you are to complete at the end of the assignment and submit to the attention of your CCP staff contact.

For citizens or residents of the U.S., please note that all payments of fees and expenses made to you will be reported as income for U.S. income tax purposes; therefore, it is imperative that you maintain accurate records of your business expenses so that you can take the proper deductions when filing your tax returns. Original receipts and copies of expense reports submitted to JSI for reimbursement should be maintained for your records for tax purposes.

All travel and related expenses will be handled by JSI. Copies of receipts are needed for lodgings, as well as for all expenses over $25. *Please read carefully* the guidelines on allowable coverage, and be sure to use the JSI Travel Expense Report for non-employees in reporting your expenses.

Please sign two copies as indicated at the end of this letter. One should be retained for your records and the other should be returned to me for JHU/CCP records. Also, please provide the name and phone number for the person who should be contacted in case of emergency.

If you need further information or have any problems or questions, we would be glad to provide assistance. We are delighted that you are available for this consultancy and look forward to working with you.

Sincerely,

Alice Payne Merritt
Deputy Project Director
Center for Communication Programs

----[ELW]

ACCEPTED AND AGREED:

_____
Signature

ROBERT LEDERER
Name

MURIEL VAND' VYVEL
Emergency Contact

_____
Social Security Number

Date  12.1.00

Telephone number  941 637-1070

Citizen of [Country]  USA.

Enclosures:    Consultant Fees Support Form
               Trip Report Format

LED 000082

Exhibit C

SHEET 1    PAGE 1

Volume:   II
Pages:  1-356
Exhibits:   39

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * *

DR. ROBERT LEDERER,

    Plaintiff

                Civil Action

VS

                No. 04-CV-10284-NG

JOHN SNOW, INC. and
THE JOHNS HOPKINS UNIVERSITY/
CENTER FOR COMMUNICATION
PROGRAMS,

    Defendants

* * * * * * * * * * * * * *

    DAY TWO of DEPOSITION of DR. ROBERT LEDERER, a witness called on behalf of the Defendants, taken pursuant to the Massachusetts Rules of Civil Procedure, before Arlene Boyer, a Professional Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at the offices of Melick, Porter & Shea, LLP, 28 State Street, Boston, Massachusetts, 02109, on Wednesday, May 11, 2005, commencing at 9:40 a.m.

---

PAGE 2

2

APPEARANCES

JOHN ROONEY, ESQ.
MATTHEW GRYGORCEWICZ, ESQ.
Melick, Porter & Shea, LLP
28 State Street
Boston, Massachusetts 02109
(617) 523-6200
    Counsel for the Defendant,
    The Johns Hopkins University/
    Center for Communication Programs
ANDREW E. CAPLAN, ESQ.
MICHAEL SUGRUE, ESQ.
Perkins, Smith & Cohen
One Beacon Street, 30th floor
Boston, Massachusetts 02108-3106
(617) 854-4000
    Counsel for the Defendant,
    John Snow, Inc.
DAVID B. STEIN, ESQ.
JAMIE ROWSELL, ESQ.
Rubin, Weisman, Colasanti,
Kajko & Stein, LLP
430 Bedford Street
Lexington, Massachusetts 02420
(781) 860-9500
    Counsel for the Plaintiff
Also Present:
Kenneth J. Olivola, Director
John Snow, Incorporated

---

PAGE 3

3

I N D E X
WITNESS         DIRECT CROSS REDIRECT RECROSS
ROBERT LEDERER
(By Mr. Rooney)         9
(By Mr. Caplan)       109
(By Mr. Grygorcewicz)          329

PRE-MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 2 | Letter to Mr. Lederer from Johns Hopkins dated May 11, 1999 | 6 |
| 3 | Scope of Work for Technical Advisor for Clinics Document | 6 |
| 4 | E-Mail to Mr. Lederer from Ms. Liskin dated September 7, 2000 | 6 |
| 5 | Letter to Ms. Liskin from Mr. Lederer dated September 8, 2000 | 6 |
| 6 | E-Mail to Mr. Lederer from Mr. Rebbert dated October 2, 2000 | 6 |
| 7 | E-Mail to Mr. Lederer from Ms. Wagner dated October 24, 2000 | 7 |
| 8 | E-Mail to Mr. Lederer from Ms. Wagner dated November 21, 2000 | 7 |
| 9 | E-Mail to Mr. Lederer from Ms. Wagner dated November 29, 2000 | 7 |
| 10 | Fax to Mr. Lederer from Johns Hopkins dated December 1, 2000 | 7 |
| 11 | Note to Mr. Lederer from Ms. Wagner dated December 1, 2000 | 8 |

