UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DR. ROBERT LEDERER,<br><br>    Plaintiff,<br><br>v.<br><br>JOHN SNOW, INC. AND<br>THE JOHNS HOPKINS UNIVERSITY<br>CENTER FOR COMMUNICATION<br>PROGRAMS,<br><br>    Defendants. | CIVIL ACTION NO.<br>04-CV-10284-NG |

**MEMORANDUM OF LAW IN SUPPORT OF JOHN SNOW'S
SUMMARY JUDGMENT MOTION**

Defendant John Snow, Inc. ("John Snow") submits this memorandum of law in support of its motion for summary judgment.

**Summary of the Argument**

Robert Lederer's sole claim for breach of an alleged <u>oral contract for a long term consulting position</u> fails as a matter of law under the parol evidence rule based on the undisputed fact that Lederer signed an unambiguous <u>written contract for a "short term" consulting position "for a maximum of 14 working days."</u>  Summary judgment is eminently fair in light of Lederer's admission that he read and understood the contract before he signed it and that he expected the contract would govern the terms and conditions of his engagement.

Lederer's contract claim also fails based on the undisputed fact that Lederer was a subcontractor to The Johns Hopkins University Center for Communication Programs

("Johns Hopkins"), and it, not John Snow, was responsible to pay Lederer's salary. Given that John Snow is not liable for any salary that may be owed (and that John Snow long ago fully reimbursed Lederer's out-of-pocket expenses), John Snow is entitled to summary judgment as a matter of law based on the undisputed facts.

**Facts**

The Parties

John Snow was the prime contractor on the Women's Reproductive Health Initiative, a reproductive health services project in Romania funded by, and under the auspices of, the United States Agency for International Development ("USAID"). (Deposition of John Snow, by its Rule 30(b)(6) designee Kenneth Olivola ("Olivola Depo") p. 94, true copy attached to the Affidavit of Counsel Andrew F. Caplan ("Caplan Aff") as Exh A.) Johns Hopkins was a subcontractor to John Snow on the Initiative. (Caplan Aff Exh C: Angelici Depo p. 74; Caplan Aff Exh B: Olivola Depo Exh 2, p. 2, Section B). Lederer was a subcontractor to Johns Hopkins. (Caplan Aff Exh C: Angelici Depo pp. 76-77; Caplan Aff Exh G: Complaint Exh. B).

Negotiations

In the autumn and winter of 2000, Lederer communicated with representatives of Johns Hopkins and John Snow concerning a potential long-term position with the Women's Reproductive Health Initiative. (Caplan Aff Exh D: Lederer Depo v1 pp. 69-70, 72-76; Caplan Aff Exh F: Lederer Depo v2 pp. 20-22; Caplan Aff Exh E: Lederer Depo v2Exhs 4 & 5). Lederer claims that, during a meeting in Baltimore, Maryland in October 2000, defendants verbally agreed to hire him as a long-term consultant for the duration of the Initiative. (Caplan Aff Exh G: Complaint ¶10). Lederer raised a host of

issues during the meeting in Baltimore (and on other occasions). (Caplan Aff Exh F: Lederer Depo v2 pp. 136-38).  His counterparts at Johns Hopkins and John Snow requested time to consider Lederer's requests and get back to him.  (Id.).  Wanting assurance that his laundry list of requests was met, Lederer requested a written contract once the parties agreed on terms. (Id.).

It was important to Lederer to have the negotiations reduced to writing. (Id. pp. 135-38; see also id. pp. 169-70).  Lederer "wanted a comprehensive looking contract, a legal looking-contract with content that [he] had requested." (Id. pp. 169-70).  He "made it clear again and again and again" that he wanted a written contract so that he could count on having the assignment and be sure of the terms of the engagement. (Id. pp. 135-38, 169-70, 215-16).