---

PAGE 4

4

PRE-MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 12 | Letter to Mr. Lederer from Ms. Wagner dated November 30, 2000 | 8 |
| 13 | E-Mail to Mr. Lederer from Ms. Wagner dated December 18, 2000 | 8 |
| 14 | Note to U.S.A.I.D. from Mr. Lederer dated January 2, 2001 | 8 |
| 15 | E-Mail to Mr. Lederer from Ms. Angelici dated January 10, 2001 | 8 |
| 16 | Letter to Mr. Hashem from Mr. Lederer dated January 5, 2001 | 9 |
| 17 | E-Mail to Mr. Lederer from Ms. Monaghan dated January 31, 2001 | 9 |
| 18 | E-Mail to Mr. Lederer from Ms. Monaghan dated January 30, 2001 | 9 |
| 19 | E-Mail to Mr. Lederer from Mr. Rebbert dated October 2, 2000 | 179 |
| 20 | Letter to Mr. Rebbert from Mr. Lederer dated October 3, 2000 | 182 |
| 21 | E-Mail to Mr. Lederer from Ms. Wagner dated October 3, 2000 | 182 |
| 22 | E-Mail to Mr. Lederer from Ms. Wagner dated October 24, 2000 | 191 |
| 23 | E-Mail to Mr. Lederer from Ms. Wagner dated October 24, 2000 | 194 |
| 24 | E-Mail to Mr. Proper from Mr. Lederer dated November 13, 2000 | 213 |
| 25 | Contractor Employee Biographical Data Sheet | 217 |

Lederer v. Snow and Johns Hopkins          R. Lederer, Vol. II, 5/11/05

SHEET 10  PAGE 37

37

1    was going to be a short-term consultancy
2    contract?
3    A   I didn't sign a contract in which I believed
4        there was any short-term consultancy attached.
5    Q   At some point, you received a contract, correct,
6        or a letter agreement?
7    A   I received a fax.
8    Q   Was that a two-page fax?
9    A   Can you show me?
10   Q   Sure. It's marked as Exhibit Number 10.
11   A   I recall this.
12   Q   You recall receiving that. Is that your
13       signature on the second page?
14   A   It appears to be.
15   Q   It's dated December 1 of 2000?
16   A   Right.
17   Q   This indicates in the first line that, "We are
18       happy to confirm your short-term appointment as a
19       consultant." Did I read that correctly?
20   A   I'm sorry. Which line is it?
21   Q   The first line.
22   A   Yes.
23   Q   So when you signed this, were you agreeing that
24       you were a short-term consultant?

PAGE 38

38

1    A   No.
2    Q   You read this before you signed it, correct?
3    A   Yes.
4    Q   Did you have a conversation with anyone at Johns
5        Hopkins or John Snow before you signed this?
6    A   Yes.
7    Q   Who did you speak to?
8    A   More than likely, it was Angelici or Erika
9        Wagner, and she would have passed that
10       information along to Ms. Angelici.
11   Q   You said ordinarily. Do you have a specific
12       recollection of who you spoke to about this
13       contract?
14   A   I may have notes to that.
15   Q   But as you sit here today, you can't identify
16       that conversation?
17   A   Right.
18   Q   What discussions took place with regard to the
19       term short-term appointment?
20   A   Specifically to that, I went beyond that
21       question.
22   Q   That's not my question. My question is did you
23       have any discussions with them about the term?
24   A   I don't recall whether I spoke with them about