Based on his prior experience working as a subcontractor to USAID contractors, Lederer understood that USAID required that agreements to hire subcontractors to work for USAID subcontractors had to be reduced to written agreements. (Id. pp. 135-38; see also id. pp. 169-70).  More specifically, Lederer understood that his alleged oral agreement for an assignment on the Romania project had to be reduced to a written contract. (Id. pp. 135-38; see also pp. 169-70).  Lederer expected that the written contract would govern the terms and conditions of his assignment. (Id. p. 138; see also id. pp. 169-70).

The written contract

On or about December 1, 2000, Lederer received a letter agreement from Johns Hopkins which stated, in pertinent part:

> We are pleased to confirm your short-term appointment
> as a consultant for The Johns Hopkins

> University/Center for Communication Programs (JHU/CCP).
>
> The assignment is to provide professional services in Romania for the period from December 4, 2000 to December 17, 2000 for a maximum of 14 working days…

(Complaint ¶14 and Exh. B).

Lederer read and understood the contract that Johns Hopkins furnished to him. (Caplan Aff Exh F: Lederer Depo v2 pp. 149-50; see also id. p. 107). Lederer signed the short term agreement and returned it to Johns Hopkins on or about December 1. (Id. pp. 167-69).

John Snow is not a party to the written contract between Lederer and Johns Hopkins. (See Caplan Aff Exh G: Complaint Exh. B. Rather, Lederer and Hopkins were the parties to the contract. Id.; see also Caplan Aff Exh C: Angelici Depo pp. 76-77).

There is no written agreement for a long term position. (See Caplan Aff Exh F: Lederer Depo v2 p 124).

Payments to Lederer

Lederer was paid in full all salary due and owing for his short term consultancy. (See Exhibit A to Caplan Aff: Olivola Depo pp. 53-56; Caplan Aff Exh H). Lederer was fully reimbursed for all expenses he incurred on his consultancy. (See Olivola Aff.) (see also Caplan Aff Exh F: Lederer Depo v2 pp. 250-257, 308-09) (Despite claiming that his out-of-pocket expenses have not been fully reimbursed, Lederer is unable to state -- or even approximate -- the amount of unpaid expenses he is owed, other than to say the amount is "trivial" compared to his salary claim.) (*Plaintiff Robert Lederer's*

*Answer To The Defendant Johns Hopkins University/Center For Communication Program's First Set Of Interrogatories*, Response No. 9).[1]

In any event, Johns Hopkins, not John Snow, was responsible to pay Lederer's salary for the consultancy. (Angelici Depo pp. 21, 75-76; Olivola Depo pp. 37-38; see also Lederer Depo v2 p. 144).

## Argument

### I.   The Parol Evidence Rule Precludes Lederer's Oral Contract Claim.

"It is an elementary substantive rule of the common law that parol evidence is inadmissible to vary or contradict the terms of a written instrument." Housing Auth. of College Park v. Macro Housing, Inc., 340 A.2d 216, 218 (Md. 1975) (quoting Freeman v. Stanbern Constr. Co., 106 A.2d 50 (Md. 1954)).  "Maryland law generally requires giving legal effect to the clear terms of a contract and bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." Calomiris v. Woods, 727 A.2d 358, 361 (Md. 1999) (citation omitted).[2]  "The reason for that rule…is that when contracting parties have discussed and agreed upon their obligations to each other and reduced them to writing, their written contract is more

---

[1] Q: "Please describe fully and in complete detail all your damages which you claim to have received as a result of the events alleged in your complaint."

A: As a result of JHU's breach of contract, I lost approximately ten (10) months of income. Plaintiff will supplement this interrogatory.")