PAGE 39

39

1    the short-term part. I didn't appreciate the
2    entire nature of this paper, except for a part
3    that I'd like to address.
4    Q   Well, when you say you didn't appreciate the
5        nature of the paper, what do you mean by you
6        didn't appreciate it?
7    A   Because this did not include the language and
8        elements of our conversations, our numerous
9        conversations that occurred on telephone and
10       during my visit in October.
11   Q   So the document that's in front of you as Exhibit
12       Number 10 which you signed did not incorporate
13       some of the conditions or terms that you
14       discussed prior to December 1?
15   A   Exactly, and requests.
16   Q   Beyond the short-term appointment, did you talk
17       about and was it incorporated into this document
18       the period of December 4 through December 17,
19       2000?
20   A   I'm sorry. Could you repeat that?
21   Q   You'll see in the second paragraph that it says,
22       "This assignment is to provide professional
23       services in Romania for the period from December
24       4, 2000 to December 17, 2000 for a maximum of 14

PAGE 40

40

1    working days," and it goes on. Did you discuss
2    those dates, December 4 through December 17 prior
3    to signing this on December 1?
4    A   After I read this, I made contact with those
5        individuals.
6    Q   No, that's not my question.
7    A   I'm getting to that.
8    Q   Go right ahead. I'm sorry for interrupting.
9    A   And I specifically had problems with much of the
10       language in here, and they said -- I was given an
11       ultimatum. We know what you need, we know what
12       we promised, we need you in Romania. Sign the
13       thing and get it back to us. I said but there's
14       a lot there that we've talked about that you
15       promised, in addition to Medivac accounts and so
16       forth, things that meant a great deal to me that
17       were not in this two-page document, and I was
18       essentially told you'll get it, you'll get
19       everything in written contract when you arrive in
20       Bucharest.
21   Q   Are you done?
22   A   Yes.
23   Q   Did you memorialize this conversation in writing
24       in terms of your understanding not being

**Lederer v. Snow and Johns Hopkins**          R. Lederer, Vol. II, 5/11/05

SHEET 27   PAGE 105

PAGE 105                                                                105

1    concepts.  I was disillusioned with some of the
2    disorganization and some of the individuals who
3    had positions of importance with the project.
4    Q   Would you agree with me that it was your feeling
5        or your position that unless changes were made,
6        you were not going to continue on with the
7        project?
8    A   No, that's incorrect.
9    Q   So when you said "thereby attract me once again,"
10       what did you mean by that?
11   A   I'll try it again.
12   Q   Yes, please do.
13   A   That big disillusion with what I had seen over
14       there, I was waiting for the gentleman here, Mr.
15       Olivola, to make the necessary changes that he
16       was already contemplating and to therefore
17       attract me to a new and improved project, which I
18       was guaranteed to be a part of.  It's just that
19       he and others, I assume, would have to shuffle
20       the deck.
21   Q   So you were looking to be attracted to a new
22       project?
23   A   Not a new project.  It was going to be -- make
24       this akin to a baseball game.  If your left

PAGE 106                                                                106

1    fielder falls down and gets up with a limp and
2    now you realize you've got to replace that person
3    or you possibly could lose a ball going out
4    there.  And essentially, this man was informed,
5    Mr. Olivola, they have had that information prior
6    to my flight up here, but that things were
7    definitely unglued over there, to put it
8    lightly.
9    Q   What conversations did you have with Hopkins as
10       opposed to Snow relating to changes that you
11       thought needed to be made?
12   A   I worked communally with both of them.  I had
13       more access to -- well, not upon my return, but I
14       had more access to the individuals in Romania as
15       I spoke to them about problems.  But once I got
16       back here, all they were interested in was a
17       nice, clean response with smoked glass.
18   Q   If I could summarize your position, and I'd ask
19       you whether or not you would agree with this or
20       disagree, that the exhibit which constitutes --
21       would you agree that your position is that
22       Exhibit Number 10 is a written agreement between
23       you and -- what does it say --
24   A   CCP.

PAGE 107                                                                107

1    Q   Yes.
2    A   I would say that this is an interim --
3    Q   No.  Go ahead.
4    A   I would say that this was an interim to provide
5        them something for the files, as I was told,
6        while awaiting the entire contract to get drawn
7        up.  And this was told to me by Wagner and
8        Angelici and everything, but the time -- now all
9        of a sudden after all of this background time, it
10       was essential, because I should have been there
11       much earlier to get on that plane.
12   Q   But I guess my question is you would agree that
13       this is an agreement that you signed?
14   A   An interim agreement.
15   Q   An interim agreement you signed.  And you would
16       agree with me that when you read it and signed
17       it, you understood what it was saying?
18   A   I will state that I disagreed with what it
19       said.
20   Q   But you understood what it said, correct?
21   A   I can read.
22   Q   Would it also be your position that the terms and
23       conditions that are in Exhibit Number 10 are
24       different than or do not include terms and