[2] It is unnecessary for this Court to perform a choice of law analysis when, as here, there is no actual conflict between the laws of the various states involved with this case: Maryland (where the parties conducted face-to-face negotiations and where Lederer alleges the oral contract was entered), Massachusetts (John Snow, Inc.'s principal place of business) or Florida (Lederer's state of residence and the location where he executed the written contract). Kaufman v. Richmond, 442 Mass. 1010, 1012, 811 N.E. 2d 987, 989 (2004) ("Choice of law analysis is unnecessary when that choice will not affect the outcome of the case");  see Calomiris, 727 A.2d at 361; Berman, 325 Mass. at 378, 90 N.E. 2d at 843; King v. Bray, 867 So. 2d 1224, 1226 (Fla. Dist. Ct. App. 2004) ("The parol-evidence rule is a substantive rule of law and reduced to its essence, provides that a written document intended by the parties to be the final embodiment of their agreement may not be contradicted, modified or varied by parol evidence") (collecting cases).

reliable as evidence than memory." Housing Auth. of College Park, 340 A.2d at 218 (quoting Freeman, 106 A.2d at 50); see also Berman v. Geller, 325 Mass. 377, 379-380, 90 N.E.2d 843 (1950) (quoting Glackin v. Bennet, 226 Mass. 316, 319-20 (1917)) ("Where the writing shows on its face that it is the entire agreement of the parties and comprises all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction.'"); Cady v. Marcella, 49 Mass. App. Ct. 334, 338, 729 N.E.2d 1125, 1130 (2000) (citing Robert Indus., Inc. v. Spence, 362 Mass. 751, 754, 291 N.E.2d 407 (1973) (even in the absence of an integration clause, parol evidence is not admissible to contradict the facially unambiguous terms of a written contract).

"Under the parol evidence rule, a written agreement 'discharges prior agreements,' thereby rendering legally inoperative communications and negotiations leading up to the written contract." Calomiris, 727 A.2d at 361-362 (citing Restatement (2d) Contracts §213 (1979); see also Freeman, 106 A.2d at 50 ("All prior and contemporaneous negotiations are merged in the written instrument, which is treated as the exclusive medium for ascertaining the extent of the obligations.")  "The requirement that courts give legal effect to the unambiguous provisions of a contract and the rule that prohibits the admission of parol evidence for ascertaining the parties' intent provide a necessary legal foundation for the certainty of contracting parties." Id. at 362.

In the present matter, Lederer relies on extrinsic evidence in an attempt to show that defendants committed to hire him for a long-term position of approximately eight months, while the written agreement unambiguously calls for a two-week assignment.

On that point, the written agreement is clear and unambiguous: the contract states in no uncertain terms that Lederer was hired for a "short term" assignment "for a maximum of 14 working days."  No reasonably prudent person could read the contract as providing a long-term assignment.  See Calomiris, 727 A.2d at 362-363 (written contract not ambiguous unless, when read by reasonably prudent person, it is susceptible of more than one meaning.) ("[T]he question of whether a contract is ambiguous ordinarily is interpreted by the court as a question of law."); see also Lederer Depo, v2 pp. 149-50 (Lederer admits he understood the contract when he read and signed it.)

    This is precisely the type of case in which Maryland's highest court has "frequently" barred the admission of extrinsic evidence under the parol evidence rule. Calomiris, 727 A.2d at 363-64 (collecting cases).  Such claims fair no better in Massachusetts courts. See, e.g., USTrust v. Henley & Warren Mgmt, Inc., 40 Mass. App. Ct. 337, 663 N.E.2d 1238 (1996) (affirming summary judgment dismissal of claim where parol evidence rule precluded evidence of prior conversation that allegedly varied or amplified terms contained in unambiguous written agreement); see also Berman, 325 Mass. at 378, 90 N.E. 2d at 843 (oral contract merged in written agreement that contained all that was necessary to constitute a contract.)  Thus, such evidence is legally inoperative and cannot be used to prove that the written agreement was contrary to the written agreement that Lederer signed.

    It is eminently fair to apply the parol evidence rule and grant summary judgment under the circumstances of this case.  Lederer himself requested that the terms of his engagement be reduced to writing so that he could count on having the assignment and be sure of the terms of the engagement. (Caplan Aff Exh F: Lederer Depo v2 pp. 136-38,

169-70, 215-16).  A written contract was so important to Lederer that he asked for one "again and again and again."  (Id.).  Based on personal experience on prior USAID projects and discussions with defendants in this case, Lederer knew that his alleged oral agreement for an assignment on the Romania project had to be reduced to a written contract. (Id. pp. 135-38; see also pp. 169-70).