PAGE 108                                                                108

1    conditions that you talked about before this
2    date?
3    A   Well, as you brought to my attention when I
4        didn't see something on Page 2, that obviously
5        some of the terms are accurate, but it was
6        clarified to me that when they put that first
7        sentence in there, nobody took responsibility
8        for that.  They may have even placed it in the
9        hands of legal.  But the fact is this was only
10       really to be an insertion for the pre-vacation
11       time.
12   Q   Would you agree with me that Exhibit Number 10
13       does not incorporate what you say are additional
14       terms and conditions that you had discussions
15       with prior to signing this?
16   A   Yes.
17            MR. ROONEY:  That's all the questions I
18       have, sir.  Thank you very much.
19            THE WITNESS:  Thank you.
20            MR. CAPLAN:  If we can just take five
21       so I can get organized here.
22
23            (Whereupon, a brief recess was taken,
24       and John Rooney left the deposition.)

Lederer v. Snow and Johns Hopkins             R. Lederer, Vol. II, 5/11/05

SHEET 38 PAGE 149

149

1    didn't stipulate to or agree to.
2  Q  Let me just parse it out for a second. Your
3    testimony is you didn't stipulate to it being a
4    short-term appointment, correct?
5  A  Correct.
6  Q  But you did agree that you were a consultant,
7    correct?
8  A  Correct.
9  Q  This says that you were a consultant for Johns
10    Hopkins University/Center for Communication
11    Programs. Is that consistent with your
12    agreement?
13  A  No.
14  Q  Why not?
15  A  Because it doesn't mention John Snow.
16  Q  Put aside my first series of questions for a
17    second. When you read this agreement, you
18    understood it, correct? You understood it but
19    disagreed with the substance?
20  A  Exactly.
21  Q  Is there anything in this --
22  A  With the substance and the omissions.
23  Q  Fair enough. But by the same token, you
24    understood what the words on the page meant,

PAGE 150

150

1    correct?
2  A  Yes.
3  Q  Second paragraph, accurate or not accurate
4    depiction of your agreement?
5  A  May I state something?
6  Q  No. Please answer my question.
7  A  All right. I understood what the words meant,
8    but I didn't understand when I saw the term
9    short-term appointment; how could they spell that
10    out when I was only going over for a first part?
11    That was to be, again, renewed, or I should say
12    that I was taking only a break from that --
13  Q  So again, you understood the words on the page,
14    but you had some confusion about why they chose
15    to put those particular words on the page?
16  A  Yes, absolutely.
17  Q  Can you answer my question now, please, sir?
18  A  I'm sorry, go ahead.
19  Q  Second paragraph, accurate or not accurate
20    statement of your agreement?
21  A  I understand what it says. I do know that to the
22    letter I believe that that six-day week didn't
23    apply. I think that I was utilized just about
24    every day, and whether I stayed there for 14

PAGE 151

151

1    days, working days, 14 working days or more, the
2    record would --
3  Q  But that's not my question. My question isn't
4    whether it worked out this way. My question is
5    whether this accurately depicts what your
6    agreement was.
7  A  Actually, no. I was to work every day.
8  Q  Who said that to you?
9  A  They did, Angelici and Hashem. For this first
10    period, I was to be there working every day,
11    either traveling and working or working. That's
12    essentially the same.
13  Q  But it's your position this was an eight-month
14    engagement, right?
15  A  Exactly, but initially, for the first
16    introduction --
17  Q  Sir, if you could just answer my question. I
18    just asked you if it was an eight-month
19    engagement, and the answer is yes.
20  A  It was for the duration of October, I believe,
21    whatever the contract term -- whenever the
22    contract that JSI/CCP had.
23  Q  Was the agreement that it would be six days a
24    week for the eight months, except for perhaps the