Lederer received a written contract that clearly told him that he was hired for a "short term" position "for a maximum of 14 working days."  (Caplan Aff Exh G: Complaint Exh. B).  Lederer admits that he read and understood the written contract and expected that it would govern the terms and conditions of his assignment. (Caplan Aff Exh F: Lederer Depo v2 pp. 138, 149-50, 169-70; see also id. p. 107).  Lederer signed the contract and returned it to Johns Hopkins. (Id. pp. 167-69).

"A judge uses summary judgment for the purpose for which it was intended when, as in this case, a party seeks to alter what the agreement provides by saying, in effect, 'that was not what was meant at all.'" USTrust, 40 Mass. App. Ct. at 343, 663 N.E. 2d at 1242.  To do otherwise would undermine the certainty of contracts.  See Calomiris, 727 A.2d at 362 & 368 ("It is improper for the court to rewrite the terms of a contract or draw a new contract, for the parties, when the terms thereof are clear and unambiguous…").

II.     **The Contract Claim Must Fail Because John Snow Was Not Responsible To Pay Lederer's Salary, And John Snow Fully Reimbursed Lederer's Expenses.**

It is undisputed that John Snow was not responsible to pay Lederer's salary. (Caplan Aff Exh C: Angelici Depo pp. 21, 75-76; Caplan Aff Exh A: Olivola Depo pp. 37-38; see also Caplan Aff Exh F: Lederer Depo v2 p. 144).  Rather, it was Johns Hopkins' responsibility to pay Lederer's salary. (Caplan Aff Exh C: Angelici Depo pp.

8

21, 75-76; Caplan Aff Exh A: Olivola Depo pp. 37-38).  This arrangement makes perfect sense, as Lederer was a subcontractor to Johns Hopkins, which, in turn was a subcontractor to John Snow. (Caplan Aff Exh C: Angelici Depo pp. 74, 76-77; Caplan Aff Exh B: Olivola Depo Exh 2, p. 2, Section B; Caplan Aff Exh G: Complaint Exh B). Lederer's contract was with Johns Hopkins, and John Snow was not a party to the contract.  (See Caplan Aff Exh G: Complaint Exh. B; see also Caplan Aff Exh C: Angelici Depo pp. 76-77).  Johns Hopkins' Rule 30(b)(6) witness readily admitted that Johns Hopkins -- and not John Snow -- was responsible for Lederer's salary. (Caplan Aff Exh G: Angelici Depo pp. 76-77).  Finally, John Snow fully reimbursed Lederer's out-of-pocket expenses in connection with this matter. (See Affidavit of Kenneth L. Olivola) (see also Caplan Aff Exh G: Lederer Depo v2 pp. 250-257, 308-09).

     Summary judgment is warranted because Lederer has no reasonable expectation of proving essential elements of his contract case, *i.e.*, that John Snow owed him a contractual duty to pay his salary, or that John Snow breached a contractual obligation to reimburse Lederer's out-of-pocket expenses. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 575 N.E. 2d 734, 738 (1991) (A moving party is entitled to summary judgment if it demonstrates, by reference to materials described in Mass. R. Civ. P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of its case.).

**CONCLUSION**

For all of the foregoing reasons, this Court should grant summary judgment with respect to the single claim Robert Lederer has asserted against John Snow, Inc.

                                            Respectfully submitted,
                                            JOHN SNOW, INC.
                                            By their Attorneys,

                                            s/ Andrew F. Caplan
                                            Andrew F. Caplan, BBO #564127
                                            Perkins Smith & Cohen LLP
                                            One Beacon Street, 30th Floor
                                            Boston, MA  02108
Dated:  August 15, 2005                     (617) 854-4000

7409-1-SJ MemLaw∂2.doc