PAGE 152

152

1    first couple of weeks where you're claiming it
2    was full-time, seven days?
3  A  Yes, seven days. It was going to be between six
4    and seven, that was our agreement, on a per diem
5    payment basis, no vacations other than --
6  Q  Did you have any issues with the third paragraph?
7  A  Issues, you mean by reading it and understanding
8    what it meant?
9  Q  Yes. Did you have any disagreement that this was
10    an accurate statement --
11  A  Well, I just thought it was a lot of work to take
12    care of in such a short time, and they agreed.
13    The scope of work was almost unrealistic.
14  Q  Did you take any issue with the fourth paragraph,
15    that your assignment was to assist JHU and John
16    Snow with the Women's Reproductive Health
17    Institute in Romania?
18  A  Initiative.
19  Q  Initiative, thank you, sir.
20  A  That was it.
21  Q  Was part of your agreement that you would do a
22    needs assessment of the current service delivery
23    and management systems at family planning clinics
24    in three judets? Is that sentence consistent

Exhibit D

Date: 1/02/01
To  : U.S.A.I.D./ Romania
From: Robert Lederer, M.D, M.P.H.

I was asked to visit Romania for nearly two weeks as Medical TA for thirty-six model service
delivery sites in three judets at three service delivery levels. The model centers are located in the
targeted judets- Lasi, Constanta and cluj. The breakdown of service levels is as follows:
*3 private family planning clinics
*17 government family planning cabinets
*15 rural dispensaries.

The purpose of this abridged visit to Romania turned out to be one whose design was actually to
familiarize me with two Romanian physician project officers, Cornelia Maior-Rosca, Laurentiu
Mihail Stan and the Project Director from JSI, Walter Proper. I spent nearly my entire stay,
visiting 2 judets, Constanta and Lasi. I had the opportunity to visit approximately 10 sites, family
planning cabinets, a family planning reference center and several rural dispensaries. Essentially, I
was obliged to spend the majority of time during these visits, making cursory introductions and
fielding a few questions from the doctors, which followed some basic inquiries I made relating to
supplies and quality of service issues.

Paritally due to the pre-Holiday activities in Romania and partially due to organizational snafus in
preparation for my arrival – re: itinerary, traveling time, etc., I was disheartened by the fact that
my time was not utilized efficiently.

To say that need for competent TA exists within this target group of Judets, represents a gross
understatement of existing problems that I have ALREADY assessed. Not having been
adequately briefed on this current Project's budgetary constraints and evident manpower woes,
I'll not comment on projections for meaningful outcomes.
I will, however, express concerns about the competence of the team presently assembled in
Bucuresti. I have valid reasons for bringing this problem to your attention. As the Project is
currently structured and being administered, I am not optimistic about its ACTUAL projected
outcomes for the fall of 2001.

*I am certain that I can make significant contributions to the under-served, and to the needs of
this Project, based upon the human suffering, deprivation and absence of medical organizational
skills that I've witnessed. However, unless a reassessment is shortly forthcoming, regarding the
present 3 member/ director "team", I must, in all honesty to the Mission, and as importantly, to
my sense of propriety, plus personal and professional stature, withdraw my name from this
ongoing burlesque – posing as a useful U.S./J.S.I. financed rural family planning project.


Very truly yours,

Robert A. Lederer, M.D., M.P.H.
RAL/b



Exhibit E



## JOHNS HOPKINS
U N I V E R S I T Y
BALTIMORE, MARYLAND 21218-2694

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   P
B206124

ALLFIRST FINANCIAL CENTER, N.A.
MILLSBORO, DELAWARE

B 206124

62-17
311

DATE: 01/16/2001

****7520   DOLLARS AND 00 CENTS   $7,520.00**

THE
DER OF    ROBERT LEDERER
PO BOX 110521
NAPLES, FL

VOID AFTER 180 DAYS



⑈206124⑈ ⑆031100173⑆    353000⑈

## JOHNS HOPKINS
U N I V E R S I T Y

316 Garland Hall
3400 N. Charles Streets
Baltimore, Maryland 21218-2694

B 206124

| INVOICE DATE | INVOICE NUMBER | DESCRIPTION | NET AMOUNT |
|---|---|---|---|


000037

Exhibit F

**From:**       "Abul Hashem" <abul_hashem@jsi.com>
**To:**         <kangelici@jhuccp.org>
**Date:**       11/7/00 2:06PM
**Subject:**    Re: Bob

Dear Karen:

Sorry, that it ended this way.  Let's pursue the other candidate you
mentioned.  I really appreciate your sincere effort.

Thanks.

Hashem

>>> "KAREN ANGELICI" <kangelici@jhuccp.org> 11/07 1:47 PM >>>
Hi Hashem,

Just a quick update on Bob.  I spoke with him about getting work
references and he gave me some story about a flood destroying his
files in 1993 and then a car break-in in 1997 where more files were
taken.  He then proceeded to tell me that this was taking up a lot of
his valuable time and that when he appoints a time for me to call
these new references I had better call them then so as not to waste
their time.  He was extremely rude on the phone.  Erika and I have
spent a huge amount of time tracking down his references and tracking
him down--he doesn't have a direct phone number--only a place to leave
a message and he seems to always call from a pay phone.  We intend on
pursuing other candidates and will keep you posted.  I am sorry this
took up so much of your time, Hashem.  Bear with us!  Karen


**CC:**         <jsirom.wp@fx.ro>, <EREBBERT@jhuccp.org>, <EWAGNER@jhuccp.org>,
<GSAFFITZ@jhuccp.org>

000016

Exhibit G

Page 1

1                  UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

2


    R. ROBERT LEDERER

3                  Plaintiff

4    vs.                              CIVIL NO:

5    JOHN SNOW, INC. AND              04-10284-NG

    THE JOHNS HOPKINS UNIVERSITY

6    CENTER FOR COMMUNICATION PROGRAM

                  Defendants

7    _____/

8

9         The deposition of KAREN ANGELICI was taken

10   on Wednesday, June 29, 2005 commencing at 1:30 p.m. at

11   the Johns Hopkins University, 3400 North Charles

12   Street, Suite 113, Baltimore, Maryland 21218, before

13   Paula J. Eliopoulos, Notary Public.

14

15

16

17

18

19

20

21   REPORTED BY:   Paula J. Eliopoulos

Karen Angelici - 6/29/05

Page 86

9    A.    I don't, but it appears I did write it.
10    Q.    Is that an e-mail that you sent to Dr.
11  Lederer?
12    A.    Apparently, yes.
13          MR. CAPLAN:  That's all I have.
14          MR. HEALY:  Is that being marked, Andy?
15          MR. CAPLAN:  It was already marked during
16  Dr. Lederer's deposition.
17          MR. HEALY:  You're right.  I apologize.
18          MR. CAPLAN:  Not a problem.
19          MR. STEIN:  I just have one followup
20  question.  David Stein again.
21          EXAMINATION BY MR. STEIN:

Page 87

1    Q.    Ms. Angelici, it's your understanding that
2  the fact that Dr. Lederer did not have an acceptable
3  trip report as you testified was the only reason why
4  he did not return to Romania?
5    A.    No.  The reason why was the client did not
6  want him to return to Romania.  That was JSI.
7    Q.    Other than the trip report, did anybody
8  from JSI discuss with you the other reasons?
9    A.    I recall seeing an e-mail from JSI just
10  explaining that they did not want him to return and
11  that he was as rude an disrespectful in Romania as he
12  was to me in Baltimore.
13          But they didn't give specifics on why.  I
14  don't recall the specifics on why they did not want
15  him to return.
16          MR. STEIN:  Nothing further.
17          (Deposition concluded at 3:15 p.m.)
18
19
20
21

Page 88

9  are necessary, I will attach on a separate sheet of
10  paper to the original transcript.
11
12
13
14          _____
14                  Karen Angelici
15
16
17
18
19
20
21

Page 89

1  State of Maryland
2  City of Baltimore, to wit:
3          I, PAULA J. ELIOPOULOS a Notary Public of
4  the State of Maryland, City of Baltimore, do hereby
5  certify that the within-named witness personally
6  appeared before me at the time and place herein set
7  out, and after having been duly sworn by me, according
8  to law, was examined by counsel.
9          I further certify that the examination was
10  recorded stenographically by me and this transcript is
11  a true record of the proceedings.
12          I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in
14  the outcome of this action.
15          As witness my hand and notarial seal this
16  11th day of July, 2005.
17
18          _____
18                PAULA J. ELIOPOULOS
19                   Notary Public
20  My Commission Expires:
21  June 1, 2008

23 (Pages 86 to 89)