UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSCHUSTTS

DR. ROBERT LEDERER,          )
                             )
        Plaintiff,           )
                             )          CIVIL ACTION NO.
                             )          04-CV-10284-NG
v.                           )
                             )
JOHN SNOW, INC. AND          )
THE JOHNS HOPKINS UNIVERSITY )
CENTER FOR COMMUNICATION     )
PROGRAMS,                    )
                             )
        Defendants           )
                             )

### Affidavit Of Counsel Andrew F. Caplan

I, Andrew F. Caplan, hereby depose and state as follows:

1. I am counsel of record to the defendant, John Snow, Inc., in the above-captioned action.

2. Attached hereto as **Exhibit A** is a true copy of excerpts from the May 12, 2005 Deposition Minuscript of John Snow, Inc., by its Rule 30(b)(6) designee Kenneth Olivola.

3. Attached hereto as **Exhibit B** is a true copy of Exhibit 2 to the May 12, 2005 Deposition of John Snow, Inc., by its Rule 30(b)(6) designee Kenneth Olivola.

4. Attached hereto as **Exhibit C** is a true copy of excerpts from the June 29, 2005 Deposition Minuscript of the Johns Hopkins University Center for Communication Programs, by its Rule 30(b)(6) designee Karen Angelici.

5. Attached hereto as **Exhibit D** is a true copy of excerpts from the May 11, 2005 Deposition Minuscript of Robert Lederer.

6. Attached hereto as **Exhibit E** are true copies of Deposition Exhibit numbers 4, 5, 19 and 29 to the May 11, 2005 Deposition of Robert Lederer.

7. Attached hereto as **Exhibit F** is a true copy of excerpts from the December 12, 2004 deposition of Robert Lederer.

8. Attached hereto as **Exhibit G** is a true copy of the Complaint (and exhibits thereto) filed by Dr. Lederer in this action.

9. Attached hereto as **Exhibit H** are a true copies of the following documents produced by Johns Hopkins in this action: "Consultant Fees Support Form," John Hopkins University check dated January 16, 2001 in the amount of $7520.00, and an email dated January 26, 2001.

10. Attached hereto as **Exhibit I** is a true copy of Plaintiff Robert Lederer's Answers to the Defendant Johns Hopkins University/Center for Communication Program's First Set of Interrogatories.


Signed under the pains and penalties of perjury this 15th day of August 2005.


s/ Andrew F. Caplan
Andrew F. Caplan

7409-1-SJ-AFCAffidavit.doc

2

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-10284-NG

DR. ROBERT LEDERER,

Plaintiff

vs.

JOHN SNOW, INC. AND THE JOHNS HOPKINS
UNIVERSITY CENTER FOR COMMUNICATION PROGRAMS,
Defendants

DEPOSITION OF KENNETH J. OLIVOLA, taken

pursuant to Notice under the applicable

provisions of the Federal Rules of Civil

Procedure, on behalf of the Plaintiff, before

Alice M.S. DesVergnes, R.P.R., a Notary Public

in and for the Commonwealth of Massachusetts,

at the office of Rubin, Weisman, Colsanti,

Kajko & Stein, LLP, 430 Bedford Street,

Lexington, MA  02420, commencing on Thursday,

May 12, 2005, at 2:10 p.m.

APPEARANCES:

DAVID B. STEIN, ESQ.
RUBIN, WEISMAN, COLSANTI, KAJKO
& STEIN, LLP
430 BEDFORD STREET
LEXINGTON, MA  02420
  Counsel for the Plaintiff

ANDREW F. CAPLAN, ESQ.
PERKINS, SMITH & COHEN, LLP
ONE BEACON STREET, 30TH FLOOR
BOSTON, MA  02108-3106
  Counsel for the Defendant
  John Snow, Inc.

ROBERT W. HEALY, ESQ.
MELICK, PORTER & SHEA, LLP
28 STATE STREET
BOSTON, MA  02109
  Counsel for the Defendant
  The Johns Hopkins University

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA  01960
(781) 581-3993  (978) 535-0313 FAX  (978) 53We3142  -  3

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA  01960
(781) 581-3993  (978) 535-0313 FAX  (978) 53We3142  -  4

I N D E X

| DEPONENT | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| KENNETH J. OLIVOLA | | | |
| By Mr. Stein | 4 | | 108 |
| By Mr. Healy | | 90 | |
| By Mr. Caplan | | 109 | |

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | Notice of deposition | 7 |
| 2 | Contract | 102 |
| 3 | Concurrence document | 104 |
| 4 | Approval letter | 108 |

S T I P U L A T I O N S

It is hereby stipulated and

agreed by and between counsel for the

respective parties that all objections, except

as to form, are reserved until the time of

trial, including motions to strike.

It is further stipulated and

agreed that the reading and signing of the

deposition are not waived.  Notarization is

waived.

KENNETH J. OLIVOLA, having duly

affirmed that his testimony will be the truth,

the whole truth, and nothing but the truth and

having produced his Massachusetts driver's

license for identification purposes, testified

as follows in answer to direct interrogatories

by Mr. Stein:

Q   Before I mess it up, can you give me the

correct pronunciation of your name?

A   Kenneth John -- last name is Olivola.

Q   Spell that for me, please.

A   O-L-I-V-O-L-A.

Q   What is the middle initial?

1  A  Um, it was to work with Johns Hopkins. Among
2     us, we came up with the scope of work. I'm not
3     sure if it came from Johns Hopkins or from JSI.
4     I know that we interviewed the candidate for
5     the position.
6  Q  We meaning JSI?
7  A  Johns Hopkins and JSI.
8  Q  Okay.
9  A  I think it was a shared briefing, actually, for
10    the position. And then our part of this was to
11    provide the per diem expenses for the
12    project -- for the, for the consultant. The
13    hotel expenses and food and travel. Also the
14    airplane ticket.
15 Q  So JSI was required to pay all the expenses for
16    the management specialist?
17 A  The expenses, yes.
18 Q  Who paid their fee for the work?
19 A  Salary?
20 Q  Salary.
21 A  Johns Hopkins.
22 Q  So Johns Hopkins paid the salary of the
23    management specialist and JSI paid the

1     expenses?
2  A  Yes.
3        MR. HEALY:   Objection.
4  Q  Is that incorrect the statement I just made?
5     That JSI paid expenses and Johns Hopkins paid
6     the salary for the management specialist?
7  A  No, that's correct.
8  Q  That's correct?
9  A  Um-hum.
10 Q  Going back to this Carol Brandage -- is it
11    Brandage?
12 A  Branditch(phonetic).
13 Q  Prior to Dr. Lederer, it's your understanding
14    that she was the only other person who held the
15    position of management specialist for the
16    Romanian project?
17 A  That's my understanding.
18 Q  And you believe she was over there on two
19    separate occasions?
20 A  Yes.
21 Q  Do you know why she didn't continue on for the
22    remainder of the project as the management
23    specialist?

1  A  No.
2  Q  Who would be aware of that information?
3  A  Um, I suppose Johns Hopkins and Abul Hashem and
4     perhaps the chief of party, Walter Proper.
5  Q  Are you familiar with any of the circumstances
6     surrounding Carol Branditch and the fact that
7     she did not continue as management specialist
8     for the remainder of the project?
9  A  I don't know about that.
10 Q  At some point did you personally become aware
11    that Johns Hopkins and JSI were recruiting
12    another management specialist for the Romanian
13    project?
14 A  No.
15 Q  At any time did you become aware of that?
16 A  No.
17 Q  I think you testified that at some point in
18    2000, the year 2000, you did become aware that
19    Dr. Lederer was being considered for the
20    position of management specialist?
21 A  I was actually -- I was aware when he was a
22    consultant, so it wasn't during the recruitment
23    process. It was actually after he was

1     recruited.
2  Q  So during the recruitment process, you weren't
3     aware, is that fair?
4  A  That's fair, yes.
5  Q  And that you did become aware at some point
6     when he was already in Romania, is that fair to
7     say?
8  A  I think it's actually after he returned from
9     Romania.
10 Q  So is it fair to say you have no personal
11    knowledge concerning Dr. Lederer at any time
12    prior to January of 2001?
13 A  I'd say the end of December, 2000, is when I
14    knew. I knew of his work for us and Johns
15    Hopkins.
16 Q  At the end of December?
17 A  At the end of December.
18 Q  How did you become aware of his work on the
19    project at the end of December, 2000, the year
20    2000?
21 A  I had heard through either staff meetings or
22    discussions that there was some issues with the
23    consultancy that he had done.

1    Q    Who was present at that meeting?
2    A    Myself and Dr. Lederer.
3    Q    Can you tell me what was discussed in that
4         meeting?
5    A    Yes.  We talked about -- started about the
6         weather which is a common subject in Boston
7         when someone comes in from Florida.  We talked
8         about the project sort of in general, and what
9         I wanted to focus in on were issues around his
10        complaints about not getting paid and not
11        getting reimbursed for expenses, and it ended
12        with his expressing very strong concerns about
13        how the project was progressing, had some very
14        strong concerns about that.  And then he also
15        asked about his future on the project.
16   Q    With respect to payment of salary, again, if
17        I'm correct, JSI is not responsible for the
18        payment of Dr. Lederer's salary?
19   A    That's correct.
20   Q    It was through Johns Hopkins?
21   A    Yes.
22   Q    Are you aware of the procedure for payment
23        through Johns Hopkins?

1    A    Specifically, no.
2    Q    So was the issue of payment of salary at all
3         discussed with Dr. Lederer in this meeting?
4    A    Yes.
5    Q    What was discussed?
6    A    Um, well, I didn't know at this meeting what
7         the specific arrangements were between Johns
8         Hopkins and JSI, and so I actually didn't know
9         who he was employed by.
10   Q    At the time that you had the meeting you didn't
11        know?
12   A    Yes, I didn't know until after the meeting.
13   Q    But what was specifically discussed with
14        respect to his salary?
15   A    He was concerned, he was concerned about
16        getting paid.  My impression from the meeting
17        was he hadn't been paid.
18   Q    Did you think that was unusual that he wouldn't
19        have been paid at that point?
20   A    Um, I knew that he had finished his consultancy
21        in the middle of December; the end of January
22        is not so unusual, but, yeah, it's past the
23        30 -- he should have been paid by then, yeah.

1    Q    Just with respect to the salary issue, after
2         the meeting, did you follow-up at all with that
3         issue?
4    A    Immediately.
5    Q    What did you do?
6    A    First I called Abul Hashem, and I asked him
7         about the salary.
8    Q    What did he tell you?
9    A    He told me that we didn't employ him; that he
10        was employed by Johns Hopkins.  So then I
11        called Johns Hopkins and they told me that they
12        paid him.
13   Q    Who did you speak to at Johns Hopkins?
14   A    I don't remember specifically who I spoke to.
15        I'm not sure who I spoke to.  I work with Johns
16        Hopkins quite a bit so it could have been
17        contacts I had, it could have been someone that
18        Abul Hashem recommended that I call.  I don't
19        remember.
20   Q    When you spoke to this person and they told you
21        he was paid, did you accept that and that was
22        the end of your involvement with that issue?
23   A    Um, I think they actually faxed me or faxed

1         Hashem or we saw some record of payment.  I'm
2         not sure of that.  And we worked with Johns
3         Hopkins and frankly that wasn't necessary
4         because we have a lot of trust in Johns
5         Hopkins -- we work with them.
6    Q    So was that the end of your involvement with
7         respect to that issue?
8    A    With respect to the salary issue, yes.
9    Q    Did you ever talk to Dr. Lederer again
10        concerning the salary issue?
11   A    No.
12   Q    Do you know whether anybody from JSI talked to
13        Dr. Lederer?
14   A    I don't know.  I don't think so.
15   Q    You said at this meeting there was also
16        addressed some concerns that Dr. Lederer had
17        with the project?
18   A    Yes.
19   Q    What were those concerns?
20   A    Um, he had concerns about the project director,
21        the chief of party, Walter Proper.
22   Q    What was his concerns with respect to Dr.
23        Walter Proper?

1  A    Yes, yes.

2  Q    Would you agree with me that this contract

3       between JSI and Johns Hopkins University was

4       controlling when Dr. Lederer was hired as

5       consultant for the project?

6  A    Yes.

7  Q    Would you agree with me that the terms and

8       conditions of that contract between JSI and

9       Johns Hopkins were controlling during the time

10      that Dr. Lederer was a consultant on the

11      project?

12 A    Yes.

13 Q    Would you agree with me that the purpose of the

14      contract was for Johns Hopkins University to

15      provide technical services to JSI relating to

16      the Reproductive Health Initiative?

17 A    Yes.

18 Q    I'd just direct you to page -- I'm going to

19      refer to the actual pages as opposed to the

20      Bates stamp numbers, if you don't mind, because

21      there's several zeros before those numbers.

22      Referring you to Page 2 and Section B-3, does

23      the first sentence in that section identify

1       technical directions, state performance of the

2       work hereunder shall be subject to the

3       technical direction of JSI/WRHI project

4       director and her, his or her designees?

5  A    Yes.

6  Q    Did I read that correctly?

7  A    Yes.

8  Q    What is the acronym WRHI stand for, if you

9       know?

10 A    It's the Women's Reproductive Health

11      Initiative.  Or Women's Romania -- Women's

12      Reproductive Health Initiative, yes.

13 Q    Just one moment, sir.  I apologize.

14          And again, just referring to Page 2,

15      Section B, the first paragraph, does it state

16      within that first paragraph of the first

17      sentence in that first paragraph that JSI is

18      the prime contractor on this project?

19 A    Referring to the very first paragraph on the

20      top of the page?

21 Q    Correct, in the first sentence.

22 A    Yes, yes.  Um-hum.

23 Q    I refer you again to Page 5 of the document,

1       sir, and I refer you to paren five, salaries

2       during travel.

3  A    Yes.

4  Q    Does that second sentence state:  All travel

5       must have prior approval by JSI, did I read

6       that correctly?

7  A    Yes.

8  Q    Refer you to Page 8 of the same document, and

9       referring to Section C-1, background.

10 A    Um-hum.

11 Q    Second sentence.  Does it state:  The

12      contractor shall work under the guidance and

13      direction of JSI project director and/or his or

14      her designee.  Did I read that correctly?

15 A    Correct.

16 Q    With respect to this section, who is the

17      contractor?

18 A    Johns Hopkins.

19 Q    I refer you to Page 11 of the document of the

20      contract and again refer you to Section F-3,

21      deliverables, the second paragraph, the second

22      sentence which states:  The JSI project

23      director will have unilateral authority to

1       determine if the performance results have been

2       met.  Did I read that correctly?

3  A    Correct.

4  Q    And who is the JSI project director at that

5       time?

6  A    Um, actually, I'm not sure if it's Abul Hashem

7       or Walter Proper.

8  Q    Refer you to Page 13 of the contract.  I refer

9       you again in Section F-5, key personnel,

10      Section B.  The second sentence.  The second

11      sentence states:  Prior to making any change in

12      key personnel, the subcontractor shall notify

13      JSI reasonably in advance and shall submit

14      justification.

15          Did I read that correctly?

16 A    Yes.

17 Q    I understand I didn't read the full sentence.

18      The subcontractor with respect to that

19      statement is Johns Hopkins University, correct?

20 A    Yes.  Yes.  Um-hum.

21 Q    Do you know whether or not Dr. Lederer as a

22      consultant would have been considered key

23      personnel for this project?

# EXHIBIT B

Subcontract No. MCH-TASC 15136-0805-001

COST REIMBURSEMENT SUBCONTRACT


Between **JOHN SNOW, INC.** and **The Johns Hopkins University, School of Hygiene and Public Health, Center for Communication Programs (CCP)**
to provide services and support for
**Women's Reproductive Health Initiative (WRHI)**


Effective Date: Date of signature
Estimated Completion Date: August 29, 2001

ORIGINAL i of

JS10000000060

# TABLE OF CONTENTS

PART I - THE SCHEDULE ........................................................................................................ 1
  SECTION A - SUBCONTRACT INFORMATION ........................................................... 1
    A.1 Place of Performance ................................................................................................ 1
    A.2 Subcontract No ........................................................................................................... 1
    A.3 Subcontractor Name and Address............................................................................. 1
    A.4 Submit Financial and Technical Reports ................................................................. 1
    A.5 Effective Date ............................................................................................................ 1
    A.6 Accounting Data ........................................................................................................ 1
  SECTION B - SUPPLIES OR SERVICES AND PRICES............................................... 2
    B.1 Purpose ....................................................................................................................... 2
    B.2 Contract Type and Performance ............................................................................... 2
    B.3 Technical Directions .................................................................................................. 2
    B.4 Ceiling Price and Obligated Amount ....................................................................... 3
    B.5 Work Days Ordered ................................................................................................... 4
    B.7 Indirect Costs  (Dec 1997) ....................................................................................... 6
    B.8 Costs Reimbursable................................................................................................... 7
  SECTION C - BACKGROUND AND STATEMENT OF WORK ................................. 8
    C.1 Background ................................................................................................................. 8
    C.2 Statement of Work ..................................................................................................... 8
  SECTION D - PACKAGING AND MARKING ................................................................ 9
    D.1 Clauses Incorporated by Reference ......................................................................... 9
  SECTION E - INSPECTION AND ACCEPTANCE ...................................................... 10
    E.1 Clauses Incorporated by Reference ....................................................................... 10
    E.2 Inspection and Acceptance...................................................................................... 10
    E.3 Performance Standards............................................................................................ 10
  SECTION F - DELIVERIES AND PERFORMANCE ................................................... 11
    F.1 Clauses Incorporated by Reference ....................................................................... 11
    F.2 Performance Dates.................................................................................................... 11
    F.3 Deliverables .............................................................................................................. 11
    F.4 Reports ...................................................................................................................... 12
    F.5 Key Personnel........................................................................................................... 13
  SECTION G - CONTRACT ADMINISTRATION DATA ............................................ 14
    G.1 Clauses Incorporated by Reference ....................................................................... 14
    G.2 Submission of Technical Reports and Invoices.................................................... 14
    G.3 Documentation for Payment ................................................................................... 14
  SECTION H - SPECIAL CONTRACT REQUIREMENTS........................................... 17
    H.1 International Travel Approvals ............................................................................... 17
    H.2 Insurance and Services ............................................................................................ 17
    H.3 Severability............................................................................................................... 17
    H.4 Compliance ............................................................................................................... 18
    H.5 Claims And Disputes ............................................................................................... 18
    H.6 Assignability............................................................................................................. 18
    H.7 Termination............................................................................................................... 18
    H.8 Notices ...................................................................................................................... 19
    H.9 Approval Requirement............................................................................................. 19
    H.10 Subcontracts........................................................................................................... 19

JSI0000000061

H.11 Controlling Laws .................................................................................. 19
H.12 Deviations ......................................................................................... 20
H.13 Communications Products ................................................................. 20
H.14 Source, Origin And Nationality ........................................................ 21
H.15 Local Procurement ............................................................................ 22
H.16 Government Property ........................................................................ 22
H.17 Audit ................................................................................................. 23
H.18 Acknowledgment and Disclaimer...................................................... 23
H. 19 Copy Rights ..................................................................................... 24
H. 20 Entire Agreement ............................................................................. 24

PART II - CONTRACT CLAUSES...................................................................... 25

SECTION I CLAUSES INCORPORATED BY REFERENCE ......................... 25
I.1 Clauses Incorporated by Reference.................................................... 25
I.2 Federal Acquisition Regulation......................................................... 25
I.3 A.I.D. Acquisition Regulation........................................................... 26

PART III DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS .......................... 27

SECTION J- LIST OF ATTACHMENTS.................................................. 27

JS10000000062

**Part I - THE SCHEDULE**
**SECTION A -SUBCONTRACT INFORMATION**
**The Child Health Technical and Support Contract (MCH TASC)**

A.1  Place of Performance
United States and Romania

A.2  Subcontract No.
MCH-TASC 15136-0805-001

A.3  Subcontractor Name and Address:
Contact: Ms. Susan Dugan
The Johns Hopkins University, School of Hygiene and Public Health,
Center for Communication Programs (CCP)
111 Market Place, Suite 310
Baltimore, Maryland,  USA
Tele: (410 ) 659-6224

A.4  Submit Financial and Technical Reports to
Mr. Abul Hashem, Project Director
John Snow, Inc.
1616 North Fort Myer Drive, Suite 1100
Arlington, Va. 22209      USA
Tele: (703) 528-7474; Fax: (703) 528-7480

A.5  Effective Date: Date of signature
Completion Date: August 29, 2001

A.6  Accounting Data
Amount Obligated:  $100,000
Estimated Ceiling Price: $265,325
*Incrementally Funded*

---

*The Subcontractor has read and understands that this subcontract is funded through John Snow, Inc. by the Agency
for International Development, an agency of the U.S. Federal Governmental.  The subcontractor agrees to administer
this subcontract in accordance with the terms of this contract and within federal governmental laws and regulations.
This subcontract is subject to the Consent To Subcontract clause and is not binding until consent is received by the
Contractor.*

| John Snow, Inc. | The Johns Hopkins University, School of Hygiene and Public Health, Center for Communication Programs (JHU/CCP) |
|---|---|
| _Signature of Contractor_ | _Signature of Subcontractor_ |
| _Richard C. Owens, Jr.   Vice President_ | HERBERT R. HANSEN, JR, MBA, CPA |
| Typed Name:          Title | SR. ASSOCIATE DEAN |
| | Typed Name          Title |
| 11/7/99 | 11/4/99. |
| Date | Date |

1

ORIGINAL *i of 2*

JS10000000063

## SECTION B - SUPPLIES OR SERVICES AND PRICES

This is a Subcontract by and between John Snow, Inc., a Massachusetts corporation with its principal offices at 44 Farnsworth Street, Boston, Massachusetts 02210-1214 (hereinafter referred to as "JSI" or the "prime contractor") and The Johns Hopkins University, School of Hygiene and Public Health, Center for Communication Programs (CCP), located at 111 Market Place, Suite 310 Baltimore, Maryland 21202-4012, (hereinafter referred to "Subcontractor."

JSI has entered into Contract No. HRN-I-0098-00032-00, Task Order # 805 (hereinafter referred to as the "prime contract") between the United States Agency for International Development, an Agency of the United States Government (hereinafter referred to as "USAID.")  Under the prime contract, certain terms, conditions and clauses of the Schedule and the referenced Contract Clauses are mandatory to be passed down to all subcontractors.

In consideration of the foregoing and for other good and valuable consideration herein expressed, the parties agree as follows:

### B.1 Purpose

The purpose of this subagreement is to provide technical services to JSI in support of the Women's Reproductive Health Initiative.  The overall objective of the prime task order is to provide technical assistance and training in developing a redesigned, integrated and effectively managed reproductive health services system in Romania

### B.2 Contract Type and Performance

This is a Cost Reimbursement Type Subcontract and is subject to the outputs and deliverables and performance standards described within this subcontract.

### B.3 Technical Directions

Performance of the work hereunder shall be subject to the technical directions of the JSI/WRHI Project Director or his/her designee(s).  As used herein, "Technical Directions" is defined to include:

    (1)    Written directions to the subcontractor, which fill in details, suggest possible lines of inquiry, or otherwise complete the general scope of the work.

    (2)    Provisions of written information to the Contractor that assists in the interpretation of drawings, specifications, or technical portions of the work statement.

    (3)    Review and, where required, provide written approval of technical reports, drawings, specifications, or technical information to be delivered.

2

JSI0000000064

"Technical Directions" must be within the terms of this subcontract, shall not change or modify them in any way, and shall not constitute changes (as described in the clause of this subcontract entitled "Changes - Cost Reimbursement" (FAR 52.243-02, Alternate II), which may only be accomplished by amendment to this subcontract.

B.4 Ceiling Price and Obligated Amount

a)  Ceiling Price: The total estimated cost for performance of the work required hereunder is $265,325.

b)  For workdays ordered

| | |
|---|---:|
| Salary | $ 70,394 |
| Consultant | 59,364 |
| For Indirect Costs | 19,870 |
| For office campus Indirect Costs** | 64,321 |
| For Other Direct Costs* | 51,376 |
| Ceiling Price | $ 265,325. |

Note: ** Indirect, On and Off campus indirect costs will only be reimbursed if the costs are in accordance with the USAID approved NICRA.

c)  Obligated Amount: Wthin the total estimated costs of this subcontract, **$100,000** is currently obligated for reimbursement of allowable costs. JSI will not reimburse the Subcontractor for any amount which exceeds the amount obligated to the subcontractor.

d)  Incremental Funding  Additional funds up to the total amount of the estimated Subcontract may be obligated according to  the following:

> 1)  Availability of funding for this Subcontract is contingent upon the amount of funding that the Prime Contractor receives from USAID.  In the event that USAID does not fully fund the prime contract, then this Subcontract may not be fully funded.

> 2)  The performance of the Subcontractor may have a direct impact on future obligations to this subcontract

3

JSI0000000065

B.5 Work Days Ordered

| Function Labor Category and Specialist | Days | Rate Yr. 1 | Total Yr. 1 | Days | Rate Yr. 2 | Total Yr. 2 | Total Contract |
|---|---|---|---|---|---|---|---|
| **Management Specialist - Carol Brancich | 85 | 388 | 32,980 | 65 | 404 | 26,260 | 59,240 · |
| **Evaluation Specialist - Deborah Kluge | 90 | 388 | 34,920 | 45 | 388 | 17,460 | 52,380 |
| **Financial Specialist - Margaret Rowan | 18 | 388 | 6,984 | 0 | 0 | 0 | 6,984 |
| Program Assistant | 30 | 115 | 3,450 | 30 | 120 | 3,600 | 7,050 · |
| Administrative Support | 8 | 250 | 2,000 | 8 | 260 | 2,104 | 4,104 · |
| Total Cost for workdays ordered | | | | | | | 133,862 |

Notes:

1. The yearly or daily salary is the ceiling rate for each functional category and specialist.

2. Positions above, identified with ** asterisks, are considered key positions. Any changes to the individuals identified by the Subcontractor to fill key positions in the labor categories above must be approved in advance and in writing by JSI. (See subcontract clause F.4).

   a) Subject to the ceiling price of the contract, and prior written approval of the USAID Technical Officer (through JSI) the subcontractor may adjust the number of workdays actually employed in the performance of the work by each position specified in this order. The subcontractor shall attach a copy of the approval to the final voucher submitted for payment.

   b) It is the subcontractor's responsibility to ensure that the JSI approved adjustments to the workdays ordered for each functional labor specialist do not result in costs incurred which exceed the ceiling price of this subcontract. Under no circumstances shall such adjustments authorize the subcontractor to be paid any sum in excess of the ceiling price.

B.6 Limitations to Ceiling Price

The subcontractor shall not be paid any amount in excess of the ceiling price without advance, written approval of the JSI Project Director. Each CFPP task order will include a mix of professional labor categories, an estimated number of workdays, and all estimated costs plus fixed fee. The ceiling price will be based on the following budget elements:

(a) Labor

(1) Definitions  As used herein, the terms "salaries," "wages" and "compensation" mean the periodic remuneration received for professional or technical services rendered, exclusive of any of the differentials or allowances defined in the clause of this subcontract entitled "Differentials and Allowances" (AIDAR 752.7028), unless otherwise stated. The term "compensation" includes payments for personal services (including fees and honoraria). It excludes earnings from sources other than the

4

JSI0000000066

individual's professional or technical work, overhead, or other charges (see also the clause of this contract entitled "Personnel Compensation" [AIDAR 752.7007]).

(2) Limitations  Compensation of personnel which is charged as a direct cost under this contract, like other costs, will be reimbursable in accordance with Section B of this subcontract, and the clause of this contract entitled "Allowable Cost and Payment" (FAR 52.216-07) and other applicable provisions of this subcontract, but subject to the following additional specified understandings which set limits on items which otherwise might be reasonable, allocable, and allowable.

(3) U.S. Personnel  U.S. personnel shall be paid in accordance with rates negotiated between the contractor and subcontractor. The negotiated rates for individual U.S. expatriates shall be based upon a combination of factors including, but not limited to, the labor category under which the individual is being considered for utilization, consideration of the individual's education and salary and/or consultant rate history over the most recent 3-year period. Annual salaries will be converted to daily salaries by dividing the annual figure by 260 workdays per year, except for annual salaries at the ES-6 level, which shall not exceed the established current ES-6 daily rate. CIB 92-2 effective January 1998 contains the current ES-6 rate as $118,400 per year, $455.36 per day, or $56.92 per hour, subject to annual revisions.

(4) TCNs and CCNs  All locally hired national personnel and other non-U.S. expatriates shall be paid in accordance with rates negotiated between the contractor and subcontractor.  The negotiated rates for individual locally-hired national and other non-U.S. expatriates shall be based upon a combination of factors including, but not limited to, the prevailing in-country salaries for the professional category being negotiated and consideration of the individual's education and salary and/or consultant rate history over the most recent 3-year period. Annual salaries will be converted to daily salaries by dividing the annual figure by 260 workdays per year, except for annual salaries at the ES-6 level, which shall not exceed the established current ES-6 daily rate. CIB 92-2 effective January 1998 contains the current ES-6 rate as $118,400 per year, $455.36 per day, or $56.92 per hour, subject to annual revisions. Unless otherwise authorized by the Mission Director, the compensation of such TCN or CCN employees shall be paid in the currency of the cooperating country.

(5) Salaries During Travel  Salaries and wages paid while in travel status will not be reimbursed for a travel period greater than the time required for travel by the most direct and expeditious air route.  All travel must have the prior approval of JSI.

(6) Return of Overseas Employees  Salaries and wages paid to an employee serving overseas who is discharged by the subcontractor for misconduct, inexcusable nonperformance, or security reasons will in no event be reimbursed for a period which extends beyond the time required to return him promptly to his point of origin by the most direct and expeditious air route.

(7) Annual Salary Increases  Annual salary increases for personnel utilized under this subcontract are based on the annual increase percentage rate set forth in the

5

JSI0000000067

subcontractor's proposal.   The annual increase will apply to individuals employed under this contract for a period of twelve consecutive months.  Under no circumstance shall the increase exceed the maximum daily rate.  The annual salary increase may not exceed the amount proposed in the subcontractor's proposal.

(8) Consultants  The use of consultants is authorized under this contract.  Fees paid to consultants and reimbursed hereunder shall be reasonable in accordance with FAR cost principles set forth at 31.205-33 entitled "Professional and Consultant Costs," and subject Section B. of this subcontract.

(9) Overtime Pay  No overtime or premium pay will be paid under this subcontract.

(10) Workday  The length of the subcontractor's overseas workday shall coincide with the workday for employees of the USAID Mission.  The length of the subcontractor's U.S. workday shall be in accordance with the Subcontractor's established policies and practices. The daily rate for a fractional day shall be pro-rated.

(11) Biographical Data Form   The subcontractor shall provide the contractor with a biographical data sheet (AID form 1420-17) for all individuals receiving compensation under this subcontract.  (See Section J for AID form 1420-17.)

(b) Other Direct Costs
(1) Other allowable direct costs necessary for the performance of the work, including, but not limited to, such costs as DBA and Medevac Insurance, travel and transportation, lodging and subsistence may be authorized in the task order. Any cost elements included in the subcontractor's indirect cost pool shall not be also charged to the subcontract as a direct cost. Lodging and subsistence costs may be authorized for locally hired national personnel in accordance with the clause of this subcontract entitled "Travel and Transportation (JAN 1990)", AIDAR 752.7002. Costs for U.S. expatriate travel/transportation to perform services overseas may be authorized by JSI in accordance with the same clause.

Allowable costs will be determined in accordance with the applicable federal cost principals.
Commercial For-Profit firms - FAR 31.2 and AIDAR 731.2
Educational Institutions - FAR 31.3 and AIDAR 731.3
Other Not-For Profit - FAR 31.7 and AIDAR 731.7

B.7 Indirect Costs  (Dec 1997)

(a) Indirect Cost Rate, G&A Rate

Pursuant to the clause of this subcontract entitled "Allowable Cost and Payment" (FAR 52.216-7), an indirect cost rate or rates shall be established for each of the subcontractor's

JSI0000000068

accounting periods which apply to this subcontract. Pending establishment of revised provisional, predetermined, or final indirect cost rates for each of the subcontractor's accounting periods which apply to this subcontract, indirect cost payments shall be made on the basis of the following rate(s) applied to the base(s) set forth below:

| Description | Rate | Type | Base of Application |
|---|---|---|---|
| Fringe Benefits   (07/01/99-06/30/00) | 28.% | Pred. | Salaries and Wages, Faculty/Staff Employees |
| Fringe Benefits   (07/01/00-06/30/01) | 28.5% | Pred. | Salaries and Wages, Faculty/Staff mployees |
| Fringe Benefits   (01/01/99-06/30/03) | 8.% | Pred. | Salaries and Wages, Post Graduate Students |
| | | | |
| Facilities and Administrative Costs 18.% | Pred. | | Off-Campus Other Sponsored Activities |
| Facilities and Administrative Costs 32.% | Pred. | | On -Campus Other Sponsored Activities |
| (F&A Rates effective (07/01/99-06/03/03)) | | | |

### Facilities and Administrative Cost Base)

Modified total direct costs, consisting of all salaries Administrative Cost and wages, fringe benefits, materials, supplies, services, travel and subcontracts up to the first 25,000 or each subgrant or subcontract (regardless of the period covered by the subgrant or subcontract). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, tuition remission, rental costs of off-site facilities, scholarships and fellowships as well as the portion of each subgrant and subcontract in excess of $25,000.

### Type
Pred. (Predetermined)
Prov. (Provisional)

(b) Ceiling on Indirect Cost Rate   (Applicable to CPFF Task Orders only)

Reimbursement for indirect costs shall be paid at the lower of the negotiated final (or predetermined) rates. In no case will JSI reimburse indirect cost rates in an amount exceeding five percent (5%) of the rates listed in B.5 above. If the final indirect cost rates are less than the negotiated ceiling rates, the negotiated rates will be reduced to conform with the lower rates.

This understanding shall not change any monetary ceiling, obligation, or specific cost allowance or disallowance. The subcontractor must receive prior written approval of JSI to make changes in reclassifying or allocating indirect costs.

B.8 Costs Reimbursable

The U.S. Dollar costs allowable shall be determined in accordance with Far 52.216-7 "Allowable Cost and Payment", FAR 52.216-8 "Fixed Fee", if applicable, and AIDAR 752.7003, "Documentation for Payment".

---

JSI0000000069

END OF SECTION B

# SECTION C - BACKGROUND AND STATEMENT OF WORK

C.1 Background

The Subcontractor shall provide technical services and other resources as necessary to support the purpose and objectives of the prime contract as more specifically described below in the Statement of Work. The contractor shall work under the guidance and direction of the JSI Project Director and/or his/her designee.

C.2 Statement of Work

JHU/CCP will have the following responsibilities in the implementation of Women's Reproductive Health Initiative in Romania:

1. Conduct a diagnostic assessment of the specific management needs at the national and local level and provide inputs in the design and delivery of management training to the officials of the Ministry of Health (MOH), three judets and the service providers;
2. Participate in the design and delivery of training program in strategy development and program implementation to family planning/MCH and Health promotion staff at MOH, local health authorities in 3 judets, and a small cadre of professionals from the Romanian Institute of Health Management and the Institute of Post-Graduate Education; as well as participate with these individuals and donors in the development of a National framework and short- and long-term strategy for ensuring access to efficient, high quality, patient-centered reproductive health services through a decentralized system
3. Provide technical assistance in the design of (a) good management principles, (b) continuous quality (clinic and management) monitoring and improvement system, and (c) management of client provider satisfaction, preferably using principles developed by the MAQ (Maximizing Access and Quality) program
4. Perform an analysis of acceptable financial practices and financial barriers to accessible reproductive health services.
5. Develop or adapt monitoring and evaluation tools for reproductive health programs at the national and local health authority level
6. Develop work plan in coordination with JSI and update annually
7. Submit quarterly reports of project activities to JSI

END OF SECTION C

8

JSI0000000070

# SECTION D - PACKAGING AND MARKING

D.1  Clauses Incorporated by Reference  FAR 52.252-2  (FEB 1998)

This contract incorporates one or more clauses by reference with the same force and effect as if they were given in their full text.  The full text may be accessed electronically at this address:
http://www.info.usaid.gov

AID Acquisition Regulation (48 CFR CHAPTER 7)

| Number | Title | Date |
|--------|-------|------|
| 752.7009 | MARKING | Jan 1993 |

"It is USAID policy that USAID financed commodities and shipping containers, and project construction sites and other project locations be suitable marked with the USAID emblem. Shipping containers are also to be marked with the last five digits of the USAID financing document number.  As a general rule, marking is not required for raw materials shipped in bulk (such as coal, grain, etc.) or for semi-finished products which are not packaged.

Specific guidance on marking requirements should be obtained prior to procurement of commodities to be shipped, and as early as possible for project construction sites and other project locations.   This guidance will be provided through the cognizant technical office indicated on the cover page of this contract, or by the Mission Director in the Cooperating Country to which commodities are being shipped, or in which the project site is located.

Authority to waive marking requirements is vested with the Regional Assistant Administrators, and with Mission Directors.

A copy of any specific marking instructions or waivers from marking requirements is to be sent to the Contracting Office; the original should be retained by the Contractor."

END OF SECTION D

JSI0000000071

## SECTION E - INSPECTION AND ACCEPTANCE

E.1 Clauses Incorporated by Reference  FAR 52.252-2  (FEB 1998)

This contract incorporates one or more clauses by reference with the same force and effect as if they were given in their full text.  The full text may be accessed electronically at this address:
http://www.info.usaid.gov

Federal Acquisition Regulations (48 CFR Chapter 1) Clauses

| Number | Title | Date |
|--------|-------|------|
| 52.246-5 | Inspection of Services - Cost Reimbursement | Apr. 1984 |
| 52.246-15 | Certificate of Conformance | Apr. 1984 |

E.2  Inspection and Acceptance

JSI inspection and acceptance of services, reports and other required deliverables or outputs shall take place at:

John Snow, Inc.
1616 North Fort Myer Drive
Suite 1100
Arlington, Virginia, USA  22209-3100

or at any other location where the services are performed and reports and deliverables or outputs are produced or submitted .  The JSI Project Director (or designee) has authority to inspect and accept all services, reports and required deliverables or outputs.

E.3  Performance Standards

Evaluation of the subcontractor's overall performance in accordance with the performance standards set forth herein shall be conducted by the Project Director and shall become a permanent record with regard to this contract.  The annual performance overview will be included in the subcontractor's annual work plan.

End Section E

10

JSI0000000072

# SECTION F - DELIVERIES AND PERFORMANCE

F.1 Clauses Incorporated by Reference   FAR 52.252-2 (FEB 1998)

This contract incorporates one or more clauses by reference with the same force and effect as if they were given in their full text. The full text may be accessed electronically at this address:
http://www.info.usaid.gov

Federal Acquisition Regulations (48 CFR Chapter 1) Clauses

| Number | Title | Date |
|---|---|---|
| 52.242-15 | STOP WORK ORDER | AUG 1989 |
| | Alternate I (APR 1984) | |

F.2  Performance Dates

(a) The effective date of this subcontract is **the date of signature.**
(b) The estimated completion date is **August 29, 2001.**

F.3  Deliverables

The Subcontractor shall provide outputs and reports required by JSI. The Subcontractor shall submit for technical review all information necessary to demonstrate and support the achievement of performance results no later than the scheduled due dates agreed upon. The Contractor shall provide an explanation if any results have not been achieved according to the schedule.

The Project Director (or designee) will review the documentation to determine if the performance results have been met. The JSI Project Director will have unilateral authority to determine if the performance results have been met.

The Subcontractor is required to submit the following reports and plans:

(a) Annual Work Plans  Within 30 days of award, and annually thereafter, the subcontractor shall submit for JSI Project Director approval, a work plan describing the activities anticipated for the following 12 months.

(b) Quarterly Progress Reports  Within 30 days of the subcontract's first full quarter, and quarterly thereafter, the subcontractor shall submit for JSI Project Director approval a

---

11

JSI0000000073

summary of activities completed or under way during the preceding 3 months, including a summary of contract finances.

(c) <u>Annual Report</u>  Within 30 days of each 12-month period, the subcontractor shall submit for JSI Project Director approval a summary of activities carried out under contract during the preceding 12 months, addressing both the technical and financial issues. The annual report will be in lieu of the 4th quarterly report.  The reports will include, at a minimum, the actual milestones or benchmarks achieved or an explanation of why milestones were not achieved, and other commentary deemed appropriate to demonstrate performance over the preceding three months.  The annual report will summarize the financial situation of the subcontract showing a comparison of actual expenditures to the estimated budget and obligated amounts.

(d) <u>Trip Reports</u> Subcontractor employees and consultants are required to submit a trip report to JSI within twenty (20) days of the completion of an international trip.  The trip report shall be submitted in hard copy and on disk in a for mat compatible with "Microsoft-word" format.

(e) <u>Ad Hoc Reports</u> Should additional reports or information be required for the prime contract to comply with USAID requirement, then Subcontractor will submit the information to JSI upon request.


## F.4 Reports

(a) <u>Performance Monitoring Reports (PMRS)</u>
Within 20 days of the three-month periods (calendar quarters) ending on March 31, June 30, September 30, and December 31, the subcontractor shall submit to the JSI Project Director a completed PMR form "USAID 1420-66." Form USAID 1420-66 is attached to the Schedule. (See list of attachments, Section J.)

The performance reports shall summarize progress of the major activities in process in relation to the requirements of the subcontract, indicating any problems encountered, and proposing remedial actions as appropriate.

The submission within 20 days is to allow time for JSI to incorporate the information into the JSI report to USAID.


(b) <u>Invoices and Financial Reports</u>   Financial reports shall be submitted in accordance with Section G.

---

JSI0000000074

F.5 Key Personnel

a) The subcontractor will assign the following key personnel for the performance of this subcontract:

| Name | Position |
|---|---|
| Carol Brancich | Management Specialist |
| Deborah Kluge | Evaluation Specialist |
| Margaret Rowan | Financial Specialist |

b) The key personnel position specified above is considered to be essential to the work being performed hereunder. Prior to making any change in the Key Personnel, the subcontractor shall notify JSI reasonably in advance and shall submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the project. The listing of Key Personnel may, with the consent of the contracting parties, be amended from time to time during the course of the subcontract to either add or delete personnel, as appropriate. Consent shall not be unreasonably withheld.

c) If the individual is identified as "key personnel" in the prime contract, failure to provide the individual may be considered non-performance by the Subcontractor unless such failure is beyond the control of the Subcontractor. The Subcontractor is responsible to notify JSI immediately and to take steps to rectify the situation and shall propose a substitute candidate for the vacated position. The Subcontractor must request written approval from JSI to replace key personnel. JSI will in turn request approval from the USAID contracting officer.

d) This clause does not constitute an agreement to employ the above named individuals for the term of the subcontract. JSI reserves the right to request that the subcontractor replace any individual under the subcontract if the performance of that individual does not meet the standards required to successfully complete the terms of the subcontract.

e) All key personnel assigned to this subcontract must be conversant in the English language. JSI reserves the right to test the individual for language capability. In the event the individual possesses the required language capability, expenses for the testing shall be an allowable cost to the subcontract. However, if the individual does not have the required language capability, expenses for language testing for such individual shall be borne by the Subcontractor at no expense to JSI or to the government.

End Section F

13

JSI 0000000075

## SECTION G - CONTRACT ADMINISTRATION DATA

G.1  Clauses Incorporated by Reference    FAR 52.252-2 (JUNE 1988)

This contract incorporates one or more clauses by reference with the same force and effect as if
they were given in their full text.

Aid Acquisition Regulation  (48 CFR CHAPTER 7)

| Number | Title | Date |
|--------|-------|------|
| 752.7003 | Documentation for Payment | Apr. 1984 |

G.2  Submission of Technical Reports and Invoices

All technical reports and invoices shall be submitted to the address in Part I, Section A, 4.

G.3  Documentation for Payment

For Cost Reimbursement Task Orders, the subcontractor is to adhere to the following:

(a)  Invoice Requirements

1. Invoices shall be submitted to the JSI Project Director,  quarterly, by the 5th
of each month following the end of a quarter, in an original and one copy.
Each invoice shall identify the subcontractor's name, address, and invoice
number and dates of performance.

2.  The invoice shall be itemized by activity and by line item and shall include
complete supporting documentation.. Documentation shall include signed
time-sheets, receipts, consultant agreements, a listing of all direct labor
furnished during the period covered by the invoice as well as a description of
the work performed, a copy of signed approvals (if required by the expense)
and any other pertinent information needed to justify that the expenditures are
reasonable, allowable and allocable.

3.  As required by AIDAR 752.7003,  the Subcontractor shall submit a
vendor's invoice detailing the quantity, description, and price for each
individual item purchased, as follows:

(i.) Expendable equipment, supplies, or commodities -- for transactions
totaling more than $2,500.

14

JSI0000000076

(ii.)Non-expendable property -- for every purchase. Non-expendable property is property which is complete in itself, does not lose its identity or become a component part of another article when put into use; is durable, with an expected service life of two years or more; and which has a unit cost of more than $500.

(iii.) The bill of lading or airway bill as evidence of shipment by U.S.-flag carrier.

(b) Invoice Form  (752.7003 April 1984)

A certified invoice shall be submitted in a form and manner satisfactory to the Contractor substantially as follows:

Total Expenditures

| Category | Budget | To Date | This Period |
|---|---|---|---|
| *Salaries and Wages | | | |
|    Home Office | | | |
|    Field Office | | | |
| Indirect Costs | | | |
|    On campus | | | |
|    Off campus | | | |
| Consultant Fees | | | |
| Training activities and Materials | | | |
| Misc international & domestic expense | | | |
| JHU Computer Center Services General support | | | |
| General Operating Costs | | | |
| Grand Total | $xxxx | $xxxx | $xxxx |

(c) Certification

The invoice shall have a certification signed by an authorized representative, as follows:

"The undersigned hereby certifies that (I) the fiscal report and the attachments have been prepared from the books and records of the Subcontractor. And to the best of my knowledge and belief, that they are correct, that the sums claimed under this Subcontract are proper and due, that al costs of contract performance have been paid by the Subcontractor, that the work reflected in the costs above have been performed, that the quantities and amounts involved are consistent with the requirements of this subcontract, that all required JSI approvals have been obtained and are attached, and ii) appropriate refund to JSI will be made promptly in the event of disallowance of costs not reimbursable under this subcontract

BY:_____
TITLE:_____
DATE:_____

JSI0000000077

(d) Summary Financial Report

A summary financial report shall accompany the invoice in substantially the following format:

Summary Financial Report

| Category | Overall Budget | Obligated Funding | Current Expenditure | Cumulative Expenditure | Balance of Obligation |
|----------|----------------|-------------------|---------------------|------------------------|-----------------------|
|          |                |                   |                     |                        |                       |

(e) Payment
The Contractor and Subcontractor shall agree on the format used. For all invoices properly submitted in accordance with the requirements herein, payment will be made by JSI to the subcontractor within 30 days of receipt of the invoice.

(f) Final Invoice
A final invoice is due no later than 60 days after the close of the project and shall be marked "FINAL".

(g) Local Currency
The Contractor is fully responsible for the proper expenditure and control of local currency, if any, provided under this contract.

End of Section G

16

JSI0000000078

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

H.1 International Travel Approvals

International travel and associated costs are subject to the advance written approval of the JSI Project Director. Where approval is required by USAID, JSI will submit the request to USAID. The Subcontractor for audit purposes must retain all travel concurrence.

H.2  Insurance and Services

Per FAR clause 52.228-3 the subcontractor is required to provide appropriate workman's compensation insurance for its employees. Where there is work under this subcontract overseas, the subcontractor is required to carry DBA insurance.

    (a) Workman's Compensation Insurance
    Pursuant to AIDAR 752.228-3 Workman's Compensation Insurance (Defense Base Act); USAID's DBA insurance carrier is:

        Rutherford International, Inc.
        5500 Cherokee Avenue, Suite 300
        Alexandria, VA. 22312
        Telephone: (703) 354-1616

    (b) MEDEVAC Insurance
    Pursuant to AIDAR 752.228-70 Medical Evacuation (MEDEVAC) Services, USAID's Medevac service provider is:

        Medex Assistance Corporation
        P.O. Box 5375
        Timonium, Md. 21094-5375
        Telephone: (410) 453-6300 in Maryland
        or (800) 537-2029 (toll-free)
        Telefax: (410) 453-6301
        Email: operations@medexassist.com

H.3  Severability

If any provision of this subcontract is determined by any court of competent jurisdiction to be invalid or unenforceable, the remainder of the subcontract other than the portions determined to be invalid or unenforceable shall not be affected thereby, and each valid provision hereof shall be enforced to the fullest extent permitted by law.

JSI0000000079

## H.4 Compliance

Failure to insist upon strict compliance with any of the terms, covenants, or conditions hereof shall not be deemed a waiver of such terms, covenants, or conditions, nor shall any waiver or relinquishment of at any one time or more times be deemed a waiver or relinquishment of such right or power at any other time or times. No waiver shall be binding unless in writing and signed by the party granting the waiver.

## H.5 Claims and Disputes

In no event shall JSI be liable to the Subcontractor for payments for any extra work the Subcontractor performs in addition to that required under the Statement of Work in each individual Task Order, unless the Subcontract has been properly modified. No officer, director, employee, or agent of JSI is authorized to direct any extra work by oral order.

Any inconsistency in this subcontract shall be resolved by giving precedence in the following manner.

      The schedule (excluding the specifications)
      Representations and other instructions
      Contract Clauses
      The specifications in the SOW

A claim by the Subcontractor must be made in writing and submitted to the JSI Project Director for a written decision. A claim by JSI against the Subcontractor is subject to a written decision by the Project Director. The JSI Project Director must render a decision within 60 days of written request of the Subcontractor's claim. The JSI Project Director's decision is final unless appealed.

The Subcontractor will proceed with performance of this subcontract pending final resolution of any claim and will comply with any decision of the JSI Project Director.

Both parties to this subcontract agree that Disputes, which cannot be resolved through the procedure described above, will be arbitrated in the normal judicial system of the Commonwealth of Massachusetts, in the United States of America.

## H.6 Assignability

This subcontract shall not be assigned by the subcontractor without the expressed written consent of JSI.

## H.7 Termination

---

18

JSI0000000080

This subcontract is subject to the "Termination (Cost Reimbursement)" (FAR 52.249-06) provision.

H.8  Notices

All notices required or permitted to be given hereunder shall be sufficient if in writing and personally delivered or sent by certified mail, return receipt requested and postage prepaid, addressed as follows:

        If to JSI:
            Attention: Project Director
            MCH TASC / (Romania)
            John Snow, Inc.
            1616 North Fort Myer Drive
            Arlington, VA.  22209-3100  USA

        If to Subcontractor:
            Attention: Ms. Susan Dugan
            The Johns Hopkins University, School of Hygiene and Public Health,
            Center for Communication Programs (CCP)
            111 Market Place, Suite 310
            Baltimore, Maryland,  USA
            Tele: (410 ) 659-6224

H.9  Approval Requirement

This subcontract is subject to the approval of the U.S. Government, and shall not be binding until written approval of the U.S. Government is received by JSI.

H.10  Subcontracts

Placement of lower tier subcontracts with other organizations, firms, institutions or individuals, and the provisions of such subcontracts are subject to the prior written consent of JSI, if they will be funded under this subcontract.  In no event shall any subcontract be on a cost-plus-percentage-of-cost basis.  Subcontracts including suppliers shall be selected on a competitive basis to the maximum practicable extent consistent with the obligations and requirements of this subcontract.

H.11  Controlling Laws

---

19

JSI0000000081

This subcontract shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts.

## H.12  Deviations

Authorized Deviations in Clauses (FAR 52.252-6  APR 1984) - The use of any FAR and/or AIDAR deviation in this subcontract is indicated by the addition of "(DEVIATION)" after the name of the regulation.

## H.13  Communications Products  (Oct 1994)

*In accordance with the following USAID's Communication Products Provision, all requests for prior approval for communication products shall be submitted to the JSI Project Director.  JSI will request approval from USAID.*

### (a)  Definition
Communications Products are any printed materials (other than non-color photocopy material), photographic services or video production services.

### (b)  Standards

USAID has established standards for communications products.  These standards must be followed unless the contract specifically provides an exception or if approved in writing by the contracting officer.  A copy of the standards for USAID financed publications and video productions is attached.

### (c)  Ineligibility

Communication products which meet any of the following criteria are not eligible for USAID financing under this agreement unless specifically authorized in the contract or in writing by the contracting officer.

(1) All communications materials funded by operating expense account funds;

(2) Any communication products costing over $25,000, including the costs of both production and execution.  For example, in the case of a publication, the costs will include research, writing, and other editorial services (including any associated overhead), design, layout, and production costs.

(3) Any communication products that will be sent directly to, or likely to be seen by, a Member of Congress or Congressional staffer; and

(4) Any publication that will have more than 50 percent of its copies distributed in the United States (excluding copies provided to CDIE and other USAID/W offices for internal use.

20

JSI0000000082

(d) Underline Proposal Estimates

The initial proposal must provide a separate estimate of the cost of every communication product as defined in paragraph (a) above, not just those that meet the criteria in paragraph (c), which is anticipated under the subcontract. Each estimate must include all of the costs associated with preparation and execution of the product. Any subsequent request for approval of a covered communication product must provide the same type of cost information.

H.14  Source, Origin and Nationality Requirements  AIDAR 752.225-70 (Feb. 1997)

*In accordance with the following AIDAR all requests for waivers and/or prior approvals shall be submitted to the JSI Project Director. JSI will request approval from USAID.*

(a)  Geographic Code

Except as may be specifically approved by the Contracting Office, all commodities (e.g., equipment, materials, vehicles, supplies) and services (including commodity transportation services) which will be financed under this contract with US dollars shall be procured in accordance with requirements in 22 CFR 228, "Rules on Source, Origin, and Nationality for Commodities and Services Financed by USAID." The authorized source code is 000 and 186 unless otherwise specified in the schedule of this contract. Guidance on eligibility of specific goods or services may be obtained from the Contracting Officer.

(b)  Ineligible goods and services

The contractor shall not procure any of the following goods or services under this contract:

1.  Military equipment
2.  Surveillance equipment
3.  Commodities and services for support of police and other law enforcement activities.
4.  Abortion equipment and services.
5.  Luxury Goods and gambling equipment, or
6.  Weather modification equipment.

(c)  Restricted Goods

The contractor shall not procure any of the following goods or services without the prior written approval of the Contracting Officer.

1.  Agricultural commodities,
2.  Motor vehicles,

21

3.    Pharmaceuticals and contraceptive items,

4.    Pesticides,

5.    Fertilizer,

6.    Used equipment, or

7.    U.S. government-owned excess property.

8.    If JSI or USAID determines that the Subcontractor has procured any of these specific restricted goods under this subcontract without prior written authorization, and has received payment for such purposes the Subcontractor agrees to refund to JSI the entire amount of purchase.

H.15  Local Procurement  AIDAR 752.226-71 (Feb. 1997)

(a)  Local Procurement

Local procurement involves the use of appropriated funds to finance the procurement of goods and services supplied by local businesses, dealers, or producers, with payment normally being in the currency of the cooperating country.

(b)  Locally Financed Procurement

All locally financed procurement must be covered by the source/origin and nationality waivers set forth in Subpart F of 22 CFR Part 228, except as provided for in 22 CFR 228.40, Local Procurement.

H.16  Government Property

(a)  Title to Property and Related Insurance

All subcontractor acquired government property shall be titled to USAID and is subject to FAR 52.245-5 and/or 52.245-2 and AIDAR 752.245-70.  The subcontractor shall provide proper insurance to minimize risk.  The subcontractor shall maintain appropriate property inventory and provide an inventory listing annually to JSI.  At the end of the subcontract term, the subcontractor shall submit an inventory schedule and a request for disposition instructions from JSI.  JSI will request any needed approvals from USAID.

(b)  IT Acquisitions

All IT acquisitions must be pre-approved by the Project Director.  The subcontractor must warrant that all IT purchases under this subcontract are Y2K compliant.  For specifics on the compliance regulations the subcontractor may request a copy from the prime contractor.

22

JSI0000000084

(c) Non-Expendable Equipment

Non-expendable government property is defined in AIDAR 752.245-70. All non-expendable equipment requires the prior approval of the JSI Project Director. (See also G.3(a)3 of this subcontract.

## H.17 Audit

The Subcontractor shall maintain books, records, documents and other evidence in accordance with the subcontractor's usual accounting procedures to sufficiently substantiate this subcontract. The subcontractor agrees to make available to JSI or the Comptroller General of the United States all records and documents which support expenditures under this program.   JHU/CCH is subject to A-133 single audit requirements and agrees to provide a copy of the A-133 audit in its entirety to JSI for each and every fiscal year covered under the effective dates of this subcontract.

## H.18 Acknowledgment and Disclaimer

### (a) Acknowledgement

John Snow and USAID shall be prominently acknowledged in all publications, videos or other information/media products funded or partially funded through this contract. The product shall state that the views expressed by the author(s) do not necessarily reflect those of USAID or of JSI. Acknowledgments should identify the sponsoring USAID Office and Bureau or Mission as well as the U.S. Agency for International Development substantially as follows:

> "This [publication, video or other information/media product
> (specify)] was made possible through support provided through
> John Snow, Inc., by the Office of _____ , Bureau for
> _____ , U.S. Agency for International Development,
> under the terms of Contract No._____ . The opinions
> expressed herein are those of the author(s) and do not necessarily
> reflect the views of the U.S. Agency for International
> Development."

### (b) Disclaimer

Unless the subcontractor is instructed otherwise by JSI publications, videos or other information/media products funded under this contract and intended for general readership or other general use will be marked with the JSI logo and with the USAID logo and/or U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT appearing either at the top or at the bottom of the front cover or, if more suitable, on the first inside title page for printed products, and in equivalent/appropriate location in videos or other

23

JSI0000000085

information/media products. Logos and markings of co-sponsors or authorizing institutions should be similarly located and of similar size and appearance.

## H. 19 Copy Rights

a) Existing Copy Rights
   Notwithstanding the inclusion of the following paragraph herein, JHU-CCP agrees to this clause subject to the terms and conditions of FAR clause 52.227-14 "Rights in Data - General (Jun 1987)". As noted hereto the Prime Contract always controls in the event of inconsistencies. JHU-CCP copyrighted materials or materials previously produced by JHU-CCP and used in the performance of this Subcontract to reduce Subcontract costs, are the property of JHU-CCP. Such materials include, but are not limited to, literacy works such as clinical guidelines and protocols, data collection tools, teaching materials, textbooks, audio-visual and other teaching guidelines, course curricula and course design materials, skills assessment guidelines, examinations of theoretical knowledge and evaluation tools. All other materials produced as a result of work financed under this contract are the property of US Government.

b) Work Produced Under This Subcontract
   Research data generated by Subcontractor under this Subcontract shall remain the property of the U.S. Government. The Subcontractor agrees to provide JSI with a copy of the final data used in any manuscript, report, or publication at the conclusion of the research or upon JSI's request. It is understood that these data will be retained by JSI and used for scientific purposes.

   Prior to publishing the written work produced under this Subcontract, JSI reserves the right to review the final manuscript for comment and concurrence and reserves the right to disclaim endorsement for the opinions expressed on behalf of JSI and AID; or to request acknowledgment of JSI's and USAID's contributions to the publication(s).

   The Subcontractor shall provide JSI with two (2) copies (English) of all published works developed and with a list of all other written materials produced under this subcontract.

## H. 20 Entire Agreement

This subcontract supersedes any prior agreements understandings or discussions relating to **The Women's Reproductive Health Inititative (WRHI).**

**End of Section H**

24

JSI0000000086

## PART II - CONTRACT CLAUSES
### SECTION I – CLAUSES INCORPORATED BY REFERENCE

I.1  Clauses Incorporated by Reference  52.252-2  (FEB 1998)

This subcontract hereby incorporates all applicable terms, conditions and clauses of the prime contract by reference with the same force and effect as if they were given in full text. Wherever the terms "Government" or "A.I.D." or "USAID" are used, "JSI" shall be substituted. Wherever the terms "Contracting Officer" or "A.I.D./CTO" or "A.I.D. Project Director" or "USAID/COTR" are used, "the JSI Project Director or his designee(s)" shall be substituted. Wherever the word(s) "contract" or "contractor" is used, the word(s) "subcontract" or "subcontractor" shall be substituted. The full text of the clause may be found at:

> http://www.arnet.gov/far  and  http://www.info.usaid.gov.

I.2  Federal Acquisition Regulation (48 CFR Chapter 1) Clauses

| | |
|---|---|
| 52.204-4 | Printing/Copying Double-sided on Recycled Paper (June 1996) |
| 52.215-2 | Audit and Records--Negotiation (Aug. 1996) |
| 52.215-8 | Order of Precedence--Uniform Contract Format (Oct. 1997) |
| 52.216-7 | Allowable Cost and Payment (Feb 98) |
| 52.216-11 | Cost Contract - NO Fee (Apr. 1984)  Alternate I (April 1984) |
| 52.228-3 | Workers' Compensation Insurance (Defense Base Act) (Apr. 1984) |
| 52.228-7 | Insurance - Liability to Third Persons (Mar. 1996) |
| 52.230-6 | Administration of Cost Accounting Standards (Apr. 1996) |
| 52.232-22 | Limitation of Funds (Apr. 1984) |
| 52.242-1 | Notice of Intent to Disallow Costs (Apr. 1984) |
| 52.242-3 | Penalties for Unallowable Costs (Oct. 1995) |
| 52.242-4 | Certification of Final Indirect Cost Rates (Jan. 1997) |
| 52.242-15 | Stop Work Order (Aug. 1989) |
| | Alternate I (Apr. 1984) |
| 52.243-2 | Changes - Cost-reimbursement (Aug. 1987) |
| | Alternate I (Apr. 1984) |
| 52.243-7 | Notification of Changes |
| 52.244-2 | Subcontracts (Cost-reimbursement and Letter Contracts) (Oct. 1997) |
| 52.245-5 | Government Property (Cost Reimbursement, Time and Material, or Labor Hour Contracts) (Jan 1996) |
| 52.247-67 | Submission of Commercial Transportation Bills to the General Services Administration for Audit (Jun 1997) |
| 52.249-6 | Termination (Cost-reimbursement) (Sept. 1996) |
| 52.249-14 | Excusable Delays (Apr. 1984) |
| 52.253-1 | Computer Generated Forms (Jan 1991) |

JSI0000000087

I.3  **A.I.D. Acquisition Regulation** (48 CFR Chapter 7) Clauses

| | |
|---|---|
| 752.211-70 | Language and Measurement (June 1992) |
| 752.225-70 | Source, Origin, and Nationality Requirements (Feb 1997) |
| 752.225-71 | Local Procurement (Feb 1997) |
| 752.228-3 | Worker's Compensation Insurance (Defense Base Act) |
| 752.228-7 | Insurance - Liability to Third Persons |
| 752.228-70 | Medical Evacuation (Medevac) Services (MAR 1993) |
| 752.245-70 | Government Property |
| 752.7001 | Biographical Data (Jul 1997) |
| 752.7002 | Travel and Transportation (Jan. 1990) |
| 752.7004 | Emergency Locator Information (Jul 1997) |
| 752.7007 | Personnel Compensation (July 1996) |
| 752.7008 | Use of Government Facilities of Personnel (Apr. 1984) |
| 752.7011 | Orientation and Language Training (Apr. 1984) |
| 752.7014 | Notice of Changes in Travel Regulations (Jan. 1990) |
| 752.7016 | Family Planning and Population Assistance Activities (Aug. 1986) |
| 752.7026 | Reports (Oct 1989) |
| 752.7027 | Personnel (Dec. 1990) |
| 752.7028 | Differentials and Allowances (July 1996) |
| 752.7029 | Post Privileges (July 1993) |
| 752.7031 | Leave and Holidays (Oct. 1989) |
| 752.7032 | International Travel Approval and Notification Requirements (Jan.1990) |
| 752.7033 | Physical Fitness (July 1997) |
| 752.7034 | Acknowledgment and Disclaimer (Dec. 1991) |

End of Section I

JS10000000088

## Part III  DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS
### SECTION J- LIST OF ATTACHMENTS

1.      USAID Geographic Codes
2.      USAID Form 1420-17 - Contractor Employee Biographical Data Sheet
3.      AID Form 1420-65 A.I.D. Contractor Employee Physical Examination Form
4.      Contractor Performance Report - Multi-purpose Form

End of Section J

JS10000000089

JSI0000000090

Attachment 1

000   UNITED STATES

899   FREE WORLD
      Any area or country in the Free World* excluding the cooperating country itself.

935   SPECIAL FREE WORLD
      Any area or country in the Free World* including the cooperating country itself.

*"Free World" excludes the following areas or countries: Afghanistan, Cambodia, Cuba, Iran, Iraq, Laos, Libya, North Korea, People's Republic of China, Syria, and Viet Nam.

941   SELECTED FREE WORLD
Any independent country in the Free World*, excluding the cooperative country itself and the following:

| Europe | Other | | |
|--------|-------|-----|-----|
| Albania | Lithuania | Angola | Kyrgyzstan |
| Andorra | Luxembourg | Australia | Mongolia |
| Armenia | Malta | Bahamas | New Zealand |
| Austria | Moldova | Bahrain | Qatar |
| Azerbaijan | Monaco | Canada | Saudi Arabia |
| Belarus | Netherlands | Cyprus | Singapore |
| Belgium | Norway | Gabon | South Africa and |
| Bulgaria | Poland | Greece | Taiwan** |
| Czechoslovakia | Portugal | Hong Kong | Tajikistan |
| Denmark | Romania | Iceland | Turkmenistan |
| Estonia | Russia | Japan | United Arab |
| Finland | San Marino | Kazakhstan | Emirates |
| France | Spain | Kuwait | Uzbekistan |
| Georgia | Sweden | | |
| Germany | Switzerland | | |
| Hungary | Ukraine | | |
| Ireland | United Kingdom | | |
| Italy | Vatican City | | |
| Latvia | Yugoslavia | | |
| Liechtenstein | | | |

*"Free World" excludes the following areas or countries:
Afghanistan, Cambodia, Cuba, Iran, Iraq, Laos, Libya, North Korea, People's Republic of China, Syria, and Viet Nam.

**Has the status of a "geopolitical entity," rather than an independent country.

*(NOTE:  Geographic Code 186 is Romania).*

JS10000000091

OMB Control No. 0412-0520: Expiration Date: 08/31/2000

## CONTRACTOR EMPLOYEE BIOGRAPHICAL DATA SHEET

| 1. Name (Last, First, Middle) | 2. Contractor's Name | |
|---|---|---|
| 3. Employee's Address (include ZIP code) | 4. Contract Number | 5. Position Under Contract |
| | 6. Proposed Salary | 7. Duration of Assignment |
| 8. Telephone Number (include area code) | 9. Place of Birth | 10. Citizenship (*If non-U.S. citizen, give visa status*) |

**11. Names, Ages, and Relationship of Dependents to Accompany Individual to Country of Assignment**

| 12. EDUCATION (include all college or university degrees) | | | | 13. LANGUAGE PROFICIENCY | | |
|---|---|---|---|---|---|---|
| NAME AND LOCATION OF INSTITUTION | MAJOR | DECREE | DATE | LANGUAGE | Proficiency Speaking | Proficiency Reading |
| | | | | | 2/S | 2/R |
| | | | | | 2/S | 2/R |
| | | | | | 2/S | 2/R |

### 14. EMPLOYMENT HISTORY

1. Give lasts three (3) years. List salaries separate for each year. Continue on separate sheet of paper if required to list all employment related to duties of proposed assignment.
2. Salary definition – basic periodic payment for services rendered. Exclude bonuses, profit-sharing arrangements, commissions consultant fees, extra or overtime work payments, overseas differential or quarters, cost of living or dependent education allowances.

| POSITION TITLE | EMPLOYER'S NAME AND ADDRESS POINT OF CONTACT &TELEPHONE # | Dates of Employment (mm/dd/yyyy) | | Annual Salary |
|---|---|---|---|---|
| | | From    - | To | Dollars |
| | | | | |
| | | | | |

### 15. SPECIFIC CONSULTANT SERVICES (give last three (3) years)

| SERVICES PERFORMED | EMPLOYER'S NAME AND ADDRESS POINT OF CONTACT &TELEPHONE # | Dates of Employment (mm/dd/yyyy) | | Days at Rate | Daily Rate In Dollars |
|---|---|---|---|---|---|
| | | From | To | | |
| | | | | | |
| | | | | | |

### 16. CERTIFICATION: To the best of my knowledge, the above facts as stated are true and correct.

| Signature of Employee | Date |
|---|---|

Contractor certifies in submitting this form that it has taken reasonable steps (in accordance with sound business practices) to verify the information contained in this form. Contractor understands that USAID may rely on the accuracy of such information in negotiating and reimbursing personnel under this contract. The making of certifications that are false, fictitious, or fraudulent, or that are based on inadequately verified information, may result in appropriate remedial action by USAID, taking into consideration all of the pertinent facts and circumstances, ranging from refund claims to criminal prosecution.

| Signature of Contractor's Representative | Date |
|---|---|

AID 1420-17 (4/95)

JS10000000092

## INSTRUCTIONS

Indicate your language proficiency in block 13 using the following numeric interagency Language Roundtable levels (Foreign Service Institute levels). Also, the following provides brief descriptions of proficiency levels 2, 3, 4, and 5. "S" indicates speaking ability and "R" indicates reading ability. For more in-depth description of the levels refer to USAID Handbook 28.

2.  Limited working proficiency

    S    Able to satisfy routine social demands and limited work requirements.

    R    Sufficient comprehension to read simple, authentic written material in a form equivalent to usual printing or typescript on familiar subjects.

3.  General professional proficiency

    S    Able to speak the language with sufficient structural accuracy and vocabulary to participate effectively in most formal and informal conversations.

    R    Able to read within a normal range of speed and with almost complete comprehension.

4.  Advanced professional proficiency

    S    Able to use the language fluently and accurately on all levels.

    R    Nearly native ability to read and understand extremely difficult or abstract prose, colloquialisms and slang.

5.  Functional native proficiency

    S    Speaking proficiency is functionally equivalent to that of a highly articulate well-educated native speaker.

    R    Reading proficiency is functionally equivalent to that of the well-educated native reader.

## PAPERWORK REDUCTION ACT INFORMATION

The information requested by this form is necessary for prudent management and administration of public funds under USAID contracts. The information helps USAID estimate overseas logistic support and allowances; the educational information provides an indication of qualifications; the salary information is used as a means of cost monitoring and to help determine reasonableness of proposed salary.

## PAPERWORK REDUCTION ACT NOTICE

Public reporting burden for this collection of information is estimated to average thirty minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:

> United States Agency for International Development
> Procurement Policy Division (M/OP/P)
> Washington, DC  20523-1435;
> and
> Office of Management and Budget
> Paperwork Reduction Project (0412-0520)
> Washington, DC  20503

**AID 1420-17 (4/95) Back**

JS10000000093

# A.I.D. CONTRACTOR EMPLOYEE PHYSICAL EXAMINATION FORM

**PAPERWORK REDUCTION ACT STATEMENT:** Public reporting burden for this collection of information is estimated to average 4 hours, per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Agency for International Development, FA/PPE, Room 1600H, SA-14, Washington, D. C. 20523-1435; and to the Office of Management and Budget, Paperwork Reduction Project, (0412-0536), Washington, D. C. 20503.

### TO BE COMPLETED BY EXAMINEE (Please print all sections in INK or use TYPEWRITER)

| | | |
|---|---|---|
| 1. NAME OF EXAMINEE (Last, first, middle ) | 2. CONTRACT NUMBER | 3. DATE |

| 4. DATE OF BIRTH | 5. PLACE OF BIRTH | 8. SEX | 6a. CITIZENSHIP | 6b. SSN (Employee) |
|---|---|---|---|---|

| 7. MAILING ADDRESS IN THE U.S.<br><br>Phone Number: (   ) | 8. NAME AND ADDRESS OF CONTRACTOR<br><br>Contact person:<br>Telephone: (   ) |
|---|---|
| 9. NAME OF YOUR HEALTH PLAN | 10. POST OF ASSIGNMENT: |
| 11. IF DEPENDENT, FULL NAME OF SPONSOR: | Arrival Date: _____    Length of Tour_____ |

**12. FAMILY HISTORY** ( If relative has a chronic disease, Specify)

| Relation | Age | State of Health | If dead, cause of death | Age at Death | Dependents Accompanying Employee | Age | State of Health |
|---|---|---|---|---|---|---|---|
| Father | | | | | Spouse | | |
| Mother | | | | | Child | | |
| | | | | | Child | | |
| Brother | | | | | Child | | |
| Sister | | | | | Child | | |

**13. Has any blood relative ( parent, brother, sister, children ) had**

| | YES | NO | (Check each item) | Relationship |
|---|---|---|---|---|
| | | | Allergies | |
| 14. | | | Diabetes | |
| a. Examinee's statement (or evaluation) of present health: | | | Glaucoma | |
| | | | Heart Disease | |
| | | | High Blood Pressure | |
| b. Medication currently used (Please list) | | | Cancer (type) | |
| | | | Emotional Disease | |

### ANSWER ALL QUESTIONS  Do not use "PA" (Previously Answered)

| 15. DATE OF LAST EXAMINATION<br><br>Purpose of examination:<br><br>Result of examination: | 16. Any special examination or treatment indicated at present time<br>☐ Yes (Specify)    ☐ No<br><br>17. Do you have any condition which would limit your assignment because of climate, altitude, isolation, or other factors?<br>☐ Yes (Specify)    ☐ No |
|---|---|

### DO NOT WRITE IN SPACE BELOW

**PRIVACY ACT STATEMENT:** This information is requested for the purpose of assisting the physician to determine your medical status. Failure to provide full information concerning your health could result in the hampering of the medical review process. The information on this form is solely used for medical and administrative purposes. No one other than the reviewing physician and staff will have access to the medical form and information without the examinee's written authorization.

AID 1420-62 (2/93)

JSI0000000094

**CHECK EACH ITEM "YES" OR "NO". EACH ITEM CHECKED "YES" MUST BE FULLY EXPLAINED IN BLANK SPACE ON RIGHT**

| YES | NO | | |
|---|---|---|---|
| | | 18. Have you had any significant illness or injury not noted elsewhere? (specify condition and dates) | |
| | | 19. Have you ever been a patient in a mental hospital or sanitorium, or been treated by a psychiatrist or psychologist? (Give date, name of doctor and/or hospital, and type of illness) | |
| | | 20. Have you been denied life insurance? (Give details) | |

**21.  DO YOU NOW HAVE OR HAVE YOU EVER HAD THE SYMPTOMS LISTED BELOW?** *(Indicate "Yes" or "No" To Each Item)*

| YES | NO | (Check Each Item) | YES | NO | (Check Each Item) |
|---|---|---|---|---|---|
| | | Frequent or severe headaches | | | Kidney trouble, stone or blood urine |
| | | Epilepsy, fits or fainting spells | | | Sugar or albumin in urine |
| | | Eye trouble or visual defect in either eye | | | Diabetes |
| | | Skin disease | | | Rheumatic fever |
| | | Ear, nose or throat  trouble | | | Arthritis, rheumatism or joint pains |
| | | Severe tooth or gum trouble | | | Painful or "trick" shoulder or knee |
| | | Asthma | | | Bone, joint or other deformity |
| | | Hayfever or other allergies | | | Recurrent back pain; wear a back support or brace |
| | | Shortness of breath | | | Recent gain or loss of weight |
| | | Chronic cough | | | Malaria, amoebic dysentery or other Tropical disease |
| | | Coughing up blood | | | Stutter or stammer habitually |
| | | Tuberculosis, or close association with anyone who had or has tuberculosis | | | Frequent trouble sleeping |
| | | | | | Nervous trouble of any sort |
| | | Pain or pressure in chest | | | Depression or excessive worry |
| | | Palpitation or pounding of heart | | | Attempted suicide |
| | | Swelling of feet or ankles | | | Any drug or narcotic habit (specify) |
| | | High blood pressure | | | |
| | | Frequent indigestion | | | Excessive bleeding after injury or tooth extraction |
| | | Stomach, liver or intestinal trouble | | | Any reaction to serum immunization, drug or medicine |
| | | Gall bladder trouble or gall stones | | | Tumor, growth, cyst, or cancer |
| | | Jaundice or hepatitis | | | Do you use alcohol? |
| | | Rupture or hernia | | | Are you a cigarette smoker? |
| | | Piles or other rectal disease | | | Do you use any medication regularly? (specify) |
| | | Blood in or on stool, or black (Tarry) stool | | | |
| | | Frequent or painful urination | | | |

**FEMALES    ONLY**

Specify any GYN surgery or disease:

Date of last Menses:        /     /

*I CERTIFY THAT I HAVE READ THE ABOVE INSTRUCTIONS AND ANSWERED ALL QUESTIONS TRULY AND COMPLETELY TO THE BEST OF MY KNOWLEDGE.*

| 22. TYPED OR PRINTED NAME OF EXAMINEE | DATE | SIGNATURE OF EXAMINEE |
|---|---|---|
| | | |

*NOTE For the Examining Physician:* Please review the Medical History and make appropriate comments on all positive historical data.  You are required to inform the examinee of any abnormality which you have noted and/or which may require medical attention.

23. SIGNIFICANT AND/OR INTERVAL HISTORY: (Note: the examining physician MUST COMMENT on all items checked "Yes" in items 18-21).

AFD 1420-63 (2/93)

JS10000000095

# REPORT OF MEDICAL EXAMINATION
*(To Be Completed And Signed By The Examining Physician)*

**GUIDELINES FOR EXAMINING PHYSICIAN:** The individual you are examining will be serving at one of a variety of overseas posts. Many of these posts are remote, unhealthful, and have limited or no medical support such as doctors, nurses, laboratory facilities, and hospitals. Many illnesses and injuries that can be handled routinely in developed countries such as the U.S., become major or life threatening problems in many underdeveloped overseas locations.

The effect of adverse environmental conditions, such as altitude, air pollution, poor sanitation, and exposure to tropical diseases, on any existing medical problem should be considered.

Please evaluate thoroughly all items listed on the examination form. It is most important that you:

- Comment on all items checked "Yes" on the medical history, items 15–21.
- Record all physical findings after completing the examination as requested.
- Order and record (or attach copies of) all laboratory and x-ray data requested. We do want all of the tests completed as requested for the age of the examinee. Guidelines for age are noted on the physical examination form.
- Comment on all indicated follow-up examinations and conditions that may require frequent observation or prolonged treatment.
- Sign and date that portion of the examination form completed by you.

---

**24. RACE** *(Check one)*
☐ white  ☐ black  ☐ other _____

**26. HEARING**

SPOKEN VOICE:  right  ☐ normal  ☐ abnormal

left  ☐ normal  ☐ abnormal

AUDIOGRAM: *(performed if indicated by gross evaluation)*

Frequency in Hertz and levels in decibels.

| | 500 | 1000 | 2000 | 4000 |
|---|---|---|---|---|
| right | | | | |
| left | | | | |

**25.**

HEIGHT _____ in. or _____ cm.

WEIGHT _____ lbs. or _____ kg.

**27. DISTANT VISION**
right 20/            corrected 20/
left 20/             corrected 20/

**28. INTRAOCULAR TENSION** *(Over Age 40)*
right _____ mmHg        left _____ mmHg

**29. PULSE** *(Sitting)*

**30. BLOOD PRESSURE** *(Sitting)*

---

CLINICAL EVALUATION: *(Describe every abnormality in detail. Enter pertinent item number before each comment.)*

| NORMAL | Check Each Item As Indicated. Enter "NE" If Not Evaluated. | ABNORMAL | DESCRIBE ABNORMAL FINDINGS |
|---|---|---|---|
| | 31. Head, Face, Neck and Scalp | | |
| | 32. Nose and Sinuses | | |
| | 33. Mouth and Throat | | |
| | 34. Ears — including otoscopic | | |
| | 35. Eyes — including ocular mobility, pupillary reaction and ophthalmoscopic (visual acuity under item 27) | | |
| | 36. Lungs and Chest (includes breast) | | |
| | 37. Heart (thrusts, size, rhythm, sounds) | | |
| | 38. Vascular system (varicosities, etc.) | | |
| | 39. Abdomen and Viscera (includes hernia) | | |
| | 40. Anus and Rectum (hemorrhoids, Fistulae. Prostate) | | |
| | 41. Endocrine System | | |
| | 42. G-U System | | |
| | 43. Extremities (strength, range of motion) | | |
| | 44. Spine, Other Musculoskeletal | | |
| | 45. Identifying body marks, scars, tattoos | | |
| | 46. Skin, lymphatics | | |
| | 47. Neurologic | | |
| | 48. Psychiatric (specify any personality deviation) | | |
| | 49. Pelvic ( over age 21) (Papanicolaou done ☐ ) | | Papanicolaou Result Class _____ |
| | 50. Sigmoidoscopy (over age 50 or if indicated) | | |

AID 1420-62 (2/93)

Page 3

JS10000000096

"ALL TESTS ARE REQUIRED UNLESS OTHERWISE SPECIFIED"

(LAST).                    (FIRST)

**NAME OF EXAMINEE:**

| 51. HEMATOLOGY (all ages) | | 52. STOOL EXAM FOR OCCULT BLOOD (40 yrs. and over or when indicated) | 53. ECG (40 YRS. and over or when indicated). Submit all tracings. |
|---|---|---|---|
| Hematocrit | % | | Result: |
| Hemoglobin | gms | | |
| WBC | /cmm | a. Pos _____ Neg _____ | |
| Differential: | | b. Pos _____ Neg _____ | |
| Granulocytes | % | c. Pos _____ Neg _____ | 54. CHEST X-Ray (Required for all examinations for persons age 18 and over or when otherwise indicated.) |
| Lymphocytes | % | | |
| Eosinophils | % | | Date:          Results: |
| Other | % | X3 on successive days | |

| 55. SCREENING CHEMISTRY PROFILE TO INCLUDE: (FASTING) 18 yrs. and over | 56. URINALYSIS (all ages) | 57. TUBERCULIN TEST: PPD (all ages) Date _____ | 58. G6PD (if going to Malarial areas) |
|---|---|---|---|
| | | Results:_____ mm of induration | Normal _____ |
| Blood Glucose | Specific Gravity | | |
| Cholesterol | Albumin | Previously positive   Yes ____ No ____ | |
| Creatinine | Sugar | | Deficient _____ |
| Uric Acid | WBC | Previous BCG     Yes ____ No ____ | |
| SGPT | RBC | | |
| SGOT | Casts | 59. MAMMOGRAPHY (suggested if over age 40 and if clinically indicated) | 60. SICKLE HEMOGLOBIN (when indicated) |
| Alk Phos | Other | Results and Date: | Present _____ |
| Bilirubin | | | Not Present _____ |

| 61. SEROLOGY   (specify test and results ) (12 yrs. and over) |
|---|
| STS _____           HIV   (optional) _____ |

| 62. ASSESSMENT OF SIGNIFICANT FINDINGS | RECOMMENDATION FOR TREATMENT/FURTHER  STUDY |
|---|---|
| | |

In my opinion, the employee is physically qualified to engage in the type of activity for which he/she is employed, and employee and/or dependent is physically able to reside in _____(the country of assignment).

| 63. TYPED NAME OF EXAMINING PHYSICIAN | SIGNATURE | | DATE |
|---|---|---|---|
| ADDRESS: | CITY | STATE | ZIP |
| TELEPHONE | | | |

AID 1420-62 (2/93)

JS10000000097

Attachment 4

SAMPLE GUIDELINE
FOR
QUARTERLY PERFORMANCE REPORTS
(for technical or professional services contracts)

Contractor_____
Contract #_____
Reporting period: _____ to _____

## Section I- CONTRACTOR'S REPORT

Section I, which the contractor prepares, consists of two parts. The first part is a narrative of progress on major activities and the second part requires data entry

## A. Narrative:

The narrative should cover each of the five elements described below. Element #1 should not exceed a paragraph. Element #2 may require a short paragraph to summarize each expected result. For element #3, a sentence on each activity should be sufficient to describe what is in process during the quarter. (Distinguish among core, buy-in and sub-contracting activities) Element # 4 is the essential part of the report. Of particular interest are issues regarding timeliness, technical quality and cost-effectiveness of each of the activities or delivery orders in progress. Element # 5 provides the opportunity to draw attention to possible problems or to adjustments

1. Background: Describe briefly the overall contract final objective in terms of level of effort, if appropriate, and total estimated cost needed to accomplish objective.

2. Expected Results:  Summarize the specific results expected at conclusion of contract

3a. Current core activities: Describe briefly each of the major activities in process during current quarter as found in work plans and/or contract.

3b. Current buy-ins:  Summarize objective of each active delivery order  under companion contract.

JS10000000098

3c. Current subcontracting activities: Describe briefly each subcontracting activity and identify the subcontractor.

4. Performance: For each of the activities described in number 3a (core), b (buy-ins), and c (subcontracting) above, state whether on-target or not, and comment, particularly in terms of comparing actual accomplishments with the objectives, deliverables, or requirements established for the period, and explain reasons why objectives, deliverables or requirements were not met, as appropriate.

5. Statement of Work: Comment as to whether circumstances have changed which would require modification in any elements of the statement of work.

Level of effort data should be expressed in person months and needs to be furnished on level of effort contracts only. Financial data may be an estimated amount and can be rounded to the nearest thousandth.

**B. Administrative Information:**

Contract Data:    Total level of effort* _____p/m
                  Total estimated cost $_____

1. Level of effort* (last three months):    _____p/m
2. Cumulative level of effort*              _____p/m
3. Unused level of effort*                  _____p/m
4. Expenditures (last three months):    $_____
5. Cumulative expenditures to date:     $_____
6. Remaining unexpended balance:        $_____

*Applies to level of effort contracts only

**Section II - PROJECT OFFICER'S COMMENTS**

The cognizant project officer, acting in his/her capacity as the contract officer's technical representative as specified in the contract agreement, will complete section II and pass his/her comments on to the cognizant contracting officer. The project officer will acknowledge receipt and provide feed-back, as appropriate, to

JSI0000000099

1. Comment on contractor's technical performance (quality of technical assistance, professional services, and/or products) and provide examples, if appropriate.

2. Comment on contractor's administrative performance (timeliness in meeting schedules and/or delivering materials/products) during the quarter and give example(s), if appropriate.

3. Comment on contractor's management (cost-effectiveness, quality of communication with staff and with USAID for the quarter and provide examples as appropriate.

4. React to contractor's assessment of performance regarding any of the activities/deliverables described in section IA, number 4 above.

5. Note areas for potential contractor improvement regarding management/provision of any services related to the activities/deliverables and/or specific contract results.


Project Officer/Office Symbol. _____ Date _____


## Section III - CONTRACT OFFICE'S COMMENT

> The cognizant Contract Office personnel will complete Section III in consultation with the cognizant project officer and mutually agree on any actions that need to be

1. Comment on any areas of concern particularly regarding Contractor's response to questions 4 and 5 in Section I above and Project Office's response to question 3 in Section II above.

2. Identify actions to support, correct, or improve contractor's performance (show-cause notice, cure notice, contract modification, incremental funding, technical direction to contractor, approvals and/or clearances, interpretations of statement of work or adjustments in work plans, feed-back to contractor regarding performance and/or deliverables ) that need to be taken and indicate action officer and due date.


Contract Officer/Office Symbol_____ Date _____

File: p:\oppub\docs\qreport.x13

**JSI**

John Snow, Incorporated

1616 N. Fort Myer Drive    703 528 · 7474   Voice
11th Floor    703 528 · 7480   Fax
Arlington · Virginia    jsinfo@jsi.com   Email
22209

TO:     Herbert R. Hansen, Sr. Associate Dean for Finance and Administration
Johns Hopkins University, Center for Communication Programs

FROM:    Abul Hashem, Project Director
John Snow, Inc., MCH TASC Project

RE:     Amendment #1 to Subcontract MCH TASC 15136-0805-001
Women's Reproductive Health Initiative (TASC/Romania)

DATE:    August 17, 2001

CC:     Susan Dugan, Sponsored Projects/Finance Manager, JHU/CCP

---

The purpose of this amendment is to revise the obligated amount and completion date for the subcontract between John Snow, Inc. and Johns Hopkins University/Center for Communication Programs for the TASC/Romania Project.

**Modification**
Please make the following changes to the subcontract:

Part I, Section A – Subcontract Information;
     A.5: Completion Date :
     Replace August 29, 2001 with September 28, 2001

     A.6: Total Amount Obligated:
     And Section B.4 Ceiling Price and Obligated Amount, c) Obligated Amount:
     <u>Replace the Section with the following text:</u>
     Obligated Amount: Within the total estimated costs of this subcontract, and the available funds from USAID, $64,163.50 is currently obligated for reimbursement of allowable costs. With the increased obligation, a **total of $164,163.50** has been obligated to the Subcontract. JSI will not reimburse the subcontractor for any amount which exceeds the amount obligated to the subcontractor.

JSI0000000101

# JOHNS HOPKINS
UNIVERSITY

## Center for Communication Programs

School of Hygiene and Public Health
111 Market Place - Suite 310
Baltimore, Maryland 21202 USA
Telephone (410) 659-6300 / Fax (410) 659-6266
Telex 240430 JHUPCS UR

November 8, 1999

Mr. Abel Hashem
Project Administrator
John Snow, Inc.
1616 N. Fort Myer Drive
11th floor
Arlington, VA 22209

Subject:    Subcontract No. MCH-TASC 15136-0805-001
                Women's Reproductive Health Initiative (WRHI) - Romania

Dear Mr. Hashem:

      We have signed both copies of the subject subcontract and are returning one to you.
Thank you very much for your efforts in the preparation and approval of these documents.

Sincerely,

Susan H. Dugan
Sponsored Projects/Finance Mgr.
Center for Communication Programs

...jsiroman.doc

JS10000000102

# EXHIBIT C

Page 1

1                UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

2

    R. ROBERT LEDERER

3                    Plaintiff

4    vs.                              CIVIL NO:

5    JOHN SNOW, INC. AND              04-10284-NG

    THE JOHNS HOPKINS UNIVERSITY

6    CENTER FOR COMMUNICATION PROGRAM

                    Defendants

7    _____/

8

9            The deposition of KAREN ANGELICI was taken

10   on Wednesday, June 29, 2005 commencing at 1:30 p.m. at

11   the Johns Hopkins University, 3400 North Charles

12   Street, Suite 113, Baltimore, Maryland 21218, before

13   Paula J. Eliopoulos, Notary Public.

14

15

16

17

18

19

20

21   REPORTED BY:   Paula J. Eliopoulos

Karen Angelici - 6/29/05

Page 2

1  APPEARANCES:
2      DAVID B. STEIN, ESQUIRE (VIA PHONE)
           On behalf of the Plaintiff
3
4      ANDREW F. CAPLAN, ESQUIRE (VIA PHONE)
           On behalf of John Snow, Inc.
5
6      ROBERT W. HEALY, ESQUIRE
       PHILIP S. ROBERTS, ESQUIRE
7      JOHN F. ROONEY, III, ESQUIRE (VIA PHONE)
           On behalf of John Hopkins University
8
9
10 ALSO PRESENT:  Robert Lederer (via phone)
11
12
13
14
15
16
17
18
19
20
21

Page 3

1              STIPULATION
2        It is stipulated and agreed by and between
3  counsel for the respective parties that the filing of
4  this deposition with the Clerk of Court be and the
5  same is hereby waived.
6            - - - - - - -
7  Whereupon,
8            KAREN ANGELICI,
9  called as a witness, having been first duly sworn to
10 tell the truth, the whole truth, and nothing but the
11 truth, was examined and testified as follows:
12       EXAMINATION BY MR. STEIN:
13 Q.   Good afternoon, Ms. Angelici.
14 A.   Good afternoon.
15 Q.   As you know, my name is David Stein.  I
16 represent the Plaintiff in this action, Dr. Robert
17 Lederer.  And I'm going to ask you a series of
18 questions this afternoon concerning your involvement
19 with respect to Mr. Lederer and the Romania project.
20       Could you please state your full name,
21 please.

Page 4

1  A.   Karen Elaine Angelici.
2  Q.   And where do you reside, Ms. Angelici?
3  A.   In Baltimore City.  Do you want an
4  address?
5  Q.   That's okay.
6        And what is your business address, please?
7  A.   210 Guilford Avenue, second floor,
8  Baltimore, Maryland 21202.
9  Q.   And with whom are you employed,
10 Ms. Angelici?
11 A.   Johns Hopkins University.
12 Q.   And what is your position at Johns Hopkins
13 University?
14 A.   I have an appointment as a faculty
15 associate in the Department of International Health at
16 the School of Public Health.
17 Q.   And how long have you been employed by
18 Johns Hopkins?
19 A.   About eight years.
20 Q.   So approximately 1997; is that correct?
21 A.   Actually, I started in December of '96.

Page 5

1  Q.   Have you always held the same position or
2  has your position changed since you became employed at
3  Johns Hopkins?
4  A.   It's changed.
5  Q.   What was your position when you got hired?
6  A.   I was hired as a program officer at the
7  Hopkins Center for Communication Programs.
8  Q.   What did that job entail?
9  A.   I oversaw a behavior change communication
10 project in the country of Moldavia.  That's what I was
11 hired for.
12 Q.   And did that position change at some
13 point?
14 A.   Yeah.  Over the years I gradually got
15 promoted over time.
16 Q.   Okay.  Can you just kind of give me a
17 brief history of your employment there?
18 A.   Yes.  I was a program officer, I'm not
19 sure how long, about a year.  Program Officer I.  I
20 was promoted to a Program Officer II a few years
21 later.  Then I was promoted to a Senior Program

2 (Pages 2 to 5)

Karen Angelici - 6/29/05

Page 14

1  fair to say?
2      A.    Yes.
3      Q.    And that role was to, you said, hire, I
4  didn't hear exactly, you said your role was, to hire a
5  what?
6      A.    Hire a consultant to go to Romania for an
7  8 to 10 month assignment with JSI.
8      Q.    What kind of consultants were you asked to
9  hire?
10     A.    A doctor, specifically.
11     Q.    And what was your understanding as to what
12  this doctor's role would be as a consultant in
13  Romania?
14     A.    My understanding is that the doctor was
15  supposed to provide technical assistance to clinics
16  and several regions of Romania in the area of quality
17  assurance, service delivery.
18     Q.    Anything else?
19     A.    Not that I recall.
20     Q.    I'd like, Ms. Angelici, I'd like to refer
21  to an Exhibit, please.

Page 15

1      MR. ROONEY:  David, again, for the record,
2  I had asked that these documents be sent to me prior
3  to the deposition for ease of the stenographer and
4  ease of everyone referencing them and they weren't.
5      MR. STEIN:  I agree that was obviously a
6  mistake on our end.  It was supposed to be sent
7  overnight to you.
8      MR. ROONEY:  And they weren't.  So, you
9  know, you're going to have to give the deponent
10  time --
11     MR. STEIN:  Yes.  Absolutely.
12     I'm referring to the exhibit -- it was
13  already marked as Exhibit 3 to Bob Lederer's -- Robert
14  Lederer's deposition.  Do you have that, Bob?
15     MR. HEALY:  One moment.  You said Lederer
16  number 3?
17     MR. STEIN:  Yes.  Which was the scope of
18  work.  The technical advisor for clinics, that's on
19  the top of the document.
20     MR. CAPLAN:  David, this is Andy here.
21  While he's looking, are we using the usual

Page 16

1  stipulations for this case?
2      MR. STEIN:  Yes.
3      MR. CAPLAN:  You might want to tell them
4  to the reporter.
5      MR. STEIN:  Reserve all objections except
6  as to form of the question, motion to strike until the
7  time of trial.  Is that satisfactory?
8      MR. CAPLAN:  Yes.
9      MR. HEALY:  She has the document.
10     Q.    Ms. Angelici, can you take a look at that
11  document, please?
12     A.    Sure.
13     Q.    Just for the record, this has already been
14  marked as Lederer Exhibit 3.
15     MR. HEALY:  Just for ease, assuming that
16  this document and others become exhibits, do you want
17  to remark them?
18     MR. STEIN:  I don't have to.  If you guys
19  are okay just referring back to the exhibits that were
20  already marked, I don't have a problem with that.
21     MR. CAPLAN:  That's fine.

Page 17

1      MR. ROONEY:  That's fine with me.  Do you
2  have a question about this document, David?
3      MR. STEIN:  I do.
4      MR. ROONEY:  Go for it.
5      Q.    Ms. Angelici, have you ever seen this
6  document?
7      A.    Yes.
8      Q.    And what is it?
9      A.    It's the scope of work for a technical
10  advisor for clinics.
11     Q.    And prior to today, you have seen this
12  document before?
13     A.    I don't recall seeing this document,
14  but --
15     Q.    Do you know who prepared this document?
16     A.    No.
17     Q.    You're not sure if you've seen it before
18  today?
19     A.    I don't remember seeing it, but we
20  typically have a scope of work for our consultants.
21     Q.    Is this the scope of work for the

5 (Pages 14 to 17)

Karen Angelici - 6/29/05

Page 18

1  consultant that you were hired -- I mean that you were
2  asked to hire?
3      A.   It appears to be.
4      Q.   And why do you say it appears to be?
5      A.   Because I don't remember the exact scope
6  of work that was drafted for this assignment.
7      Q.   At the time that you came onboard,
8  Ms. Angelici, had there already been a doctor
9  consultant on the project?
10     A.   No.
11     Q.   Are you familiar with whether there was at
12 any time a doctor consultant on the project?
13         MR. ROONEY:  Prior to her involvement?
14         MR. STEIN:  Prior to her involvement, yes.
15     A.   I mean with certainty I can't answer that
16 question.  But typically I would know of any staff
17 coming through the department hired by us.
18     Q.   You don't recall specifically whether
19 there was a doctor consultant with respect to this
20 project prior to your involvement?
21     A.   No.  I don't think there was.

Page 19

1      Q.   At the time that Ms. Leskin turned the
2  project over to you, there was no doctor consultant;
3  is that correct?
4          MR. ROONEY:  Objection.  She said she
5  didn't know, David.
6      Q.   No, at the time.  Let me try to rephrase
7  the question.
8          At the time that Ms. Leskin turned the
9  project over to you, Ms. Angelici, was there a doctor
10 consultant onboard with respect to the project?
11     A.   Not to my knowledge.
12     Q.   When you were asked to hire this
13 consultant, what steps did you take to do so?
14     A.   I was already handed information on
15 Dr. Lederer and told that -- Laurie Leskin told me she
16 had already spoken with Mr. Lederer.  He was
17 interested in the position and I should set up an
18 interview.  And so I did so.
19     Q.   So at the time you came onboard, you were
20 already provided information with regard to
21 Dr. Lederer; is that correct?

Page 20

1      A.   Yes.
2      Q.   And did you contact him directly?
3      A.   I don't recall.
4      Q.   Do you know if anybody else would have
5  contacted him directly?
6      A.   It's possible my assistant may have
7  contacted him.
8      Q.   Is that Erica Wagner?
9      A.   Yes.
10     Q.   Who was she?  She was your assistant?
11     A.   Yes.
12     Q.   And what was her role as your assistant?
13 What did she do?
14     A.   She served as secretary and program
15 assistant.  She processed payments, contracts, handled
16 logistics.  Provided overall support for all of the
17 projects.
18     Q.   What was your understanding as to JSI's
19 role in hiring this doctor consultant for the Romanian
20 project?
21     A.   JSI would have to approve anyone who Johns

Page 21

1  Hopkins planned to hire.  Since they were the client,
2  we would require their approval.
3      Q.   Who would actually pay this doctor
4  consultant?
5          MR. ROONEY:  Objection.
6      Q.   Are you familiar with how this doctor
7  consultant would have been paid?  Who would have made
8  payments to him?
9          MR. CAPLAN:  You mean, David, at the end
10 of the day who --
11     Q.   At the end of the day.
12     A.   Yes.
13     Q.   Who was that?
14         MR. ROONEY:  Objection.
15     A.   Johns Hopkins would pay his salary.
16     Q.   Johns Hopkins would pay the salary of the
17 doctor consultant?
18     A.   Yes.
19     Q.   You stated a few moments ago that you were
20 asked to set up a meeting with Dr. Lederer; is that
21 correct?

6 (Pages 18 to 21)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Karen Angelici - 6/29/05

Page 70

1      A.    Someone did that.  I don't recall the
2  outcome of that.
3      Q.    Was there an issue with yourself or
4  anybody else at JHU concerning that request by
5  Dr. Lederer?
6          MR. ROONEY:  Was there a concern, is that
7  what you said?
8      Q.    Yes.
9      A.    What do you mean?
10     Q.    Did anybody -- did yourself or anybody
11 else at JHU consider that was not appropriate, an
12 appropriate request by Dr. Lederer?
13         MR. ROONEY:  Objection.  You can answer.
14     A.    That wasn't the issue.  The issue was
15 whether the client would pay for it.
16     Q.    Was that an unusual request, in your
17 experience?
18     A.    The dollar amount, if I recall, was
19 extremely high for the inoculations requested.  So
20 that I found unusual which is why we weren't certain
21 JSI would pay for it.

Page 71

1      Q.    How about the actual request itself for
2  the inoculations, did you consider that unusual based
3  on your experience?
4      A.    I don't know.  A little unusual, perhaps,
5  but not within, you know, the realm of reasonableness,
6  I guess.
7      Q.    Had Dr. Lederer discussed with you the
8  fact that he actually wanted to bring his dog over to
9  Romania?  Do you recall that at all?
10     A.    I vaguely recall that, yes.
11     Q.    What do you recall about that
12 conversation?
13     A.    Just that if he moved there long term he
14 wanted his dog -- he wanted us to pay for his dog to
15 be relocated as well.
16     Q.    And what was the result of that issue?
17     A.    It was a mute issue because this was a
18 short term consultancy for two weeks.  So, to my
19 recollection, it wasn't further discussed.
20     Q.    Subsequent to your discussion with
21 Dr. Lederer about the trip report, do you recall any

Page 72

1  discussions with anybody else concerning Dr. Lederer
2  subsequent to that?
3          MR. ROONEY:  That she had?
4          MR. STEIN:  Yes.
5      A.    I'm sure I had discussions with other
6  people after the trip report submission.
7      Q.    Do you recall any specific conversations?
8      A.    I recall -- yes, I recall talking with JSI
9  about whether or not we would still pay him if he
10 never submitted an acceptable trip report.  I had
11 similar discussions with my boss, Gary Saffitz.
12         I had other discussions with my boss, Gary
13 Saffitz, who said Dr. Lederer was calling the
14 president and harassing her.  You know, there were
15 various discussions about payment for Dr. Lederer and
16 the issue of the trip report being unacceptable.
17     Q.    At some point did you learn that
18 Dr. Lederer was not returning to Romania?
19     A.    I learned that I think almost before
20 Dr. Lederer even returned home from Romania.  I can't
21 recall the specifics, but I recall seeing an e-mail

Page 73

1  from the head of the JSI Romania office that said we
2  do not want him to come back.
3      Q.    Who was that, do you recall?
4      A.    Who was that?
5      Q.    Yes.
6      A.    Walter Proper.
7      Q.    At some point were you aware that Walter
8  Proper was removed from the project?
9      A.    I was made aware, yeah, eventually that
10 that had happened.
11     Q.    Do you know why that happened?
12     A.    No.
13     Q.    Had anybody discussed with you problems
14 with Walter Proper on the project?
15     A.    No.
16     Q.    You had no discussions?
17         MR. ROONEY:  Objection.
18     A.    No.
19     Q.    I'm sorry if I asked you this question.
20 Who made the decision that this was going to be a
21 shorter term consultancy?

19 (Pages 70 to 73)

Karen Angelici - 6/29/05

Page 74

1    A.    JSI ultimately made that decision.
2    Q.    Did anybody from JSI discuss that with
3  you?
4    A.    I don't recall how it was decided, but JSI
5  gave us the final go ahead to hire Dr. Lederer for the
6  two week assignment.
7         MR. STEIN:  I have nothing further.
8         MR. CAPLAN:  This is Andy Caplan up in
9  Boston.  I represent John Snow, Inc. and I have a few
10  questions.
11        EXAMINATION BY MR. CAPLAN:
12   Q.    On the Romania project, the project was
13  ultimately being performed for USAID; is that correct?
14   A.    Yes.
15   Q.    And then John Snow, Inc. was the prime
16  contractor to USAID?
17   A.    That was my understanding.
18   Q.    And, in turn, Johns Hopkins was a
19  subcontractor to John Snow?
20   A.    Yes.
21   Q.    And as you stated, Johns Hopkins needed

Page 75

1  the approval of John Snow to make various decisions,
2  including hiring consultants; is that correct?
3    A.    Yes.
4    Q.    Did John Snow ever give its approval --
5  ever give Hopkins approval to hire Dr. Lederer for
6  anything longer than a two week engagement?
7    A.    No.
8    Q.    And am I correct that it was Johns Hopkins
9  and not John Snow who was responsible to pay Dr.
10  Lederer his salary?
11        MR. ROONEY:  Objection.
12   A.    It was in our contract to pay Dr. Lederer
13  for the consultancy if he met, you know, if he
14  completed his scope of work.
15   Q.    What contract are you referring to?
16   A.    The consultancy contract dated 11-27 of
17  2000.
18   Q.    You are referring to Dr. Lederer's Exhibit
19  10?
20        MR. HEALY:  Unless we've looked at that
21  today, Andy, no.

Page 76

1    Q.    Maybe I didn't follow.  Are you referring
2  to the consultancy agreement, Dr. Lederer's
3  consultancy agreement or something different?
4    A.    No, Dr. Lederer's consultancy agreement.
5    Q.    I thought we did look at that as Lederer's
6  Exhibit 10?
7         MR. HEALY:  I thought it was Lederer
8  Exhibit 29 we looked at today.
9         MR. CAPLAN:  Maybe I have the same thing
10  with two different stickers on it.  Let me just find
11  29.
12        Fair enough.  So you were referring to
13  Lederer Exhibit 29?
14   A.    Yes.
15   Q.    And Lederer Exhibit 29 accurately reflects
16  the terms of Dr. Lederer's consultancy; is that
17  correct?
18   A.    Yes.
19   Q.    Referring you to the first sentence.  Dr.
20  Lederer was hired for a short term appointment as a
21  consultant for the Johns Hopkins University/Center for

Page 77

1  Communications Programs; correct?
2    A.    Yes.
3    Q.    And if I can refer you to the second page.
4         Do you see, if you can look at the bottom,
5  the signature line where it says accepted and agreed.
6  Are you with me?
7    A.    Yes.
8    Q.    Right above there do you see in brackets
9  the initials ELW?
10   A.    Yes.
11   Q.    Do you know whose initials those are?
12   A.    No.
13   Q.    Do you know if those are Erica Wagner's
14  initials?
15   A.    They could very well be.
16   Q.    You have worked -- you've worked with her
17  over a certain period of time?
18   A.    Yes.
19   Q.    Do you know if she has a practice of
20  putting her initials on documents that she drafted?
21   A.    I don't recall, honestly.

20 (Pages 74 to 77)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

# EXHIBIT D

SHEET 1   PAGE 1

> Volume:   II
> Pages: 1-356
> Exhibits: 39

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * *

DR. ROBERT LEDERER,

      Plaintiff

              Civil Action

VS

              No. 04-CV-10284-NG

JOHN SNOW, INC. and
THE JOHNS HOPKINS UNIVERSITY/
CENTER FOR COMMUNICATION
PROGRAMS,

      Defendants

* * * * * * * * * * * * * *

    DAY TWO of DEPOSITION of DR. ROBERT LEDERER, a
witness called on behalf of the Defendants, taken
pursuant to the Massachusetts Rules of Civil
Procedure, before Arlene Boyer, a Professional Court
Reporter and Notary Public, in and for the
Commonwealth of Massachusetts, at the offices of
Melick, Porter & Shea, LLP, 28 State Street, Boston,
Massachusetts, 02109, on Wednesday, May 11, 2005,
commencing at 9:40 a.m.

PAGE 2

2

APPEARANCES

JOHN ROONEY, ESQ.
MATTHEW GRYGORCEWICZ, ESQ.
Melick, Porter & Shea, LLP
28 State Street
Boston, Massachusetts 02109
(617) 523-6200
    Counsel for the Defendant,
    The Johns Hopkins University/
    Center for Communication Programs
ANDREW E. CAPLAN, ESQ.
MICHAEL SUGRUE, ESQ.
Perkins, Smith & Cohen
One Beacon Street, 30th floor
Boston, Massachusetts 02108-3106
(617) 854-4000
    Counsel for the Defendant,
    John Snow, Inc.
DAVID B. STEIN, ESQ.
JAMIE ROWSELL, ESQ.
Rubin, Weisman, Colasanti,
Kajko & Stein, LLP
430 Bedford Street
Lexington, Massachusetts 02420
(781) 860-9500
    Counsel for the Plaintiff
Also Present:
Kenneth J. Olivola, Director
John Snow, Incorporated

PAGE 3

3

I N D E X
WITNESS     DIRECT CROSS REDIRECT RECROSS
ROBERT LEDERER
(By Mr. Rooney)      9
(By Mr. Caplan)      109
(By Mr. Grygorcewicz)      329

PRE-MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 2 | Letter to Mr. Lederer from Johns Hopkins dated May 11, 1999 | 6 |
| 3 | Scope of Work for Technical Advisor for Clinics Document | 6 |
| 4 | E-Mail to Mr. Lederer from Ms. Liskin dated September 7, 2000 | 6 |
| 5 | Letter to Ms. Liskin from Mr. Lederer dated September 8, 2000 | 6 |
| 6 | E-Mail to Mr. Lederer from Mr. Rebbert dated October 2, 2000 | 6 |
| 7 | E-Mail to Mr. Lederer from Ms. Wagner dated October 24, 2000 | 7 |
| 8 | E-Mail to Mr. Lederer from Ms. Wagner dated November 21, 2000 | 7 |
| 9 | E-Mail to Mr. Lederer from Ms. Wagner dated November 29, 2000 | 7 |
| 10 | Fax to Mr. Lederer from Johns Hopkins dated December 1, 2000 | 7 |
| 11 | Note to Mr. Lederer from Ms. Wagner dated December 1, 2000 | 8 |

PAGE 4

4

PRE-MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 12 | Letter to Mr. Lederer from Ms. Wagner dated November 30, 2000 | 8 |
| 13 | E-Mail to Mr. Lederer from Ms. Wagner dated December 18, 2000 | 8 |
| 14 | Note to U.S.A.I.D. from Mr. Lederer dated January 2, 2001 | 8 |
| 15 | E-Mail to Mr. Lederer from Ms. Angelici dated January 10, 2001 | 8 |
| 16 | Letter to Mr. Hashem from Mr. Lederer dated January 5, 2001 | 9 |
| 17 | E-Mail to Mr. Lederer from Ms. Monaghan dated January 31, 2001 | 9 |
| 18 | E-Mail to Mr. Lederer from Ms. Monaghan dated January 30, 2001 | 9 |
| 19 | E-Mail to Mr. Lederer from Mr. Rebbert dated October 2, 2000 | 179 |
| 20 | Letter to Mr. Rebbert from Mr. Lederer dated October 3, 2000 | 182 |
| 21 | E-Mail to Mr. Lederer from Ms. Wagner dated October 3, 2000 | 182 |
| 22 | E-Mail to Mr. Lederer from Ms. Wagner dated October 24, 2000 | 191 |
| 23 | E-Mail to Mr. Lederer from Ms. Wagner dated October 24, 2000 | 194 |
| 24 | E-Mail to Mr. Proper from Mr. Lederer dated November 13, 2000 | 213 |
| 25 | Contractor Employee Biographical Data Sheet | 217 |

SHEET 5  PAGE 17

17

1  A  Not on the tapes that I listened to.
2  Q  By qualifying that, am I to then assume that you
3     believe there are tape recordings of
4     conversations, but you just haven't found them or
5     listened to them?
6  A  Yes.
7  Q  Just let me try to close the door on this issue.
8     The approximate dozen or so that you found, were
9     they located in one location?
10 A  No.
11 Q  They were located throughout your house?
12 A  No.
13 Q  Where were they located?
14 A  One set might have been in a cabinet near one
15    phone.
16 Q  Was there more than one set?
17 A  A set of maybe three tapes.
18 Q  If you listened to approximately a dozen, where
19    were the other approximate eight?
20 A  Somewhere within the distance you could throw a
21    baseball.
22 Q  Would it be fair to say that you then searched
23    within the area of the telephone for additional
24    tapes?

PAGE 18

18

1  A  I searched, giving it as much time as I could.
2  Q  And obviously, if there had been some
3     conversations on there from Johns Hopkins or John
4     Snow, you would have recalled those, correct?
5  A  During my recent search, yes.
6  Q  The first contact or the first interaction you
7     had with --
8        MR. CAPLAN:  For the record, Ken
9     Olivola is joining us as the representative of
10    John Snow, Inc.
11       MR. ROONEY:  We just started some
12    background information about documents and
13    materials from day one. Your timing is good.
14    I'm just about to get into I guess day two
15    substance.
16 Q  Your first contact with Johns Hopkins would have
17    been around 1999?
18 A  I don't recall.
19 Q  Let me show you this. I took the opportunity to
20    mark it as Exhibit Number 2. Can you take a
21    moment to read that, sir?
22 A  (Witness complies.)
23 Q  Did you have an opportunity to read it?
24 A  Yes.

PAGE 19

19

1  Q  It would appear that sometime in the spring of
2     1999 or perhaps before that, you had
3     correspondence with a Dr. Piotrow, P-i-o-t-r-o-w,
4     regarding employment opportunities at Johns
5     Hopkins; is that fair to say?
6  A  No, it isn't.
7  Q  What's unfair about that?
8  A  Well, I would frame my response that I may have
9     received this letter, but I don't see it as --I
10    don't recall making a direct inquiry.
11 Q  Is that your correct address, post office box?
12 A  That's not my address.
13 Q  That's not your address. Do you have any memory
14    of receiving that letter?
15 A  No, I don't.
16 Q  Do you have any memory of sending a note to Dr.
17    Piotrow?
18 A  At this time, no, I don't.
19 Q  Do you know who Dr. Piotrow is?
20 A  I believe that she held a position of director I
21    think for CCP.
22 Q  During this time period, May of 1999, were you
23    working?
24 A  That's going back too far. I don't recall at

PAGE 20

20

1     this time.
2  Q  Well, do you recall if you were working at all in
3     the calendar year 1999?
4  A  That, I can't recall at this time.
5  Q  What about the calendar year 2000?
6  A  In the calendar year 2000, yes, I was working for
7     JSI/CCP.
8  Q  Prior to September of 2000, were you working?
9  A  I don't recall.
10 Q  How were you first contacted with regard to this
11    particular project in Romania?
12 A  That's a good question. I believe, and this is
13    to the best of my memory, that I believe it was
14    either the HR manager, Mr. Rebbert, or Laurie
15    Liskin I believe made contact with me.
16 Q  Do you recall the substance of that contact,
17    whether it was a written communication, or was it
18    telephone?
19 A  Probably both.
20 Q  Do you recall, though, as you sit here?
21 A  Probably both.
22 Q  Let me show you this, sir, which is Exhibit
23    Number 4. It appears to be an e-mail from Laurie
24    Liskin to you dated September 7, 2000.

SHEET 6   PAGE 21 ——————————————    ————— PAGE 23 —————————————————

21

1      (Pause.)
2    Q  Have you had an opportunity to read it?
3    A  I have.
4    Q  Having had an opportunity to review this, is it
5       your memory that this was the initial contact to
6       you regarding this Romanian project?
7    A  Honestly, I don't remember if this was the
8       initial contact. That is my e-mail address.
9    Q  Have you seen any documents recently which would
10      have pre-dated September 7, 2000 from Johns
11      Hopkins?
12   A  I'm sorry, I don't recall.
13   Q  Do you recall whether or not you responded to
14      this e-mail either by way of e-mail or by way of
15      letter?
16   A  It's too far back for me to remember.
17   Q  Is there anything else you wanted to add?
18   A  Go ahead.
19   Q  In this, it indicates that they were looking for
20      someone who could spend up to eight months, or
21      failing that is available to come for several
22      long technical assistant trips. Did I read that
23      correctly?
24   A  I'm reading it with you.

23

1       speaking with Ms. Liskin?
2    A  I'm sorry. It's been too much time.
3    Q  As a result of Exhibit Number 4, you indicated
4       that you do not recall whether or not you wrote a
5       communication back; is that correct, you just
6       don't recall?
7    A  My response to you is that I don't recall whether
8       I wrote and phoned or phoned or wrote and then
9       phoned. I can't tell you what the method or --
10   Q  Let me show you what I've marked as Exhibit 5.
11      Does that appear to be a letter from you?
12   A  Yes.
13   Q  And this was after your initial conversation with
14      Ms. Liskin about this project, correct?
15   A  I would assume.
16   Q  You say, "The chance to serve on this long-term,
17      eight-month reproductive health project is
18      equally intriguing and challenging," correct?
19   A  Correct.
20   Q  Then you mention further on that you "shall
21      prepare for this assignment." Do you see where I
22      read that?
23   A  Yes.
24   Q  What assignment were you preparing for?

————— PAGE 22 —————————————————    ————— PAGE 24 —————————————————

22

1    Q  Did you have a telephone conversation with Ms.
2       Liskin about either that eight-month period of
3       time or the several long technical assistant
4       trips?
5    A  I don't recall speaking to her about several long
6       assistant trips.
7    Q  Do you recall speaking to her about the eight-
8       month commitment?
9    A  I remember speaking to her about her need to fill
10      a position that would be for the duration of the
11      project in Romania.
12   Q  This was an initial discussion or one of the
13      first?
14   A  This was a discussion that I had with Ms. Liskin.
15   Q  And you'd agree with me, sir, that no agreement
16      or contract came out as a result of this
17      discussion?
18   A  Out of my initial conversation with Ms. Liskin,
19      no contract was made.
20   Q  At some point, did you have conversations or
21      communications further with Johns Hopkins or John
22      Snow with regard to this project?
23   A  Yes.
24   Q  Do you recall the next step in the process after

24

1    A  The long-term Romanian Women's Reproductive
2       Health Initiative.
3    Q  But at this point in time, you'd agree with me no
4       details were known by you and no agreement had
5       been fashioned?
6    A  There might have been a lot of conversation
7       between us that would have encouraged me to make
8       preparations.
9    Q  What specifically was said by Ms. Liskin that
10      would have encouraged you to commit yourself for
11      an eight-month project?
12   A  Again, my memory doesn't serve to repeat that at
13      this time to you.
14   Q  You just don't remember?
15   A  I may have notes on that conversation.
16   Q  Where would those notes be?
17   A  I don't know at this time.
18   Q  Have you searched for those notes?
19   A  I've searched for a lot of notes, and may I
20      inject that the area that I live in has been
21      struck by the nation's worst natural disaster.
22   Q  I understand that, but my question was --
23   A  My records are in disarray or been totally
24      destroyed.

105

1    concepts.  I was disillusioned with some of the
2    disorganization and some of the individuals who
3    had positions of importance with the project.
4  Q   Would you agree with me that it was your feeling
5    or your position that unless changes were made,
6    you were not going to continue on with the
7    project?
8  A   No, that's incorrect.
9  Q   So when you said "thereby attract me once again,"
10   what did you mean by that?
11 A   I'll try it again.
12 Q   Yes, please do.
13 A   That big disillusion with what I had seen over
14   there, I was waiting for the gentleman here, Mr.
15   Olivola, to make the necessary changes that he
16   was already contemplating and to therefore
17   attract me to a new and improved project, which I
18   was guaranteed to be a part of.  It's just that
19   he and others, I assume, would have to shuffle
20   the deck.
21 Q   So you were looking to be attracted to a new
22   project?
23 A   Not a new project.  It was going to be -- make
24   this akin to a baseball game.  If your left

106

1    fielder falls down and gets up with a limp and
2    now you realize you've got to replace that person
3    or you possibly could lose a ball going out
4    there.  And essentially, this man was informed,
5    Mr. Olivola, they have had that information prior
6    to my flight up here, but that things were
7    definitely unglued over there, to put it
8    lightly.
9  Q   What conversations did you have with Hopkins as
10   opposed to Snow relating to changes that you
11   thought needed to be made?
12 A   I worked communally with both of them.  I had
13   more access to -- well, not upon my return, but I
14   had more access to the individuals in Romania as
15   I spoke to them about problems.  But once I got
16   back here, all they were interested in was a
17   nice, clean response with smoked glass.
18 Q   If I could summarize your position, and I'd ask
19   you whether or not you would agree with this or
20   disagree, that the exhibit which constitutes --
21   would you agree that your position is that
22   Exhibit Number 10 is a written agreement between
23   you and -- what does it say --
24 A   CCP.

107

1  Q   Yes.
2  A   I would say that this is an interim --
3  Q   No.  Go ahead.
4  A   I would say that this was an interim to provide
5    them something for the files, as I was told,
6    while awaiting the entire contract to get drawn
7    up.  And this was told to me by Wagner and
8    Angelici and everything, but the time -- now all
9    of a sudden after all of this background time, it
10   was essential, because I should have been there
11   much earlier to get on that plane.
12 Q   But I guess my question is you would agree that
13   this is an agreement that you signed?
14 A   An interim agreement.
15 Q   An interim agreement you signed.  And you would
16   agree with me that when you read it and signed
17   it, you understood what it was saying?
18 A   I will state that I disagreed with what it
19   said.
20 Q   But you understood what it said, correct?
21 A   I can read.
22 Q   Would it also be your position that the terms and
23   conditions that are in Exhibit Number 10 are
24   different than or do not include terms and

108

1    conditions that you talked about before this
2    date?
3  A   Well, as you brought to my attention when I
4    didn't see something on Page 2, that obviously
5    some of the terms are accurate, but it was
6    clarified to me that when they put that first
7    sentence in there, nobody took responsibility
8    for that.  They may have even placed it in the
9    hands of legal.  But the fact is this was only
10   really to be an insertion for the pre-vacation
11   time.
12 Q   Would you agree with me that Exhibit Number 10
13   does not incorporate what you say are additional
14   terms and conditions that you had discussions
15   with prior to signing this?
16 A   Yes.
17       MR. ROONEY:  That's all the questions I
18   have, sir.  Thank you very much.
19       THE WITNESS:  Thank you.
20       MR. CAPLAN:  If we can just take five
21   so I can get organized here.
22
23       (Whereupon, a brief recess was taken,
24   and John Rooney left the deposition.)

SHEET 29 PAGE 113

113

1    A   With Abdul Hashem?
2    Q   Yes.
3    A   Did I have any conversations. I don't believe
4        so. Not that I recall.
5    Q   Prior to the meeting in Baltimore, did you have
6        any conversations with anyone on behalf of JSI?
7        Strike that.
8            Prior to the Baltimore meeting, did you
9        have any conversations with anyone at JSI?
10           MR. CAPLAN: For the record, my
11       colleague, Michael Sugrue, S-u-g-r-u-e, is going
12       to be joining us for the afternoon.
13   A   Not that I recall.
14   Q   Prior to the Baltimore meeting, did you have any
15       communications with anyone at JSI?
16   A   Not that I recall.
17   Q   So as best as you can recall, when you spoke with
18       Abul Hashem in person in Baltimore, that was your
19       first communication with anyone at JSI?
20   A   I believe so.
21   Q   At the Baltimore meeting, the folks you met with
22       gave you some information about certain issues
23       that were occurring on the ground over in
24       Romania, correct?

PAGE 114

114

1    A   Yes.
2    Q   And if my notes are accurate, they made you aware
3        that the person who's replacement -- strike that.
4        They were interviewing you as the possible
5        replacement for a certain person at the Romanian
6        project, correct?
7    A   I don't know if the person was still there.
8    Q   But you understood that you were being
9        interviewing to possibly replace someone that had
10       been at the Romanian project?
11   A   Yes.
12   Q   Did you know who that person was either by name
13       or title?
14   A   They told me the name, but I -- at some point, I
15       recalled it, and then I forgot it.
16   Q   Did you know the title or the position of the
17       person you were replacing?
18   A   I thought she was a doctor.
19   Q   Did you understand that you were replacing the
20       chief of party?
21   A   No.
22           MR. STEIN: Sorry, what was that?
23           THE WITNESS: The party.
24           MR. CAPLAN: Chief of party.

PAGE 115

115

1    Q   You understand Walter Proper was the chief of
2        party at the Romanian project?
3    A   When I went there.
4    Q   Right. So you didn't think you were being
5        interviewed to possibly replace him, did you?
6    A   No.
7    Q   It was someone else?
8    A   Yes, that was my understanding.
9    Q   And you understood from the conversation at the
10       Baltimore meeting that the person you were being
11       interviewed potentially to replace had fallen
12       into some conflict with Susan Monaghan, who was
13       the health mission contract officer for the U.S.
14       mission in Bucharest, correct?
15   A   To the best of my memory here, there was a
16       conflict ongoing between what she interpreted to
17       be and what she helped to devise to be the scope
18       of work and the ensemble there from JSI/CCP. And
19       apparently, there was this individual whose name
20       I wish someone would throw on the record. This
21       individual apparently either -- there was
22       friction somewhere along the line, and I thought
23       that that friction was between that person and
24       Susan, and that's my recollection.

PAGE 116

116

1    Q   Susan worked for U.S.A.I.D.; is that correct?
2    A   Yes.
3    Q   And you understood that this whole project was
4        under the auspices of U.S.A.I.D., correct?
5    A   Yes.
6    Q   You understood that JSI was the prime contractor
7        for U.S.A.I.D.?
8    A   To my knowledge.
9    Q   And you understood that Johns Hopkins was a
10       subcontractor to John Snow on this project?
11   A   This is interesting. I could never get it
12       straight out of Ms. Angelici where the
13       responsibility came between who was the prime,
14       whether Hopkins had it or whether JSI had it, and
15       she had to go back and forth to determine who
16       really had the authority to write the contract.
17       But then it became evident that the contract was
18       going to come out of Hopkins.
19   Q   Let me see if I'm following you. When you say
20       "the contract," do you mean that your contract
21       for this assignment was to be between you and
22       Johns Hopkins?
23   A   With an association with JSI, but the prime --
24       you used the -- I believe you used the word

Lederer v. Snow and Johns Hopkins          R. Lederer, Vol. II, 5/11/05

SHEET 30  PAGE 117

117

1  prime.  And the prime was something that I guess
2  was still being thrown about between these
3  individuals with whom I made conference.
4  Q  At some point before you left for Romania, did
5  you gain clarity on that issue?
6  A  Actually, thinking back on that time, I think
7  that they were tossing up as to who had the
8  financial responsibilities for payment, where it
9  was going to come, who was going to send the
10  checks, where it was going to be directed from.
11  They were very confused, and I tried to un-
12  confuse the situation.
13  Q  Did you succeed?  At some point before you left
14  for Romania, did you understand that John Snow
15  was the prime contractor on this project?
16  A  At some point, I understood that Snow was the
17  contractor.
18  Q  And you understood that before you went to
19  Romania, correct?
20  A  I can't answer that now.
21  Q  At some point, you came to understand that
22  Hopkins was a subcontractor to Snow, correct?
23  A  I believe I have.  Again, I've never seen the
24  actual -- the hierarchy and how it's been divided

PAGE 118

118

1  by U.S.A.I.D.
2  Q  Your best understanding in this matter is that
3  John Snow was the prime contractor to U.S.A.I.D.,
4  and Johns Hopkins was a subcontractor to John
5  Snow, correct?
6  A  That really wasn't my primary interest, and I
7  never really saw it formalized.
8  Q  That's not my question.  I'm not asking what your
9  top interest, your bottom interest, your medium
10  interest is.  I'm just asking you what you
11  understood.  My question is did you understand
12  that on the cast of characters here, John Snow
13  was the prime contractor, and Johns Hopkins was
14  their subcontractor?
15  A  It wasn't clear to me.
16  Q  So you didn't understand that?
17  A  You might say.
18  Q  But you understood that wherever those two stood
19  in the hierarchy, ultimately they worked for
20  U.S.A.I.D.?
21  A  Yes.  U.S.A.I.D. is the funding.
22  Q  You had prior experience yourself working as a
23  subcontractor to other contractors for
24  U.S.A.I.D., correct?

PAGE 119

119

1  A  Yes.
2  Q  And that's something that you disclosed to Johns
3  Hopkins and perhaps John Snow during the
4  interview process, correct?
5  A  Yes.
6  Q  What was the extent of your prior experience
7  working as a subcontractor to contractors on
8  U.S.A.I.D. projects?
9  A  What was the extent?  Subcontractor.
10  Q  One gig, a thousand gigs?  Just give me a best
11  sense of the extent of your experience as a
12  subcontractor to U.S.A.I.D. contractors.
13  A  Two or three.
14  Q  Did you understand from that experience that
15  prime contractors on U.S.A.I.D. projects needed
16  U.S.A.I.D.'s blessing in order to hire a
17  subcontractor?
18  A  Yes.
19  Q  Did you understand in this matter that the prime
20  contractor needed U.S.A.I.D.'s blessing in order
21  to hire the subcontractor position for which you
22  were being interviewed?
23  A  Yes.  Apparently, this is the route taken here.
24  Q  And you understood that when you were

PAGE 120

120

1  interviewing, correct, based on your prior
2  experience?
3  A  No, based on the information I was given.
4  Q  So you were told when you were interviewing for
5  this position that before you could be hired,
6  U.S.A.I.D. needed to give its blessing?
7  A  Yes.
8  Q  Who told you that?
9  A  Angelici and Abdul.  Those are the two main
10  players, yeah.
11  Q  Was that discussed at the Baltimore meeting?
12  A  Yes.
13  Q  Did you already know that before the Baltimore
14  meeting?
15  A  It was made clearer.
16  Q  So that was clear to you?
17  A  Yes.
18  Q  Were you ever told that U.S.A.I.D. had given
19  their blessing to hire you for a long-term
20  consulting agreement?
21  A  Yes.
22  Q  When were you told that and by whom?
23  A  It may have been Wagner, it may have been
24  Angelici, somebody from the office.  They

Lederer v. Snow and Johns Hopkins            R. Lederer, Vol. II, 5/11/05

121

1    congratulated me.  They said -- the term was
2    concurrence.  And they were waiting, and they
3    were waiting, and they needed me out of there,
4    and they finally received concurrence, and I was
5    approved for the entire length of the project.
6  Q  That waiting was waiting and waiting after the
7    Baltimore meeting, correct?
8  A  Right.
9  Q  And they were waiting for the U.S.A.I.D. blessing
10    coming up to the potential departure date into
11    late November, correct?
12  A  That was part of it, part of the wait.
13  Q  I understand there's other things you want to
14    say.  If we could focus on my question, we can
15    get out quicker.  I'm just trying to pinpoint the
16    time frame.  When you say waiting, waiting,
17    waiting, the waiting took us all the way into
18    late November, correct?
19  A  Yes.
20  Q  Do you have any specific memory of a conversation
21    where you were told that U.S.A.I.D. concurrence
22    for your hire had been received or obtained?
23  A  Yes.  There were telephone message and telephone
24    conversations.

122

1  Q  As best as you can --
2  A  In fact, it was in an e-mail, too, I believe.
3  Q  As best as you can recall, what were you told
4    verbally was the concurrence?  What were you told
5    about that?
6  A  That I was approved for the entire project.
7  Q  And you recall receiving an e-mail to that same
8    effect?
9  A  That concurrence had been approved.
10  Q  Did you receive an e-mail saying that concurrence
11    was received for the entire project?
12  A  I don't recall.
13  Q  Sir, have you ever seen a single piece of paper
14    from anyone other than yourself stating that you
15    were hired for anything other than two weeks?
16  A  I don't recall.
17  Q  And that would be important to you?
18
19       (Whereupon, Jamie Rowsell arrived at
20    the deposition.)
21
22  A  To answer your question, yes.
23  Q  So it would be important to you to try to find a
24    piece of paper coming out of either Snow or

123

1    Hopkins that corroborated your position that it
2    was an eight-month engagement, correct?
3  A  Well, there are documents that I've submitted to
4    my attorney that talks about my long-term
5    assignment and about the -- and about my --
6    their agreement to have me serve for the entire
7    project --
8  Q  Really?
9  A  -- for eight or nine months.  Yes.
10  Q  You say you have documents that show an agreement
11    to hire you for eight months?
12  A  It wasn't an agreement.  There are words to the
13    effect.
14  Q  So you say you have documents in this case --
15  A  When I say documents --
16  Q  Let me finish my question, sir, please.  You have
17    documents where in substance, either Snow or
18    Hopkins tells you that there's a commitment or an
19    agreement to hire you for eight months?
20  A  Not in those words.  I don't believe in those
21    words.
22  Q  What were the words, then?
23  A  I don't have the documents in front of me.
24  Q  Clearly, there's documents that discuss the

124

1    possibility of a long-term assignment, correct?
2  A  Yes.
3  Q  There's no dispute in this case it was discussed.
4    But I'm asking you as we sit here today, do you
5    remember ever seeing a document that expressed
6    either an agreement or a commitment for anything
7    other than a two-week engagement?
8  A  I don't recall an agreement.
9  Q  A commitment?
10  A  A commitment, agreement.
11  Q  Do you recall any writing from Snow or Hopkins
12    about a long-term engagement that discussed it as
13    anything beyond a possibility or an option?
14  A  Well, the word option wasn't used, and the intent
15    in the letter, as I read it, and my discussions
16    preceding the letter being sent all indicated
17    that if I were to be accepted by U.S.A.I.D. and
18    concurrence was to be reached, and I was to pass
19    all the hurdles, that length of time which is
20    mentioned in prior correspondence and notes would
21    apply to me.
22  Q  It's your sworn testimony that they told you that
23    verbally?
24  A  In letter or verbally.

Lederer v. Snow and Johns Hopkins                R. Lederer, Vol. II, 5/11/05

133

1   ever ask for compensation greater than $470 an
2   hour (sic.)?
3   A  From these people?
4   Q  From them, or saw it fit to ask other people.
5   A  Well, sure, other people, but no, not from them.
6      That was the agreed-upon amount.
7   Q  So it's your testimony today that you never
8      approached John Snow or Johns Hopkins asking for
9      greater than $470 an hour (sic.) compensation
10     after the Baltimore meeting, correct?
11  A  Right.
12  Q  Did you ask for compensation greater than $470 an
13     hour (sic.) prior to or at the time of the
14     Baltimore meeting?
15  A  I believe that I -- I believe I sketched out a
16     figure of more, but that wasn't the amount agreed
17     upon verbally, if that's what you're getting at.
18     I think on a form somewhere I sent in an upper
19     range of what I would like, but I don't believe
20     that that was what we -- I know it wasn't what we
21     agreed upon in Baltimore.
22  Q  So you do recall at some point in time you sent
23     in a form. Did you send it in to Johns Hopkins
24     or Snow?

134

1   A  Don't recall. I think it was probably Hopkins,
2      but I don't recall.
3   Q  Is it fair to say that Hopkins was your primary
4      contact in negotiating this contract?
5   A  Yes and no.
6   Q  What's the yes part, and what's the no part?
7   A  Yes, insofar as they did a lot of the clerical;
8      and no, insofar as they seemed to yield to all
9      the authority that came out of, what is it,
10     Farnsworth Street here in Boston.
11  Q  At any point in time, did the folks at Johns
12     Hopkins tell you that they needed to obtain
13     approval from John Snow in order to bring you on
14     board?
15  A  That's why he was there. That's why Abdul was at
16     the meeting.
17  Q  They told you that's why he was at the meeting?
18  A  Absolutely. They said you need to meet with
19     Abdul, and if Abdul likes you and he likes what
20     he has, he's known about some of, you know, the
21     paperwork and so forth we've given, they've done
22     a great -- you know, taken a lot of time to do
23     whatever, you know, informative things that they
24     need to come up with, and now all you have to do

135

1   -- and this is what I was told on the phone -- is
2   he has to accept you.
3   Q  So Johns Hopkins representatives told you that
4      they needed approval from John Snow before you
5      could be brought on board?
6   A  Both had to agree. That's what I was told.
7   Q  Who from Hopkins told you that?
8   A  To the best of my knowledge, going back some
9      time, I believe it was Angelici.
10  Q  In the prior two or three times that you'd had an
11     engagement as a subcontractor to a U.S.A.I.D.
12     contractor, had you signed written contracts?
13  A  Yes.
14  Q  Did you understand based on your prior experience
15     that that was a requirement, that agreements to
16     hire subcontractors to work for U.S.A.I.D.
17     contractors had to be reduced to a written
18     agreement?
19  A  That was my understanding.
20  Q  And you understood in this case that your
21     agreement to receive whatever assignment you were
22     to receive would have to be reduced to a written
23     contract?
24  A  That's my understanding.

136

1   Q  And you understood that at least in part from
2      prior experience, correct?
3   A  Yes.
4   Q  Is that also something that the folks either from
5      Hopkins or Snow mentioned to you, hey, when we're
6      done with these negotiations, you're going to
7      have to sign a written contract?
8   A  I brought it up.
9   Q  What did they say?
10  A  And they concurred.
11  Q  In Baltimore?
12  A  In Baltimore.
13  Q  What did you say, and what did they say about the
14     contract?
15  A  Well, I said, you know, there are a lot of things
16     here we haven't discussed, let me bring up some
17     topics, and I brought them up. And I brought
18     them up there, and I brought them up back at the
19     office. And, you know, they'd have to check into
20     a few of them, and they'd get back to me after I
21     returned back to Florida. But I had a laundry
22     list, and I wanted to see that they were met, and
23     I said now we need to put it all down in
24     contract, and they were having problems with

Lederer v. Snow and Johns Hopkins          R. Lederer, Vol. II, 5/11/05

137

1    communications between one another, between the
2    offices within CCP and JSI. They couldn't seem
3    to get themselves organized.
4           And I think even Ms. Wagner makes a
5    point in an e-mail, which I believe I gave my
6    attorney, in an e-mail sent to me in which she
7    kind of let a cat out a little bit by saying
8    they're having a bit of organizational problems.
9    Q   So you told the reps from Hopkins and Snow that
10   you wanted the negotiated terms to be reduced to
11   a written contract, correct?
12   A   That I expected a contract on all this, yes.
13   Q   And they told you that it would be reduced to a
14   contract, correct?
15   A   That it would be forthcoming, yes, and they were
16   going to get it all together and get my
17   reimbursements out and so forth.
18   Q   Who were the folks on the other side of that
19   conversation that there would be a written
20   agreement for this arrangement?
21   A   JSI and CCP; namely, Angelici and Abdul and Mr.
22   Rebbert. He was part of the -- he was part of
23   conversations that also came later.
24   Q   It was important to you to have these

138

1    negotiations reduced to writing, correct?
2    A   Yes.
3    Q   There was a lot of requirements you were seeking
4    for this arrangement, correct?
5    A   Yes.
6    Q   And you wanted it to be reduced to a written
7    contract so you could be sure of what the terms
8    were, correct?
9    A   Yes, and that they were carried out.
10   Q   You understood that the contract would govern the
11   terms and conditions of your assignment, correct?
12   A   Hopefully.
13   Q   That was your expectation, correct?
14   A   Yes.
15   Q   I'm not sure there was an answer to this earlier.
16   If there was, I apologize. When you received the
17   November 27 letter agreement, what we're calling
18   the contract here, the two-week consultant
19   contract -- I believe it's Exhibit 10 -- at any
20   point before you signed it, did you write to
21   anyone to take any issues with the contents of
22   that agreement? I understand we've been on oral
23   agreements, but did you write to anyone raising
24   any issues about what appeared in that document?

139

1           MR. STEIN:  I think that was asked and
2    answered. John has asked him whether he made any
3    writings after that.
4    Q   Did you, sir?
5    A   There wasn't time.
6    Q   So the answer is no writings?
7    A   I don't recall writing.
8    Q   Did you write to anyone after you signed the
9    agreement to take issue with anything that
10   appeared in the agreement or didn't appear in the
11   agreement?
12   A   Anytime after, you mean from then to now?
13   Q   Well, why don't we narrow it down. Fair comment.
14   At any point before you came back from Romania,
15   did you send a letter, a fax, an e-mail, a
16   scroll, anything --
17   A   Andrew, have you been to Romania? Have you been
18   to Romania?
19   Q   Sir, if we could just move it along. I
20   understand some of my questions may be humorous
21   to you, but I'm trying to get you in and out
22   today. Did you send any writings to anyone
23   raising any issues about what was or wasn't in
24   the letter agreement at any point in time before

140

1    you returned from Romania, and I'm including the
2    time when you had it before Romania?
3    A   I had precious little time prior to leaving, and
4    while I was in Romania, I did all I could just to
5    stay up to the heavy schedule that they put
6    forth.
7    Q   So the answer to my question is no writings,
8    correct?
9    A   Not that I recall, no.
10   Q   What's the first time that you remember writing
11   to anyone taking issue with anything that did
12   appear or didn't appear in the letter agreement
13   you signed?
14   A   I just don't recall.
15          MR. STEIN:  Go off the record for a
16   minute.
17          MR. CAPLAN:  Sure.
18
19          (Whereupon, the luncheon recess was
20   taken, Mr. Stein left the deposition, replaced by
21   Ms. Rowsell.)
22
23
24

SHEET 36  PAGE 141

PAGE 141
141

1       A F T E R N O O N  S E S S I O N
2
3       BY MR. CAPLAN:
4    Q  I want to clarify one point we went over. Based
5       on your discussions with Snow and Hopkins about
6       your assignment, did you understand that your
7       agreement would be with Johns Hopkins?
8    A  To the best of my recollection, my agreement
9       would be a combined arrangement.
10   Q  In regard to the salary piece, if you will, in
11      your arrangement, so putting aside expenses and
12      focusing on the salary, the hourly rate, did you
13      understand that at least that portion of your
14      agreement was between you and Johns Hopkins?
15   A  No.  Again, it was a tandem arrangement.
16   Q  As we sit here today, do you have a specific
17      memory of anyone at John Snow telling you that
18      your arrangement was between yourself, Hopkins,
19      and John Snow?
20   A  Yes.  Abdul Hashem made it very clear to me that
21      he was totally involved in the decision-making
22      and in the financial arrangements and in securing
23      the U.S.A.I.D. concurrence and in many phases of
24      my engagement.

PAGE 142
142

1    Q  Do you have a specific memory of Abul Hashem ever
2       telling you that John Snow was a party to the
3       agreement with you in regard to your hourly
4       compensation?
5    A  Yes.
6    Q  What did he say specifically on that point?
7    A  Specifically on that point, after I broadcast to
8       him what I would agree to, he said that he would
9       directly -- he would directly address that issue
10      and get concurrence.
11   Q  Did he say anything further to you on the issue
12      of whether or not John Snow was a party to the
13      agreement in regard to your hourly compensation?
14   A  Yes, essentially what I referred to before and
15      the implications.
16   Q  Putting aside implications, other than what
17      you've testified to so far, did Abul Hashem
18      specifically say anything else to you for the
19      proposition that John Snow was a party to your
20      agreement in regard to your hourly compensation?
21   A  Yes.  Essentially, he was going to work it out
22      with CCP to determine how the succession of
23      payments were going to come about, but the amount
24      was going to be agreed upon because he was

PAGE 143
143

1       certain he could get it through.  He gave me an
2       upper region, and he said this is about it, and
3       it really wasn't very hard.
4    Q  I think what you're telling me is Abul Hashem was
5       involved in the negotiations about the amount of
6       your hourly rate, correct?
7    A  And in the actual carrying out of the process of
8       securing the concurrence from whoever handles the
9       fiscal arrangements.
10   Q  Abul Hashem was involved in negotiating your rate
11      and in pursuing U.S.A.I.D. concurrence for your
12      rate, correct?
13   A  By his comments to me.
14   Q  Separate from that, did Abul Hashem ever say to
15      you that John Snow was the party that would be
16      paying you your compensation?  Strike that.  Let
17      me ask a different question.
18          Did you have an understanding of who
19      would be paying you your hourly compensation,
20      Hopkins or Snow?
21   A  I was told by both parties and also Erika Wagner,
22      and I often wondered where she entered into the
23      picture, who would be paying me, and they kind of
24      had a -- they kind of had some sort of concerns

PAGE 144
144

1       also, because I could hear them chatting between
2       themselves.  So it was a question of who was
3       going to write the check, and you know, that
4       wasn't clear.  It wasn't clear to them.
5    Q  Were you ever told who would be paying you your
6       compensation hourly, putting aside the expense
7       piece?
8    A  Hourly.  I would be paid per diem.
9    Q  Fair enough.  Were you ever told who would be
10      paying you per diem, putting aside the expense
11      piece?
12   A  Not until I got back, and they were just going to
13      cut me a check for just that short amount of time
14      that I served.
15   Q  So it's your testimony that that was the first
16      time you were ever told who would be paying you
17      your per diem, was when you returned from
18      Romania?
19   A  Right, because they still hadn't agreed on how
20      these checks were going to be cut.  I did
21      testify, though, that they were supposed to be
22      wired to an account.
23          MR. GRYGORCEWICZ:  I have some here,
24      too.  These weren't entered.  They were marked,

Lederer v. Snow and Johns Hopkins          R. Lederer, Vol. II, 5/11/05

SHEET 38  PAGE 149

149

1   didn't stipulate to or agree to.
2   Q  Let me just parse it out for a second.  Your
3      testimony is you didn't stipulate to it being a
4      short-term appointment, correct?
5   A  Correct.
6   Q  But you did agree that you were a consultant,
7      correct?
8   A  Correct.
9   Q  This says that you were a consultant for Johns
10     Hopkins University/Center for Communication
11     Programs.  Is that consistent with your
12     agreement?
13  A  No.
14  Q  Why not?
15  A  Because it doesn't mention John Snow.
16  Q  Put aside my first series of questions for a
17     second.  When you read this agreement, you
18     understood it, correct?  You understood it but
19     disagreed with the substance?
20  A  Exactly.
21  Q  Is there anything in this --
22  A  With the substance and the omissions.
23  Q  Fair enough.  But by the same token, you
24     understood what the words on the page meant,

PAGE 150

150

1      correct?
2   A  Yes.
3   Q  Second paragraph, accurate or not accurate
4      depiction of your agreement?
5   A  May I state something?
6   Q  No.  Please answer my question.
7   A  All right.  I understood what the words meant,
8      but I didn't understand when I saw the term
9      short-term appointment; how could they spell that
10     out when I was only going over for a first part?
11     That was to be, again, renewed, or I should say
12     that I was taking only a break from that --
13  Q  So again, you understood the words on the page,
14     but you had some confusion about why they chose
15     to put those particular words on the page?
16  A  Yes, absolutely.
17  Q  Can you answer my question now, please, sir?
18  A  I'm sorry, go ahead.
19  Q  Second paragraph, accurate or not accurate
20     statement of your agreement?
21  A  I understand what it says.  I do know that to the
22     letter I believe that that six-day week didn't
23     apply.  I think that I was utilized just about
24     every day, and whether I stayed there for 14

PAGE 151

151

1      days, working days, 14 working days or more, the
2      record would --
3   Q  But that's not my question.  My question isn't
4      whether it worked out this way.  My question is
5      whether this accurately depicts what your
6      agreement was.
7   A  Actually, no.  I was to work every day.
8   Q  Who said that to you?
9   A  They did, Angelici and Hashem.  For this first
10     period, I was to be there working every day,
11     either traveling and working or working.  That's
12     essentially the same.
13  Q  But it's your position this was an eight-month
14     engagement, right?
15  A  Exactly, but initially, for the first
16     introduction --
17  Q  Sir, if you could just answer my question.  I
18     just asked you if it was an eight-month
19     engagement, and the answer is yes.
20  A  It was for the duration of October, I believe,
21     whatever the contract term -- whenever the
22     contract that JSI/CCP had.
23  Q  Was the agreement that it would be six days a
24     week for the eight months, except for perhaps the

PAGE 152

152

1      first couple of weeks where you're claiming it
2      was full-time, seven days?
3   A  Yes, seven days.  It was going to be between six
4      and seven, that was our agreement, on a per diem
5      payment basis, no vacations other than --
6   Q  Did you have any issues with the third paragraph?
7   A  Issues, you mean by reading it and understanding
8      what it meant?
9   Q  Yes.  Did you have any disagreement that this was
10     an accurate statement --
11  A  Well, I just thought it was a lot of work to take
12     care of in such a short time, and they agreed.
13     The scope of work was almost unrealistic.
14  Q  Did you take any issue with the fourth paragraph,
15     that your assignment was to assist JHU and John
16     Snow with the Women's Reproductive Health
17     Institute in Romania?
18  A  Initiative.
19  Q  Initiative, thank you, sir.
20  A  That was it.
21  Q  Was part of your agreement that you would do a
22     needs assessment of the current service delivery
23     and management systems at family planning clinics
24     in three judets?  Is that sentence consistent

SHEET 42  PAGE 165

165

1   you were required to fill out paperwork to submit
2   requests for payment?
3   A  In the same way they were required to submit
4   forms to me, yes.
5   Q  So whether or not it was this exact form, you
6   knew when you got back it wasn't just going to be
7   a verbal hey, I'm back, give me some dough. You
8   knew you --
9   A  Mr. Caplan, I may have submitted that form before
10  I left.
11  Q  That's not my question, sir. The next paragraph,
12  do you agree that that reflects part of your
13  agreement? Well, you know what, there's a lot of
14  things in there. Why don't we take it one at a
15  time. The first part when it says, "For citizens
16  or residents of the U.S., please note that all
17  payments of fees and expenses made to you will be
18  reported as income for U.S. income tax purposes."
19  Do you agree that that was a term of your
20  agreement?
21  A  Yes.
22  Q  Next it says, "It's imperative that you maintain
23  accurate records of your business expenses so
24  that you can take the proper deductions when

PAGE 166

166

1   filing your tax returns." Was that part of your
2   agreement?
3   A  Yes.
4   Q  Next sentence, "Original receipts and copies of
5   expense reports submitted to JSI for
6   reimbursement should be maintained for your
7   records for tax purposes." Was that part of the
8   agreement?
9   A  Yes.
10  Q  Next sentence, "All travel and related expenses
11  will be handled by JSI." Is that accurately part
12  of your agreement?
13  A  Yes.
14  Q  Next sentence, "Copies of receipts are needed for
15  lodgings as well as for all expenses over $25."
16  Do you agree that that was part of your
17  agreement?
18  A  Yes.
19  Q  Next sentence, "Please read carefully the
20  guidelines on allowable coverage and be sure to
21  use the JSI travel expense report for non-
22  employees in reporting your expenses." Was that
23  part of your agreement?
24  A  I'm reading it, yes, and it was part.

PAGE 167

167

1   Q  The next paragraph asks you to -- I'm
2   paraphrasing, but asks you to sign one copy of
3   the agreement, keep it for yourself, and send
4   another one back. My question is when you signed
5   this agreement on or about December 1, did you
6   send it to anyone?
7   A  Did I send what?
8   Q  The signed agreement 10. When you signed it on
9   or about December 10 (sic.), did you send it to
10  anyone at Hopkins or Snow?
11  A  I'm sorry, did I sent what?
12  Q  Exhibit 10, those two pages.
13  A  These two pages.
14  Q  Let's take it one step at a time. You signed
15  that on or about December 1, correct?
16  A  Yes.
17  Q  The letter asked you to return it to Johns
18  Hopkins for its records. My question is did you
19  send it back to them?
20  A  I believe I did.
21  Q  On or about December 1?
22  A  Yes.
23  Q  To whom?
24  A  Probably to Wagner.

PAGE 168

168

1   Q  But you're not sure exactly who you sent it to?
2   A  At this particular date, sitting at this desk,
3   no.
4   Q  Do you happen to remember by what means you sent
5   it in?
6   A  May have faxed it.
7   Q  I'm not asking what might have happened. A lot
8   of things could happen. Do you have any memory
9   of how you sent it in?
10  A  I can't tell you for sure, but I would put money
11  -- if I were to guess, I probably would have
12  faxed it, seeing that I was flying out shortly,
13  and they were putting pressure on me.
14  Q  Your best memory is you signed this and faxed it
15  back?
16  A  That's an important facet here, and they were
17  putting severe pressure to influence my
18  agreement.
19  Q  Rest assured we'll get to that.
20  A  All right.
21  Q  My question is your best memory is you signed
22  Exhibit 10 on or about December 1 and sent it
23  back to Hopkins by fax on or about that date,
24  correct?

SHEET 43  PAGE 169

169

1    A   I would imagine.
2    Q   I'm going to ask you this next question with some
3        trepidation. If possible, I'm looking for the
4        short version, but if you need to give the long
5        version, the floor is yours. As succinctly as
6        you can, can you just give me a list of the terms
7        that had been agreed upon for your assignment
8        that aren't in Exhibit 10? I know you've gone
9        through and told me as to what's on the page what
10       you agreed with and what you didn't. What were
11       the terms that you say were agreed to that aren't
12       in here?
13   A   You know, I made a very short laundry list, but I
14       was told that I can't refer to any notes.
15   Q   That's the exercise. I'm asking you as you sit
16       here today --
17   A   I know, that's the exercise.
18   Q   -- from your memory, which I'm going to ask you
19       to call upon, as best as you can remember as you
20       sit here today, please give me a list of all of
21       the terms that you say were agreed to but that do
22       not appear in Exhibit 10.
23   A   I wanted a comprehensive contract, a legal-
24       looking contract with content that I had

PAGE 170

170

1        requested. I wanted all and every item that had
2        been discussed during the Baltimore summit to
3        materialize in a written form on the sheets of a
4        contract.
5    Q   The question is what were the terms that --
6    A   Some were how do I get out of the country in a
7        hurry if there's an insurrection or they decide
8        to hang me or any of my associates. Where do I
9        catch the plane -- it's called Medivac -- for a
10       medical reason.
11   Q   What else was agreed to that's not in this
12       contract?
13   A   What about -- I mean, there were so many items.
14       What about the vaccinations. Where is it that
15       they're paying me for it all. What about the
16       adjunct payment for flying and taking care of my
17       dog. Housing stipends. A precise order of work
18       schedule as to how many workdays am I actually
19       going to be. Is it going to be six six-day work
20       weeks, or in a month, will there be seven and
21       three six days. I wanted it all spelled out.
22   Q   Anything else missing that was part of your
23       agreement?
24   A   Why don't you just push me a little bit. I'm

PAGE 171

171

1        trying to come up with this. It's been a few
2        years.
3    Q   Take your time, sir.
4    A   I brought up an issue of what if I needed to
5        leave for a family emergency or some kind of a
6        personal issue. I wanted it included in some
7        clause there and how that would be -- how that
8        problem would be addressed.
9    Q   Was there an agreement on that issue?
10   A   Yeah. We talked about it, sure.
11   Q   What was the agreement?
12   A   They would make a contingency plan.
13   Q   What else, sir?
14   A   Of course, the housing arrangement was very
15       important. I wanted it in the contract, because
16       that's apart from my per diem, and this is
17       usually set up by U.S.A.I.D. and JSI and people
18       like that. I wanted to have it clearly denoted
19       that they knew where my monies were going and,
20       you know, I wanted the forms all attached to the
21       agreement. So not just the -- not just the
22       schedule and the frequency, but I wanted to know
23       that they knew where it needed to go.
24   Q   What else?

PAGE 172

172

1    A   Well, without the benefit of my notes right now
2        under this kind of very uncomfortable setting,
3        I'm kind of coming up with a big blank, but I
4        sure wasn't when I sat there discussing the --
5        negotiating the agreements.
6    Q   As we sit here today, can you think of any other
7        terms that were agreed to that don't appear in
8        Exhibit 10 other than what you've been able to
9        tell us --
10   A   There were others.
11   Q   Can you remember any others --
12   A   I'm really trying.
13   Q   If you think of any others before we adjourn,
14       please let us know.
15   A   Oh, yes, another issue. I wanted a little bit of
16       preliminary work done before I even departed to
17       find out how in the world am I getting around.
18       Am I taking the night train to Bucharest, or am
19       I, you know, going to be riding on top of the
20       baggage cars. How do you get around in that
21       country. And I'd like that arrangement, if we're
22       going to set up for a lease car arrangement,
23       which I thought was probably a very practical way
24       before I get over there, maybe we could kind of

177
1   project, it was a chance at that point; there was
2   no commitment, right?
3   A  Exactly.  But not an outside chance.  She was
4   very encouraging that I should continue along in
5   the process to be selected.
6   Q  No commitments, though, right?
7   A  I'm sorry?
8   Q  No commitments, though, right?
9   A  Very encouraging, extremely.
10  Q  No commitments, right?
11  A  That's an interpretation.  It wasn't like a legal
12  commitment, no.  Or should I state it another
13  way.  She didn't send a contract down to me the
14  next day.
15  Q  Did she verbally make commitments to you as of
16  September 8?
17  A  She told me essentially that I was definitely
18  their prime candidate for the position.
19  Q  A candidate's not a commitment, right, sir?
20  A  You know, it's all in the interpretation.  I feel
21  that this woman definitely encouraged me to not
22  get involved in anything else because she was
23  going to move this along very rapidly.
24  Q  Yes or no, did she make a commitment?

178
1   A  I guess it's an interpretation.  I thought that
2   she put her foot way out there as far as inviting
3   me to continue with the process.  I simply
4   disagree with your interpretation of commitment.
5   Q  What's your understanding of the word commitment,
6   sir?
7   A  I think that if you lead a person down a path in
8   which one believes -- and this is now just my
9   interpretation off the cuff -- you are setting
10  yourself into alignment for I guess someone
11  considering -- someone considering a very, very
12  strong possibility that you are going to be now
13  -- why are you making faces?
14  Q  I'm sorry.  It's late in the day.
15  A  No, no.  Do you have a problem?
16  Q  Sir, please continue.
17  A  That essentially that if you're influencing a person
18  in a way to encourage them to go further along
19  with the application procedure, and then you're
20  in a sense putting yourself out there and
21  inviting that person because there is such a
22  strong, strong, strong interest that it's a type
23  of commitment.
24  Q  So you understand that when someone strongly

179
1   encourages you to pursue a job, that that's a
2   commitment for the job?
3   A  No, it's not a commitment for the job.
4   Q  That's my question.
5   A  It's more than just a casual invitation to apply.
6   Q  Did you feel that Laurie Liskin had committed
7   that this assignment was yours as of September 8?
8   A  No, not at all.
9         MR. CAPLAN:  Would you mark that,
10  please.
11
12        (Exhibit Number 19, E-Mail to Mr.
13        Lederer from Mr. Rebbert dated
14        October 2, 2000, was Marked for
15        Identification.)
16
17  Q  Sir, showing you what we've marked as Exhibit 19,
18  if you could look that over and look up when
19  you're finished, please?
20  A  (Witness complies.)
21  Q  Is that an e-mail that you received from Eric
22  Rebbert on or about October 2 of 2000?
23  A  It appears that I have.
24  Q  Eric Rebbert was one of your contacts at Hopkins

180
1   for this possible assignment, correct?
2   A  Yes.
3   Q  Do you know who ENI was?
4   A  No, I don't.
5   Q  But he told you he was "meeting with ENI staff"
6   --- whoever that is -- "tomorrow to discuss the
7   possibility of a position/consultancy with
8   JHU/CCP."  Do you see that?
9   A  Yes.
10  Q  Do you remember reading this e-mail at the time?
11  A  If I received it, I would read it.
12  Q  And at least at that time, he told you that the
13  possibility on the table was a position
14  consultancy with Hopkins, correct?
15  A  He wrote JHU/CCP.
16  Q  That's Hopkins, right?
17  A  Yeah.  I didn't even know what CCP was probably
18  at that time.
19  Q  But it ain't JSI, is it?
20  A  I don't see JSI in this e-mail.
21  Q  So at least as of October 2, 2000, Hopkins told
22  you clearly in writing that the possibility on
23  the table was a position consultancy with Johns
24  Hopkins University/CCP, correct?

SHEET 46 PAGE 181

181

1  A  Yeah. According to this e-mail, yes.
2  Q  And you knew that Rebbert was one of the
3     authorized spokespersons for Hopkins?
4  A  Yes.
5  Q  He was one of the people that was tasked with
6     speaking with you, correct?
7  A  Yes. I believe his title was HR manager.
8  Q  Did you find him to be a reliable source of
9     information about this situation?
10 A  Did I find him in subsequent weeks, or did I find
11    after I received this for him to be -- how would
12    I know if he's reliable?
13 Q  Let me ask you a narrower question. You could
14    run with that one, I'm sure. He was the head of
15    HR at Johns Hopkins, right?
16 A  I understand that he was, yeah. I should say he
17    was the head of CCP HR, I think, not the head of
18    -- you know --
19 Q  Fair enough. So he's the head of the Center for
20    Communications Programs at Johns Hopkins
21    University?
22 A  Yes.
23 Q  Head of HR for them.
24

PAGE 182

182

1        (Exhibit Number 20, Letter to Mr.
2     Rebbert from Mr. Lederer dated
3     October 3, 2000, was Marked for
4     Identification.)
5
6  Q  Showing you what we've marked as Exhibit 20, did
7     you send that letter to Mr. Rebbert?
8  A  Yes.
9  Q  So as of October 3, 2000, you were eagerly
10    awaiting word from Hopkins about an eight-month
11    assignment in Romania?
12 A  That's what I'm saying.
13 Q  You were waiting for a commitment, correct?
14 A  My language is, "I'm awaiting word from your
15    office about this eight-month assignment."
16 Q  You were waiting to know whether they were going
17    to give you the assignment or not, correct?
18 A  I've been encouraged, and I'm waiting to see am I
19    going to be the one accepted.
20
21       (Exhibit Number 21, E-Mail to Mr.
22    Lederer from Ms. Wagner dated
23    October 3, 2000, was Marked for
24    Identification.)

PAGE 183

183

1  Q  Showing you what we've marked as Exhibit 21, sir,
2     if you can read that over and look up when you're
3     done, please.
4  A  (Witness complies.)
5  Q  Is that an e-mail dated October 3, 2000 that you
6     received from Erika Wagner?
7  A  Yes.
8  Q  It indicates that they want to set up a
9     conference call with various folks. Did that
10    conference call happen?
11 A  Actually, I don't recall that call ever
12    happening.
13 Q  I'll take a guess. Did that call morph into a
14    Baltimore meeting instead, or do you not recall?
15 A  That's a good way of putting it. I would say
16    that's as likely progression as I can come up
17    with.
18 Q  You don't remember a conference call, though?
19 A  No. I think they had a hard time getting a hold
20    of him.
21 Q  Who?
22 A  Walter. He didn't respond or something.
23 Q  Did you ever talk on the phone with Walter Proper
24    before you got to Romania?

PAGE 184

184

1  A  Actually, I don't recall ever speaking to him,
2     no. In fact, he didn't even -- I don't recall
3     ever speaking to him.
4  Q  Even when you were in Romania?
5  A  You said before I went to Romania.
6  Q  Okay, sorry. In your answer, you said ever, but
7     I misunderstood you.
8  A  Ever before I went to Romania. I don't
9     appreciate that, either, a lot of times.
10       MR. CAPLAN: Let's go off the record.
11
12       (Whereupon, a discussion was held off
13    the record.)
14
15 A  They were having a lot of problems with Walter.
16    Walter wasn't responding. He wasn't responding
17    to my e-mails, and Walter was kind of lost, a
18    Walter Mitty kind of guy.
19 Q  Do you remember a point in time that someone
20    asked you to contact Walter, and there was at
21    least a lag of a week before you contacted him?
22 A  No.
23 Q  That didn't happen?
24 A  No, not to my knowledge. If I was asked to get

Lederer v. Snow and Johns Hopkins                    R. Lederer, Vol. II, 5/11/05

SHEET 54  PAGE 213

213

1      November time frame, do you have in mind needing
2      the U.S.A.I.D. concurrence or something else?
3  A  I just don't know. I would say that when I would
4      receive word -- there was a point there where I
5      was becoming somewhat hesitant, because I
6      thought, you know, they tell me they're going to
7      send me this and whatever, and I remember -- I'm
8      just saying blanketly; I can't recall the exact
9      document -- we're going to fax you this. We're
10     going to send you that. She'll get back to you.
11     Kind of like lawyers operate at times. No
12     offense to anyone.
13          But, you know, the calls never came,
14     but yet, they were thinking. They were thinking,
15     but maybe not always about me. Maybe they
16     weren't thinking about what they were saying at
17     times. The call sometimes wouldn't come at the
18     appointed time, were the facts.
19
20          (Exhibit Number 24, E-Mail to Mr.
21          Proper from Mr. Lederer dated
22          November 13, 2000, was Marked for
23          Identification.)
24

PAGE 214

214

1  Q  Look up after you read Exhibit 24, please.
2      (Witness complies.)
3  A  All right.
4  Q  Is that a November 13, 2000 e-mail that you sent
5      to Walter Proper?
6  A  It appears to be.
7  Q  If you could put that next to Exhibit 22, is that
8      your first e-mail that you sent in response to
9      Exhibit 22?
10 A  I don't know.
11 Q  Do you have any memory of sending an e-mail to
12     Walter Proper before Exhibit 24?
13 A  I may have.
14 Q  Do you have any specific memory of that
15     happening?
16 A  I don't at this moment, but I may have.
17 Q  What was it that you were waiting for from Karen
18     Angelici? In Exhibit 24, you tell Walter you've
19     been meaning to get in touch with him for over a
20     week pending notice from Karen --
21 A  Yeah. Well --
22 Q  Let me finish my question, sir. In Exhibit 24,
23     you write to Walter, "I've been meaning to get in
24     touch with you for over a week pending notice

PAGE 215

215

1      from Karen confirming final terms and setting a
2      date for departure. However, as of this very
3      minute, I haven't received acknowledgment from
4      her, and so things stand in abeyance." Did I
5      read that accurately?
6  A  That's what I wrote.
7  Q  What were you referring to there?
8  A  Well, again, to assume that I can remember
9      exactly what I meant by terms, I would say that
10     had something to do with the written contract.
11 Q  Did it have to do with anything else?
12 A  And setting up the logistics of getting there.
13 Q  U.S.A.I.D. concurrence as well, correct?
14 A  Probably. Probably. I'm just not certain.
15 Q  You understand that there was no legal commitment
16     until there was a written contract and U.S.A.I.D.
17     concurrence, correct?
18 A  No.
19 Q  Did you ever work as a consultant to a U.S.A.I.D.
20     contractor on a handshake?
21 A  I don't recall having worked on a handshake.
22 Q  In your experience, it was always done on a
23     written contract, correct?
24 A  Contracts are in.

PAGE 216

216

1  Q  A written contract is what you need, right?
2  A  Contracts are in.
3  Q  Right, and you wanted a written contract so you
4      could bank on having this assignment, correct?
5  A  You want to underline that? I wanted to take it
6      to the bank, you bet. I made it clear again and
7      again and again.
8  Q  And you knew you couldn't take this arrangement
9      to the bank until you had a written contract,
10     right? That's why you were so adamant to get
11     one.
12 A  Not exactly.
13 Q  You thought you could take this to the bank on a
14     handshake?
15 A  It wasn't as good. It wasn't a handshake. It
16     was a bit more than that. You see, there were
17     many conversations which transpired -- many,
18     many, many conversations -- and throughout all of
19     these conversations, nothing appeared on that
20     road except green light, green light, green
21     light, and that's why I made the various -- I
22     made the various commitments and obligations that
23     essentially was affirmed by these people to go
24     ahead and do it, and everything shall follow. We

SHEET 63   PAGE 249

249

1   A   I don't recall more than one occasion. I mean,
2       Mr. Olivola, we had a hard time communicating
3       because of his schedule and mine, and he made it
4       clear to me at some point copies would suffice.
5   Q   In any event, you understood that originals was
6       the requirement?
7   A   Originals, copies, it just depends upon the
8       assignment.
9   Q   How did it depend?
10  A   Well, because there are some assignments where a
11      copy will suffice.
12  Q   I'm talking about on this assignment. Did you
13      ever receive anything in writing from JSI that
14      told you that copies of expense receipts were
15      sufficient?
16  A   Yes. It was an e-mail from him.
17  Q   After the trip, right?
18  A   I believe it was after the trip.
19  Q   You were screaming bloody murder pay me, and
20      eventually he said fine, we'll pay you on copies,
21      right?
22  A   That's an assumption on your part.
23  Q   Is my characterization far off, sir?
24  A   Yeah.

PAGE 250

250

1   Q   In any event, at any point prior to your trip,
2       did you ever receive anything in writing from
3       John Snow telling you that copies of receipts met
4       their requirements?
5   A   Yes, that copies would meet the requirements.
6   Q   You received that in writing from John Snow?
7   A   After the trip, exactly.
8   Q   No, before the trip?
9   A   Oh, before the trip, I don't recall receiving
10      anything to that effect.
11  Q   And before the trip, they told you in writing
12      that their requirement was original receipts?
13  A   May have.
14  Q   Have you made a calculation of your monetary
15      damages in this case, the amount of money that
16      you say the Defendants owe you?
17  A   My attorneys and myself are effectively, I think,
18      coming to some sort of an amount.
19  Q   Let me ask you this. What categories of damages
20      are you seeking from the Defendants?
21  A   I'm not an attorney, and I don't know the
22      categories.
23  Q   Well, you brought the lawsuit, so what types of
24      money are you looking for? I'm not looking for

PAGE 251

251

1       legal. So in other words, let me try to lead you
2       a little bit. You claim that you're owed per
3       diem monies for a long-term assignment, correct?
4   A   That's part of it, yeah.
5   Q   So those are the types of things I'm asking you.
6       What categories of money do you claim that you're
7       owed?
8   A   I would say yes, I'm owed monies on the six- to
9       seven-day workweek all the way through the
10      contractual agreement to the end of the project,
11      and then there's usually some time afterward in
12      order to get the reports.
13  Q   So you're owed per diem for the length of the
14      project plus a certain amount of extra time for
15      paperwork and follow-up work, correct?
16  A   Yes.
17  Q   You also claim that you haven't received full
18      reimbursement for certain of your out-of-pocket
19      expenses, correct?
20  A   Yes.
21  Q   Anything else category-wise?
22  A   You know, I'd have to discuss this with my
23      lawyers.
24  Q   Well, I'm asking you, sir. As we sit here today

PAGE 252

252

1       -- I mean, you've brought the lawsuit. We're
2       more than a year into it. Is there any other
3       categories of money that you feel the Defendants
4       owe you?
5   A   Again, I'm going to defer to my attorneys.
6   Q   Can you answer the question?
7   A   I can't. It's going to be a matter that I have
8       to go into consultation with.
9   Q   You've testified at length about your
10      understanding of the Defendants' commitments to
11      you, and I'm not asking you to rehash that, but
12      based on your understanding of what they
13      committed to you, do they owe you anything other
14      than paying you --
15  A   Oh, ho ho.
16  Q   -- paying you a daily rate and paying you
17      expenses?
18  A   Beyond your imagination, sir.
19  Q   Humor me. What else do they owe you?
20  A   I'll speak to my attorneys.
21  Q   Well, sir, this is your deposition, so I'm going
22      to ask you to answer the question if you're able
23      to.
24  A   I'm not able to.

SHEET 64    PAGE 253

253

1  Q  As best as you can, how much do the Defendants
2     owe you in per diem?
3  A  To be discussed later.
4  Q  Do you have any ability to answer that question
5     today?
6  A  I don't, really.
7  Q  Let's see if we can try this.  Can we agree that
8     on the per diem piece, the rate is $470 a day,
9     correct?
10 A  Correct.
11 Q  And you claim that you're owed $470 a day for
12    between six to seven days from some point in time
13    in January of 2000 (sic.) until some point in
14    time in September or October of 2000 (sic.)?
15 A  That would be very close to the way things are,
16    yes.
17 Q  Is that how you're looking at it?
18 A  Um-hmm, to the end of the project, and that's a
19    matter of record.
20 Q  In concept, is there anything more to
21    understanding that piece of damages, other than
22    doing the math on that?
23 A  Well, that would just require doing the math and
24    then working out the seven- or six-day workweeks

PAGE 254

254

1     and so forth.  The math, that can be arrived at
2     on that.
3  Q  But in concept, you agree that that's your
4     approach.  You say that you're owed six or seven
5     days a week at $470 per hour (sic.) from some
6     point in January until some point in September or
7     October 2000 (sic.)?
8  A  That's one phase.
9  Q  That's an accurate description of your per diem
10    claim, correct?
11 A  Of my per diem, right.
12 Q  You agreed with me that you had a number of
13    communications after this project demanding
14    further expense reimbursements, did you not?
15 A  Yeah.  After I returned to the States, yeah.
16 Q  Including you flew up to Boston and had a sit-
17    down with Mr. Olivola?
18 A  No, I didn't include that as an expense.  There
19    may have been some --
20 Q  You misunderstood me.  I'm talking about your
21    communications about looking for more expenses
22    after Romania included a face-to-face discussion
23    with Mr. Olivola in Boston, correct?
24 A  Yes.

PAGE 255

255

1  Q  And at the time, you calculated out what you were
2     owed, correct?
3  A  I calculated what I believed I was owed up to, I
4     don't know, maybe it was shortly before our
5     meeting.
6  Q  At the time, how much were you owed?
7  A  I don't recall.
8  Q  As between one dollar and a million dollars, what
9     were you owed?
10 A  Something between that.
11 Q  Can you put any better figure on it?
12 A  I really can't.
13 Q  Is that important to you?
14 A  Not as important as this entire case is.
15 Q  Well, you've sued my clients for not paying you
16    expenses.  Can you give me any more --
17 A  No, no, no, no, no.  I'm suing your client for
18    breaching the contract, the entire contract.
19 Q  Sir, would you agree with me that one of your
20    claims in this lawsuit is for failure to pay you
21    the expenses you're owed?
22 A  And that includes what?
23 Q  Let's take it one step at a time.  Do you agree
24    or do you disagree that you're suing Hopkins and

PAGE 256

256

1     Snow for certain expenses that you claim they owe
2     you?
3  A  No.  I'm suing them for breach of the entire
4     contract.
5  Q  And one piece of that is failure to pay you
6     expenses; is it or is it not?
7  A  To live up to what they told me they would pay
8     for my expenses, yes.
9  Q  And is that important to you?
10 A  Not as important as the entire picture.
11 Q  Can you give me any more intelligible calculation
12    of your expenses that you're claiming --
13 A  At this time, no.
14 Q  -- other than saying it's between zero and a
15    million?
16 A  No, I cannot, but again, this is --
17 Q  You can't.  Have you made any effort to calculate
18    it during this lawsuit?
19 A  Sorry?
20 Q  Have you spent any time trying to calculate what
21    you're owed in expenses?
22 A  I've discussed this briefly with my lawyers.
23 Q  What's your view on it?
24 A  That it's to be determined, that we will talk

SHEET 65   PAGE 257

257

1    about this at some near date.
2    Q   As best as you can recall, what day did you
3        actually leave for Romania?  Somewhere in the
4        December 1 to 4 time frame, you're not sure?
5    A   Exactly.
6    Q   That's the best we can do?
7    A   Yeah.
8    Q   Okay, fair enough.
9
10                (Exhibit Number 31, E-Mail to Mr.
11                Lederer from Ms. Wagner dated
12                December 1, 2000, was Marked for
13                Identification.)
14
15   Q   If you could read Exhibit 31, and my question to
16       you is do you recognize that as an e-mail that
17       you received from Erika Wagner on or about
18       December 1 of 2000?
19               (Witness complies.)
20   A   I don't recall this.
21   Q   Are you denying you received it, or are you
22       saying you don't remember one way or the other?
23   A   I believe what I said is I don't recall.
24   Q   I'm asking a followup.  By that, do you mean that

PAGE 258

258

1        you do not believe you received it, or are you
2        saying you don't recall one way or the other?
3    A   I say I don't recall.
4    Q   That's the best you can answer my question?
5    A   That is.
6    Q   I just want to be clear.  We've already covered
7        the fact that you received the written contract,
8        and you had one or more phone conversations
9        protesting what was in the contract.  I'm not
10       looking to rehash it, but just to reorient
11       ourselves.  Do you then recall receiving an
12       e-mail from someone at Hopkins telling you, as it
13       states here in Number 2, "We cannot change your
14       contract"?
15   A   No.
16   Q   So really what you're saying is it's your
17       testimony that you don't receive this e-mail,
18       because no one ever told you in writing that they
19       wouldn't change your contract, right?
20   A   I don't recall seeing anything that said they
21       couldn't change my contract.
22   Q   Do you see on Number 3, she's telling you JSI
23       will not give you 100 percent advance?
24   A   I see that.

PAGE 259

259

1    Q   Had that ever been discussed before?
2    A   Advance for what?
3    Q   Your compensation.
4    A   Excuse me?  Compensation for what?
5    Q   If you don't understand it, then you say you
6        can't answer.
7    A   I can't answer.
8    Q   Easy enough.  We'll move on.
9    A   Okay.
10   Q   Had you asked them what the method of payment was
11       at the hotel?
12   A   No.  My question is, trying to dig back to that
13       time, was how do you use currency over there, and
14       do they have banks where you can put any money,
15       and can you use traveler's checks, things like
16       that.
17   Q   Did you ever ask them what the method of payment
18       was at the hotel?
19   A   I don't recall that.
20   Q   Were you still looking for the Medex number as of
21       December 1?
22   A   And what hotel?
23   Q   Were you still looking for a Medex number as of
24       December 1?

PAGE 260

260

1    A   I don't recall.  I mean, I was looking for a
2        Medex number, but I don't recall whether it was
3        December 1.
4             MR. CAPLAN:  Let's take five.
5
6             (Whereupon, a brief recess was taken.)
7
8    Q   Can we agree that the document you consider to be
9        your trip report was dated January 2 of 2001?  I
10       think you have one in front of you.
11   A   Yes.
12   Q   Did you circulate that on or about January 2 of
13       2001?
14   A   I'm not sure when I circulated it.
15   Q   After you submitted the trip report, you were
16       told by Hopkins and Snow that it did not meet
17       their requirements for a trip report, correct?
18   A   Specifically, I was told by Angelici and Hashem,
19       in addition to the other areas I've testified to.
20   Q   They asked you to submit a trip report that met
21       their requirements, correct?
22   A   No.  The way it was said to me was this is too
23       volatile.  It's too provocative.
24   Q   Sir, you've answered my question, and more.  Let

Lederer v. Snow and Johns Hopkins          R. Lederer, Vol. II, 5/11/05

SHEET 77   PAGE 305

305

1          Mr. Olivola, was Marked for
2          Identification.)
3
4   Q   Exhibit 36, do you recognize that as some further
5       e-mails back and forth between you and Mr.
6       Olivola?
7   A   Yes.
8   Q   We can see the bottom e-mail picks up on the back
9       and forth that we were just looking at, correct?
10  A   Yes.
11  Q   So after he tells you he needs your receipts
12      ASAP, you then send him an e-mail attaching a
13      list of further charges, you tell him you have
14      receipts for hotels, but in the interest of time,
15      you're just forwarding the information without
16      the receipts, correct?
17  A   Did you read the last line of that?
18  Q   And you ask him for the telephone and fax
19      numbers.  Is that what you said in your message?
20  A   Isn't that what I said in my message, Mr. Caplan?
21      You're reading it.
22          MS. ROSWELL:  Yes or no.
23  A   Yes.
24  Q   Can we agree it took him nine minutes to give you

PAGE 306

306

1       his phone and fax number?
2   A   I don't know what these clocks --
3   Q   How about this; can we agree the same day he
4       e-mailed you the phone and fax number?  Feb. 14
5       you asked for it, and Feb. 14 he gave it to you?
6   A   It appears that way.
7   Q   So when did you send in the receipts after
8       receiving the phone and fax number?
9   A   I don't recall.
10  Q   When was your meeting with Mr. Olivola?  Was it
11      late January?
12  A   Yes.
13  Q   Without getting into the full gory details, what
14      were the topics discussed?
15  A   My experiences during the trip and my
16      observations and assessments.
17  Q   Let me back up.  How did the meeting come to
18      happen?  Did he invite you to Boston?
19  A   Yeah.
20  Q   Did he say why he was inviting you to Boston?
21  A   To discuss my experiences, assessments, and
22      observations.
23  Q   Did he say he was bringing you to Boston for any
24      other reason?

PAGE 307

307

1   A   That comes to mind as being the highlight for the
2       reason.
3   Q   At that point in time, you had an ongoing issue
4       about getting expense reimbursement; do you
5       recall that?
6   A   No.  I simply said of course I expect to be
7       compensated for my time, not a problem, and that
8       the expenses will be taken care of.  We discussed
9       it.
10  Q   So is it your testimony before you came to Boston
11      to meet with Mr. Olivola that there was no
12      dispute between you and Hopkins or Snow about
13      expense reimbursement?
14  A   What are you referring to, expense
15      reimbursements, for the trip?
16  Q   Yes.
17  A   Absolutely not.  Between myself -- not Hopkins,
18      between myself and him.
19  Q   Let me ask it again.  Before you came to Boston
20      to meet with Mr. Olivola, did you have any
21      dispute with either Hopkins or Snow about you
22      getting reimbursed for your expenses from the
23      Romania trip?
24  A   No.  The conversation was strictly between the

PAGE 308

308

1       two of us.  There was no intervening individuals.
2   Q   So you're saying Hopkins wasn't part of the
3       dispute?
4   A   What dispute?
5   Q   That's the question, was there a dispute before
6       you went to --
7   A   I was going up on an information gathering for
8       him.
9   Q   I just want a straight answer, sir.  Are you
10      telling me in your mind, there was no dispute
11      between you and anyone about expense
12      reimbursement prior to you going to Boston to see
13      Mr. Olivola?
14  A   All right.  I think somewhere along the line,
15      we're not on the same page.
16  Q   Clearly not.
17  A   Clearly.  So why don't we try to get there, all
18      right?
19  Q   All right.
20  A   Which expenses?
21  Q   In this lawsuit, you claim that you're still owed
22      certain expenses, out-of-pocket expenses, from
23      your Romania trip?
24  A   Oh, but this is trivial in comparison to the

**Lederer v. Snow and Johns Hopkins        R. Lederer, Vol. II, 5/11/05**

309

1    major --
2  Q  Just work with me. Just answer my questions.
3        MS. ROSWELL:  Just let him ask the
4     questions, and answer.
5  Q  When you came back from Romania, you expected to
6     be reimbursed for your out-of-pocket expenses in
7     Romania and ancillary activities related to
8     Romania, correct?
9  A  Yes.
10  Q  And at some point between when you came back from
11     Romania and today, you got into a fight with John
12     Snow, a dispute, about getting paid the amount
13     that you claimed for out-of-pocket expenses,
14     right?
15  A  Yes.
16  Q  My simple question is had that dispute arisen by
17     the time that you went to see Mr. Olivola, or did
18     that dispute not come up until at the meeting or
19     afterwards?
20  A  No.  There was a dispute prior.
21  Q  That's all I was asking.
22  A  It's getting late.
23  Q  When he invited you to Boston, did he indicate
24     that part of the reason for you to come up was

310

1     for he and you to try to work out any differences
2     about expense reimbursement?
3  A  That may have entered the conversation.  May
4     have.
5  Q  May have, but you don't remember?
6  A  No.  I know that the brunt of it was you need to
7     be up here.
8  Q  Do you remember any discussion at your meeting
9     with him about trying to work out any issues on
10     expense reimbursement?
11  A  We may have entered into that.
12  Q  Do you remember any discussion on that topic?
13  A  Yeah, may have been something about we need to --
14     may have been something with receipts and so
15     forth, but that was a very -- that was a real
16     aside to the conversation.
17  Q  Let me ask it this way.  As of the time you were
18     in Boston, did you have any real issue, did you
19     feel like JSI was being non-responsive about
20     expense reimbursement?
21  A  Did I have an issue?
22  Q  Yes.
23  A  Yes, I had an issue.
24  Q  So you have an issue, but it's not a big topic

311

1     with Mr. Olivola; you just kept it to yourself?
2  A  No.  There was a much bigger -- there was a much
3     bigger development of conversation that I wanted
4     to --
5  Q  I understand you had other things you wanted to
6     talk about, but when you had an issue about
7     expenses, are you telling me that it was or
8     wasn't a big topic of conversation?
9  A  It was not a big topic, as I recall.  And now I'm
10     going back trying to recall the transition from
11     the greeting to the content, and I recall that
12     was not, in my mind, one of the major, major
13     points of our conversation.
14  Q  So expenses is a topic of your meeting with Mr.
15     Olivola?
16  A  It might have been a topic.
17  Q  And your observations of the situation in Romania
18     was another topic, correct?
19  A  A major.
20  Q  Were there any other topics that you and he
21     discussed?
22  A  Yeah, when would I return.
23  Q  What was said on that topic, as specifically as
24     you can remember?

312

1  A  He couldn't give me a date.
2  Q  What else was said?
3  A  Well, he needed to -- he needed to look into it
4     because he had had some ideas about ongoing
5     issues, and that Walter was not the right man for
6     the position, and it came out of his mouth.  He
7     was over his head, kind of the Peter Principle
8     thing, where he had been working for JSI on other
9     projects, but apparently this one was well beyond
10     his capacity, and he commented to me about that.
11  Q  Did he say anything else about your return to
12     Romania?
13  A  That first that he had to check into how the
14     complaints could be attended to in an orderly
15     fashion and the arrangements be performed, and
16     then how I would be reunited with the project
17     once they could iron out some of the major
18     conflicts.
19  Q  Let me ask you this.  We're in late January.  Are
20     you asking him, hey, Ken, when am I going back to
21     Romania, what's the deal here, in words or
22     substance?
23  A  In words or substance to that effect, yeah.  I
24     thought I just mentioned that.

# EXHIBIT E

MSN Home    Hotmail    Web Search    Shopping    Money    People & Chat    Passport

**msn**

# Hotmail® *r_lederermd@hotmail.com*

Inbox    Compose    Addresses    Folders    Options                    Calendar    Help

## Inbox

**From:**    "LAURIE LISKIN" <LLISKIN@jhuccp.org>
**To:**      <R_ledererMD@hotmail.com>
**Subject:** Romania position open
**Date:**    Thu, 07 Sep 2000 13:41:20 -0400

Reply       Reply All       Forward       Delete       Previous       Next       Close

Hi Bob,

Eric Rebbert at JHU/CCP gave me a copy of your CV.  We are working on a
reproductive health care project in Romania and are looking for an MD who can
work closely with doctors and midwives in urban and rural dispensaries to
improve their medical and management skills.  Would you be interested in talking
with us further about this work?  When are you available?  What the USAID
Mission wants, ideally, is someone who can spend up to 8 months in country or,
failing that, is available to come for several long technical assistance trips.

If you are available and interested in learning more details about the position,
please send me an e-mail or call.

Thanks.

Laurie Liskin
Chief, Europe and New Independent States Division
JHU/CCP
Tel:  (410)-659-6329
Fax:  (410)-659-6266
e-mail:

Reply       Reply All       Forward       Delete       Previous       Next       Close

Move To  (Move to Selected Folder)

Inbox    Compose    Addresses    Folders    Options                    Calendar    Help

Get notified when you have new Hotmail or when your friends are on-line. Send instant messages.    to get your FREE
download of                          ! Share information about yourself, create your own public profile at

Other Links:                    Special Features:



© 2000 Microsoft Corporation. All rights reserved. Terms of Service    Privacy Statement

ROBERT LEDERER, M.D. M.P.H.
2181 PALM TREE DRIVE
PUNTA GORDA, FLORIDA 33950

MS. LAURIE LISKIN
CHIEF, EUROPE AND NEW INDEPENDENT STATES DIVISION
JHU/CCP
111 MARKET PLACE
BALTIMORE, MARYLAND, 21202-4012

410. 659-6329

September 8, 2000

Dear Ms. Liskin,

Enjoyed our conversation, you have been quite informative, and I appreciated your candor as it related to the conflicts, activities and personnel involved presently in the Project within Romania.   The chance to serve on this long-term, eight month Reproductive Health Project is equally intriguing and challenging.  As you mentioned, time is of the essence and therefore I shall prepare for this assignment and await additional updates from you at CCP and your contacts at John Snow, Inc.

Yours truly,

Bob Lederer, M.D., M.P.H.





**Hotmail**® *r_lederermd@hotmail.com*

Compose    Addresses    Folders    Options                    Calendar    Help

Inbox

From:  "ERIC REBBERT" <EREBBERT@jhuccp.org> Save Address - Block Sender
To:    <r_lederermd@hotmail.com> Save Address
Subject: touch base
Date:  Mon, 02 Oct 2000 17:02:17 -0400

Reply All        Forward        Delete        Previous        Next        Close

Hi Bob - I'm meeting with ENI staff tomorrow to discuss the possibility of a
position/consultancy with JHU/CCP. They are very interested in talking to you.
Are you still available?

Regards, -eric

----------------------------------------------------------------------
Eric T. Rebbert, PHR                        Phone: 410.659.6300
Human Resources Manager              Fax: 410.659.6266
Johns Hopkins University                  Emergency: 410.218.4867
Center for Communication Programs   email: erebbert@jhuccp.org
111 Market Place, Suite 310                www.jhuccp.org
Baltimore, MD 21202    USA

Reply All        Forward        Delete        Previous        Next        Close

Move To  [(Move to Selected Folder)        ▼]

Compose    Addresses    Folders    Options                    Calendar    Help

Get notified when you have new Hotmail or when your friends are on-line. Send instant messages. Click here to get your
FREE download of MSN Messenger Service! Share information about yourself, create your own public profile at
http://profiles.msn.com

Other Links:                        Special Features:
Buy Music                           Download new web surfing software
Download Music                      Call PC to phone for FREE*
Buy Books                           Register to vote online
Free Games                          2001: Radical changes to come?
Pharmacy                            How to get straight A's this fall
More...                             More...





EXHIBIT

LED 000072

# JOHNS HOPKINS
U N I V E R S I T Y



**Center for Communication Programs**
School of Hygiene and Public Health
111 Market Place - Suite 310
Baltimore, Maryland 21202 USA
Telephone (410) 659-6300 / Fax (410) 659-6266
Telex 240430 JHUPCS UR

November 27, 2000

Dr. Robert Lederer
P.O. Box 110521
Naples, Florida 34108

Reference:  CCP Consultancy

Dear Dr. Lederer:

We are happy to confirm your short-term appointment as a consultant for The Johns Hopkins University/Center for Communication Programs (JHU/CCP).

This assignment is to provide professional services in Romania for the period from December 4, 2000 to December 17, 2000 for a maximum of 14 working days, based on an eight-hour day, and a six-day work week, excluding travel time. Please note that John Snow Inc. (JSI) the Contractor does reimburse consultants for travel time.

Please review your scope of work carefully to ensure that you can complete the assignment within the specified time frame(s).

Your assignment is to assist JHU/CCP and John Snow Inc. (JSI) with the <u>Women's Reproductive Health Initiative</u> in Romania:

Specifically, you will:

1. Do a needs assessment of the current service delivery and management systems at family planning clinics in 3 judets.
2. Meet with JSI and USAID Romania to discuss scope of work for year 2001.

Please submit a printed report of your trip to Karen Angelici at JHU/CCP.  The report should adhere to the enclosed trip report format instructions.  This report should be received two weeks after you return from this assignment, in a form suitable for external distribution.

During your performance of these consulting services, your work will be reviewed by Karen Angelici, Acting Division Chief, E&E Division. Walter Proper, Chief of Party, JSI will be your contact in Romania.

In accepting this assignment, it is expressly understood that:

1.      You are not being compensated or receiving salary from other U.S. government funding sources for the time spent on JHU/CCP business.

2.      You have no conflict of interest that would interfere with the performance of your obligations under this assignment, and that you are not related by blood or marriage to any employee of the United States government

    or other agency who has decision-making authority over the award funding this assignment or over the project for which you will perform consulting services.  You agree to notify your JHU/CCP staff contact immediately if you know of any such changes in your circumstances.

3.      You will not use any of the data or materials developed during your consultancy or in connection with the project you are assisting for public presentation or publication without prior written permission from JHU/CCP.  Any reports or other materials produced are considered works made for hire with ownership vesting in JHU/CCP.

ED 000081

Dr. Robert Lederer
November 16, 2000

4.    You will assume all tax obligations including declaration and payment thereof.

5.    You are not covered by The Johns Hopkins University Unemployment Insurance or any other Johns Hopkins insurance plans or policies.

This agreement is limited solely to the services specified and does not give you authority to make binding commitments on behalf of JHU/CCP.

Your fee for services will be paid at the rate of US $470 gross per day. This fee is payable upon completion and submission of an acceptable report on the assignment. Enclosed is a "Consultant Fees Support Form," which you are to complete at the end of the assignment and submit to the attention of your CCP staff contact.

For citizens or residents of the U.S., please note that all payments of fees and expenses made to you will be reported as income for U.S. income tax purposes; therefore, it is imperative that you maintain accurate records of your business expenses so that you can take the proper deductions when filing your tax returns. Original receipts and copies of expense reports submitted to JSI for reimbursement should be maintained for your records for tax purposes.

All travel and related expenses will be handled by JSI. Copies of receipts are needed for lodgings, as well as for all expenses over $25. *Please read carefully* the guidelines on allowable coverage, and be sure to use the JSI Travel Expense Report for non-employees in reporting your expenses.

Please sign two copies as indicated at the end of this letter. One should be retained for your records and the other should be returned to me for JHU/CCP records. Also, please provide the name and phone number for the person who should be contacted in case of emergency.

If you need further information or have any problems or questions, we would be glad to provide assistance. We are delighted that you are available for this consultancy and look forward to working with you.

Sincerely,

Alice Payne Merritt
Deputy Project Director
Center for Communication Programs

----[ELW]

ACCEPTED AND AGREED:

Signature

Name    ROBERT LEDERER

Emergency Contact    MURIEL VAN D' VYVEL

Social Security Number

Date    10/1/00

Telephone number    941 637-1070

Citizen of [Country]    USA

Enclosures:    Consultant Fees Support Form
                    Trip Report Format

LED 000082

# EXHIBIT F

Lederer v. Snow and Johns Hopkins          R. Lederer, Vol. I, 12/2/04

SHEET 1   PAGE 1

```
                              Volume:    I
                              Pages:   1-120
                              Exhibits:   1


           UNITED STATES DISTRICT COURT
                      FOR THE
            DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * *

DR. ROBERT LEDERER,

          Plaintiff

                         Civil Action
     VS
                         No. 04-CV-10284-NG

JOHN SNOW, INC. and
THE JOHNS HOPKINS UNIVERSITY/
CENTER FOR COMMUNICATION
PROGRAMS,

          Defendants

* * * * * * * * * * * * * * *
          DEPOSITION of DR. ROBERT LEDERER, a witness
called on behalf of the Defendants, taken pursuant to
the Massachusetts Rules of Civil Procedure, before
Arlene Boyer, a Professional Court Reporter and Notary
Public, in and for the Commonwealth of Massachusetts,
at the offices of Melick, Porter & Shea, LLP, 28 State
Street, Boston, Massachusetts, 02109, on Thursday,
December 2, 2004, commencing at 12:20 p.m.
```

PAGE 2

2

APPEARANCES

ROBERT W. HEALY, ESQ.
Melick, Porter & Shea, LLP
28 State Street
Boston, Massachusetts 02109
(617) 523-6200
     Counsel for the Defendant,
     The Johns Hopkins University/
     Center for Communication Programs
ANDREW E. CAPLAN, ESQ.
Perkins, Smith & Cohen
One Beacon Street, 30th floor
Boston, Massachusetts 02108-3106
(617) 854-4000
     Counsel for the Defendant,
     John Snow, Inc.
DAVID B. STEIN, ESQ.
Rubin, Weisman, Colasanti,
Kajko & Stein, LLP
430 Bedford Street
Lexington, Massachusetts 02420
(781) 860-9500
     Counsel for the Plaintiff

PAGE 3

3

I N D E X
WITNESS      DIRECT CROSS REDIRECT RECROSS
ROBERT LEDERER
(By Mr. Healy)        4
(By Mr. Caplan)       110

E X H I B I T S

NO. DESCRIPTION                      PAGE
 1  Mr. Lederer's Curriculum Vitae    15

PAGE 4

4

```
1              S T I P U L A T I O N S
2         It is hereby stipulated and agreed by
3  and between counsel for the respective parties
4  that the deponent shall have thirty (30) days in
5  which to read and sign the transcript, under the
6  pains and penalties of perjury, after which time
7  it shall be deemed to have been signed, and that
8  the certification, filing and sealing of the
9  deposition transcript are waived.
10        It is further stipulated and agreed
11 that all objections, except objections as to the
12 form of the question, and all motions to strike,
13 shall be reserved to the time of trial.
14
15        ROBERT LEDERER, first having been
16 satisfactorily identified and duly sworn, on
17 oath, deposes and says as follows:
18
19             DIRECT EXAMINATION
20
21      BY MR. HEALY:
22  Q  Good afternoon, Mr. Lederer.  I introduced myself
23     to you earlier.  My name is Robert Healy, and I'm
24     here representing Johns Hopkins University.  Just
```

Lederer v. Snow and Johns Hopkins                    R. Lederer, Vol. I, 12/2/04

SHEET 18  PAGE 69

**PAGE 69**

69

1  Q  Including probably some of your research,
2     correct?
3  A  You got that right.
4  Q  Had you had any contact or involvement with any
5     publications prior to the hurricane in terms
6     of --
7  A  No, I wasn't at that stage.
8  Q  Sir, now -- you'll probably think finally -- I
9     want to try to begin to focus on your work with
10    JHU and JSI. First, I want to begin with when
11    did you first become involved or have any contact
12    with I'm going to say first JHU?
13 A  I was contacted sometime in the year 2000. There
14    may have been previous contacts, but for purposes
15    I hope of this deposition, 2000 should serve.
16 Q  You may have had, over the course of your entire
17    history, had contact from JHU on more than one
18    occasion, correct?
19 A  Yes.
20 Q  You're not sure, but it may have occurred?
21 A  I am.
22 Q  Now, focusing on your involvement in the program
23    in Romania in December of 2000, do you recall
24    when your first contact was with JHU?

**PAGE 70**

70

1  A  Without notes, I would assume it was toward the
2     autumn of 2000.
3  Q  Do you have notes relative to your involvement
4     with --
5  A  Yes, but I don't --
6     MR. STEIN:  Off the record.
7
8     (Whereupon, a discussion was held off
9     the record.)
10
11 Q  Let me ask you this, Mr. Lederer.  What did you
12    do to prepare for this deposition besides meeting
13    with your attorney?
14 A  Essentially, I met with my attorney, and I'm
15    relying upon my own recollection as well as
16    reviewing some of the -- certainly some of the
17    material that I had presented to him earlier.
18 Q  What materials did you review before or in
19    anticipation of this deposition?
20 A  What I would entitle the files, from my
21    perspective.
22 Q  Can you tell me in a general sense what that file
23    consists of?
24 A  E-mails, letters, a tape recording.

**PAGE 71**

71

1  Q  What is that a tape recording of?
2  A  Some messages left for me.
3  Q  Who were those messages left by?
4  A  One name I recall was Karen Angelici.
5  Q  These were messages left on your answering
6     machine in your home?
7  A  Absolutely.
8  Q  At this point in time --
9  A  I haven't finished trying to recall the various
10    things.  So it's letters, e-mails, and -- yeah,
11    correspondences.
12 Q  Is it fair to say that those materials you've
13    just referenced are in your possession or your
14    attorney's possession, correct?
15 A  Absolutely.
16    MR. HEALY:  And there's an agreement
17    that at some point in time after reviewing those
18    documents, there would be a production of some of
19    those materials, correct?
20    MR. STEIN:  That's correct.
21    MR. CAPLAN:  And there's an agreement
22    for further deposition following --
23    MR. STEIN:  We have a full
24    understanding of that.

**PAGE 72**

72

1  Q  Again, back to before I digressed, you believe
2     your first contact was approximately autumn of
3     2000?
4  A  Yeah.
5  Q  Do you recall how that contact was made?
6  A  Drawing on memory from my files, I would say Eric
7     Rebberd -- I believe that was the first contact
8     -- Eric, personnel, with JHU.
9  Q  What was the last name, again, sir?
10 A  Rebberd, R-e-b-b-e-r-d, I believe.
11 Q  Did he contact you, sir?
12 A  Yes.
13 Q  How did he contact you?
14 A  I believe by letter and phone.
15 Q  Both methods?
16 A  I believe so.
17 Q  And it's your understanding that Mr. Rebberd was
18    associated with or employed by JHU?
19 A  Right, JHUCCP.
20 Q  So we don't have to --
21 A  But he's -- yeah, he's with the -- I believe with
22    the CCP branch.
23 Q  Sir, what was the contact that was made?
24 A  He wanted to talk to me about employment.

Lederer v. Snow and Johns Hopkins                    R. Lederer, Vol. I, 12/2/04

SHEET 19 PAGE 73

PAGE 75

73

1   Q   Did he say where or what type of employment he
2        was calling you about?
3   A   I don't recall the exact contents of that
4        correspondence, but I know he wanted to speak to
5        me about coming to work.
6   Q   What was your response to that inquiry?
7   A   I returned an answer which said I'd be more than
8        pleased to talk with you.
9   Q   What happened when you made that response?
10  A   Well, it was surreal. We had a very nice
11       exchange. He's a very, very decent person to
12       speak to, and somewhere down the trail, and I
13       can't tell you days or week, but it was following
14       our conversation, I believe the next contact was
15       a woman named Laurie or Laura, Laurie Liskin,
16       L-i-s-k-i-n.
17  Q   Before your contact with Miss Liskin, did you
18       come to have some understanding of what type of
19       work JHU was potentially looking for you to do?
20  A   Yes.
21  Q   What type of work?
22  A   I'm sure that Miss Liskin did elaborate on the
23       fact that they were looking for a person to join
24       up with a project that was ongoing in Romania.

75

1   A   The information was disclosed that they were
2        looking for an individual to go to Romania for a
3        long-term assignment, and I believe the nature of
4        her letter was an eight-month duration.
5   Q   Did you say eight?
6   A   I said eight.
7   Q   And it's your memory that Miss Liskin is the
8        person who --
9   A   I wish we -- if you're confused about her name --
10  Q   No.
11  A   You don't have it?
12  Q   You're right, it's Miss Liskin. Is it Miss
13       Liskin who made contact with you in terms of the
14       length of your possible work?
15  A   Yes.
16  Q   And it's your memory that Miss Liskin indicated
17       that it was a potential for a long-term
18       commitment?
19  A   Absolutely.
20  Q   When you say long-term, are you referring to a
21       potential eight-month commitment?
22  A   At that point, I think she put it in writing, but
23       that was later to be developed.
24  Q   Did you say she did put it in writing or did not?

PAGE 74

PAGE 76

74

1   Q   But prior to your contact with Miss Liskin -- or
2        it might even be Ms. Riskin --
3   A   No. I believe it's Liskin.
4   Q   Okay, that's fine. Prior to your conversations
5        or contact with Miss Liskin, did you ever come to
6        learn what type of work or consulting you were
7        being contacted about?
8   A   I can't recall the nature of the very brief
9        correspondence that I received from Mr. Rebberd,
10       but I do know that our exchanges were very, very
11       cordial and friendly. He's a very charming
12       person. Ms. Liskin was more definitive in her
13       correspondence to me.
14  Q   But you had written correspondence between
15       yourself and Miss Liskin, correct?
16  A   Both, but certainly of the written form.
17  Q   And verbal?
18  A   Written.
19  Q   Did you have any verbal communications with her?
20  A   I believe we did.
21  Q   And it was over the course of this communication
22       or contact with Miss Liskin you came to learn
23       what type of work or consulting you were being
24       contacted about?

76

1   A   Did.
2   Q   Do you still have that writing?
3   A   I believe so, yes.
4   Q   Obviously, I would hope that at some point in
5        time, you could produce that, right, if it still
6        exists, and with the help of your attorney, that
7        will happen.
8
9            (Whereupon, a brief recess was taken.)
10
11  Q   So following the broad brush of contact you had
12       with Miss Liskin, you came to understand that
13       there was an inquiry about you doing some work
14       specifically in Romania?
15  A   Yes. I believe the country was named.
16  Q   Again, it's your memory that Miss Liskin
17       indicated that you were being contacted in terms
18       of potential long-term involvement?
19  A   Yes.
20  Q   Was that something that you, as a result of your
21       conversations with Miss Liskin, that you were
22       going to consider?
23  A   Yes.
24  Q   Were you working at that point in time, sir,

# EXHIBIT G

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                     SUPERIOR COURT
                                                 CIVIL ACTION NO.

---

DR. ROBERT LEDERER                              )
    Plaintiff                 )
                                                )
VS.                                             )
                                                )
JOHN SNOW, INC. AND                             )
THE JOHN HOPKINS UNIVERSITY / CENTER            )
FOR COMMUNICATION PROGRAMS                      )
    DEFENDANTS                )
                                                )

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.  Plaintiff, Dr. Robert Lederer, is an individual with a residential address at 81 Palm Tree Drive, Punta Gorda, Florida.

2.  Defendant, John Snow, Inc. (hereinafter "JSI"), is a Massachusetts corporation with a principal place of business at 44 Farnsworth Street, Boston, Suffolk County, Massachusetts.

3.  Defendant, John Hopkins University / Center for Communication Programs (hereinafter "JHU/CCP"), has a principal place of business at 111 Market Place, Suite 310, Baltimore, Maryland.

## FACTS

4.  Defendants, JSI and JHU/CCP provide research and consulting services in the health care and service sectors.  JSI conducts projects in many countries throughout the world.

5.  In the year 2000, JSI was involved with a project entitled, "Romania Family Health Initiative", whose objectives were to increase access and use of reproductive health services and to develop and improve the availability of services at the community level in Romania.

6.  The Romania Family Health Initiative was a US AID – FUNDED PROGRAM in conjunction with Defendant JHU/CCP.

7.    In or about May, 1999, Plaintiff received a letter from Mr. Eric Rebbert, Human Resources Manager for Defendant JHU/CCP, requesting that Plaintiff submit his curriculum vitae concerning his involvement with the Romanian project.

8.    In or about September, 2000, Plaintiff was again contacted by an employee of Defendant JHU/CCP, Laurie Liskin, concerning said health care project already in progress in Romania.  Ms. Liskin informed Plaintiff that they would require an obligation from him of approximately one year. Plaintiff informed Ms. Liskin that he was interested in serving on the Team in Romania.

9.    On October 2, 2000, Plaintiff was informed by Mr. Rebbert that both Defendant JHU/CCP and JSI were interested in opening discussions with him relating to his involvement in the Romanian project.  Soon thereafter, Plaintiff was informed that the US Mission in Bucharest, was extremely pleased with Plaintiff's experience and credentials and would proceed with negotiations and an interview for the position.

10.    Subsequently, in October, 2000, Plaintiff met with JHU/CCP and JSI in Baltimore, Maryland.  Negotiations between the parties resulted in an Agreement.  It was agreed that Plaintiff would initially go to Romania until the Christmas holidays, then return to the United States to gather his personal belongings, including his dog, and return to Bucharest in early January for the duration of the project, i.e. October, 2001.

11.    Thereafter, Plaintiff made several inquiries concerning the status of his written contract.  On each occasion, Plaintiff was informed that Defendants were working on said contract, and that he would receive it shortly.

12.    By email dated November 29, 2000, Plaintiff was informed that Defendants were ready with his contract and that he should arrange his travel and logistics to Romania (a copy of said email is attached as Exhibit A and incorporated herein by reference).

13.    Furthermore, Plaintiff arranged for, and received several vaccinations in anticipation of his many months in Romania.

14.    On December 1, 2000, the day before Plaintiff was leaving for Romania, Plaintiff received what appeared to be a letter agreement dated November 27, 2000, which covered the period in Romania from December 4, 2000 to December 17, 2000.  Plaintiff was informed that he would receive a contract while in Romania, to cover his scope of work for year 2001.  A true and correct copy of the November 27, 2000 letter agreement is attached hereto as Exhibit B and incorporated herein by reference.

15.   Plaintiff left for Bucharest, Romania on or about December 4, 2000. He completed the initial phase of the project and returned to the United States for the holidays on or about December 19, 2000.

16.   Despite various assurances, Plaintiff did not receive a copy of the contract for the remaining period of the project through October, 2001.

17.   By email dated December 18, 2000, Plaintiff was informed that the original contract was not sent to Romania on the fear that it would not make it to the Plaintiff. A true and correct copy of said email dated December 18, 2000, is attached hereto as Exhibit C and incorporated herein by reference.

18.   As part of his duties, upon his return Plaintiff was to prepare a trip report which outlined his observations and experiences in Romania during the initial phase of the project. Plaintiff provided said report to the Defendants on or about January 2, 2000. A true and correct copy of said trip report is attached hereto as Exhibit D and incorporated herein by reference.

19.   Plaintiff's report contained important observations made concerning significant deficiencies with respect to strategic regional personnel, and the planning and operations of the project. JSI and JHU/CCP were not pleased with the contents of Plaintiff's trip report and during the course of several telephone conversations, offered Plaintiff additional funds in an attempt to influence the wording of said report.

20.   In fact, Plaintiff was threatened by Defendants with their withholding of payment for the days already served on the initial phase of this long-term assignment as well as reimbursement for expenses incurred during travel. Plaintiff refused to alter the report and subsequently, was asked by Kenneth Olivola of Defendant JSI to meet with him in Boston in late January, 2001.

21.   On or about January 22, 2001, Plaintiff came to Boston and met with Mr. Olivola of Defendant JSI. Mr. Olivola assured Plaintiff that Plaintiff's concerns and observations about the projects shortfalls warranted some major revisions, and that Plaintiff's position on the assignment was not in jeopardy. Mr. Olivola further informed Plaintiff that he would be contacted shortly regarding his departure schedule for Romania.

22.   Subsequently, Plaintiff never received a follow up call concerning his departure date to Romania. Furthermore, Defendant, JSI for a significant period of time failed to compensate Plaintiff for his time and expenses for the initial phase of the project, pursuant to the Agreement. In fact, to date,

Plaintiff has not been reimbursed for his expenses incurred during the initial phase of the project.

23.    Throughout this period, Plaintiff remained in contact with the U.S. Mission in Bucharest, JSI and JHU/CCP, voicing his continuing interest and enthusiasm about the project, and his concerns about not being informed of a date for his return to Romania to complete the second phase of the project pursuant to the parties Agreement.

24.    Subsequently, Defendants failed and/or refused to allow Plaintiff to return to Romania and complete the project and failed and/or refused to reimburse Plaintiff for expenses incurred.

**COUNT I**
**BREACH OF CONTRACT**

25.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 24 as if fully restated.

26.    As set forth above, by failing to allow Plaintiff to return to Romania in January, 2001, Defendants breached their contract with Plaintiff.

27.    As a direct of proximate result of said breach of contract, Plaintiff suffered damages.

WHEREFORE, Plaintiff prays for judgment against these Defendants as follows:

1.    For damages in an amount to be proven at trial;
2.    Interest, costs and attorneys' fees; and
3.    For whatever other relief this Court deems appropriate.


DR. ROBERT LEDERER
By His Attorneys,
RUBIN, WEISMAN, COLASANTI, KAJKO & STEIN, LLP


David B. Stein, BBO# 556456
430 Bedford Street
Lexington, MA 02420
Tel.: (781) 860-9500
Fax: (781) 863-0046


Dated: December 12, 2003

*Ex A*



music · movies · games · more
**Buy it Today @ fye.com**
Over 700 Stores Coast-to-Coast

Search th

**Hotmail**        Home   |   Inbox   |   Compose   |   Address Book   Options   Help

r_lederermd@hotmail.com

Calenda

Hotmail

Save Address(es)   Block                              **Previous   Next   Close**

Free New
MSN Feat
POP Mail
Find Nev
Reminde
Directone

From : "Erika Wagner" <EWAGNER@jhuccp.org>
To : <r_lederermd@hotmail.com>
CC : "KAREN ANGELICI" <kangelici@jhuccp.org>, <abul_hashem@jsi.com>
Subject : Please Call Hashem - Urgent
Date : Wed, 29 Nov 2000 10:59:19 -0500

Reply   Reply All   Forward   Delete   Put in Folder...              **Printer Friendly Version**

Explore

Free Gam
Find a Sp
'Net Acce
Share Ph
Send Mes
Chat Roo
Upgrade.
Find Old
Shop AT&
More...

** High Priority **

Hi Bob, JSI has received USAID concurrence so we are ready to get the
contract.  Please call Hashem ASAP to arrange your travel and logistics.  The
number is (703) 528-7474.
Thanks,
Erika

2002 Microsoft Corporation. All rights reserved. TERMS OF USE   Advertise   TRUSTe Approved Privacy Statement
GetNetWise

# JOHNS HOPKINS
U N I V E R S I T Y

*Ex B*

## Center for Communication Programs

School of Hygiene and Public Health
111 Market Place - Suite 310
Baltimore, Maryland 21202 USA
Telephone (410) 659-6300 / Fax (410) 659-6266
Telex 240430 JHUPCS UR

November 27, 2000

Dr. Robert Lederer
P.O. Box 110521
Naples, Florida 34108

Reference: CCP Consultancy

Dear Dr. Lederer:

We are happy to confirm your short-term appointment as a consultant for The Johns Hopkins University/Center for Communication Programs (JHU/CCP).

This assignment is to provide professional services in Romania for the period from December 4, 2000 to December 17, 2000 for a maximum of 14 working days, based on an eight-hour day, and a six-day work week, excluding travel time. Please note that John Snow Inc. (JSI) the Contractor does reimburse consultants for travel time.

Please review your scope of work carefully to ensure that you can complete the assignment within the specified time frame(s).

Your assignment is to assist JHU/CCP and John Snow Inc. (JSI) with the Women's Reproductive Health Initiative in Romania:

Specifically, you will:

1. Do a needs assessment of the current service delivery and management systems at family planning clinics in 3 judets.
2. Meet with JSI and USAID Romania to discuss scope of work for year 2001.

Please submit a printed report of your trip to Karen Angelici at JHU/CCP. The report should adhere to the enclosed trip report format instructions. This report should be received two weeks after you return from this assignment, in a form suitable for external distribution.

During your performance of these consulting services, your work will be reviewed by Karen Angelici, Acting Division Chief, E&E Division. Walter Proper, Chief of Party, JSI will be your contact in Romania.

In accepting this assignment, it is expressly understood that:

1.      You are not being compensated or receiving salary from other U.S. government funding sources for the time spent on JHU/CCP business.

2.      You have no conflict of interest that would interfere with the performance of your obligations under this assignment, and that you are not related by blood or marriage to any employee of the United States government

        or other agency who has decision-making authority over the award funding this assignment or over the project for which you will perform consulting services. You agree to notify your JHU/CCP staff contact immediately if you know of any such changes in your circumstances.

3.      You will not use any of the data or materials developed during your consultancy or in connection with the project you are assisting for public presentation or publication without prior written permission from JHU/CCP. Any reports or other materials produced are considered works made for hire with ownership vesting in JHU/CCP.

OCT-16-1900  15:40                                                                                      P.03

Dr. Robert Lederer
November 16, 2000

4.    You will assume all tax obligations including declaration and payment thereof.

5.    You are not covered by The Johns Hopkins University Unemployment Insurance or any other Johns Hopkins
      insurance plans or policies.

This agreement is limited solely to the services specified and does not give you authority to make binding commitments
on behalf of JHU/CCP.

Your fee for services will be paid at the rate of US $470 gross per day. This fee is payable upon completion and
submission of an acceptable report on the assignment. Enclosed is a "Consultant Fees Support Form," which you are
to complete at the end of the assignment and submit to the attention of your CCP staff contact.

For citizens or residents of the U.S., please note that all payments of fees and expenses made to you will be reported as
income for U.S. income tax purposes; therefore, it is imperative that you maintain accurate records of your business
expenses so that you can take the proper deductions when filing your tax returns. Original receipts and copies of expense
reports submitted to JSI for reimbursement should be maintained for your records for tax purposes.

All travel and related expenses will be handled by JSI. Copies of receipts are needed for lodgings, as well as for all
expenses over $25. *Please read carefully* the guidelines on allowable coverage, and be sure to use the JSI Travel
Expense Report for non-employees in reporting your expenses.

Please sign two copies as indicated at the end of this letter. One should be retained for your records and the other should
be returned to me for JHU/CCP records. Also, please provide the name and phone number for the person who should
be contacted in case of emergency.

If you need further information or have any problems or questions, we would be glad to provide assistance. We are
delighted that you are available for this consultancy and look forward to working with you.

                                              Sincerely,

                                              Alice Payne Merritt
                                              Deputy Project Director
                                              Center for Communication Programs

----[ELIV]
ACCEPTED AND AGREED:

_____
Signature

ROBERT LEDERER                                    12.1.00
_____                 _____
Name                                              Date

HUMEL VANd' VYVEL                                 941 637-1070
_____                 _____
Emergency Contact                                 Telephone number

                                                  USA
_____                 _____
Social Security Number                            Citizen of [Country]

Enclosures:    Consultant Fees Support Form
               Trip Report Format

Ex C

**MSN Home**  Hotmail  **Web Search**  **Shopping**  **Money**  **People & Chat**  Passport Sign out



**Hotmail®** *r_lederermd@hotmail.com*

Inbox  Compose  Address Book  Folders  Options                    Messenger  Calendar  Help

### Folder: Inbox

From:    "Erika Wagner" <EWAGNER@jhuccp.org> Save Address - Block Sender
To:      <r_lederermd@hotmail.com> Save Address
CC:      "KAREN ANGELICI" <kangelici@jhuccp.org> Save Address
Subject: Consultant Contract
Date:    Mon, 18 Dec 2000 09:29:05 -0500

    Reply        Reply All        Forward        Delete        Previous        Next        Close

Hello Bob, welcome back from Romania.  I did not receive the signed consultant
contract from you... please fax at your earliest convenience.  Also, please fax
the consultant fees form (I've attached another one) so that I can process your
payment.
Also, may I have your mailing address so I can send the original consultant
contracts for your signature - we need one original on file here.  I didn't want
to DHL it to Romania and risk you not receiving it.  In addition, please let me
know how you would like your payment made.  I can mail you a check or we can
directly wire it to an account.  If you would like it directly deposited, please
complete the attached fiscal information sheet with your bank information.  Hope
all is well.
Erika
PS. Karen will be getting in touch with you regarding a debrief (over the
phone).

    Attachment: CFSF.doc (32k) -- View Attachment
    Attachment: fiscalinfsht.doc (11k) -- View Attachment

*Notice*: Attachments are automatically scanned for viruses using  

    Reply        Reply All        Forward        Delete        Previous        Next        Close

              Move To  [(Move to Selected Folder)          ▼]

Inbox  Compose  Address Book  Folders  Options                    Messenger  Calendar  Help

Get notified when you have new Hotmail or when your friends are online, send instant messages, listen to music and more.
Try the new browsing software from Microsoft that makes it easy to get more from the Web. Get your FREE download of
MSN Explorer at http://explorer.msn.com

Other Links:                              Special Features:
Buy Music                                 How to cut your holiday phone bill
Download Music                            Experience MSN HighSpeed!
Buy Books                                 Baby's first steps? Share the moment!
Free Games                                Greeting cards: Christmas to Kwanzaa
Pharmacy                                  Take a walk on the wild side
More...                                   More...

© 2000 Microsoft Corporation. All rights reserved. MSN TERMS OF USE and NOTICES   TRUSTe Approved Privacy Statement

Ex D

Date:  1/02/01
To  :  U.S.A.I.D./ Romania
From:  Robert Lederer, M.D, M.P.H.

I was asked to visit Romania for nearly two weeks as Medical TA for thirty-six model service delivery sites in three judets at three service delivery levels. The model centers are located in the targeted judets- Lasi, Constanta and cluj. The breakdown of service levels is as follows:
*3 private family planning clinics
*17 government family planning cabinets
*15 rural dispensaries.

The purpose of this abridged visit to Romania turned out to be one whose design was actually to familiarize me with two Romanian physician project officers, Cornelia Maior-Rosca, Laurentiu Mihail Stan and the Project Director from JSI, Walter Proper. I spent nearly my entire stay, visiting 2 judets, Constanta and Lasi. I had the opportunity to visit approximately 10 sites, family planning cabinets, a family planning reference center and several rural dispensaries. Essentially, I was obliged to spend the majority of time during these visits, making cursory introductions and fielding a few questions from the doctors, which followed some basic inquiries I made relating to supplies and quality of service issues.

Paritally due to the pre-Holiday activities in Romania and partially due to organizational snafus in preparation for my arrival – re: itinerary, traveling time, etc., I was disheartened by the fact that my time was not utilized efficiently.

To say that need for competent TA exists within this target group of Judets, represents a gross understatement of existing problems that I have ALREADY assessed. Not having been adequately briefed on this current Project's budgetary constraints and evident manpower woes, I'll not comment on projections for meaningful outcomes.
I will, however, express concerns about the competence of the team presently assembled in Bucuresti. I have valid reasons for bringing this problem to your attention. As the Project is currently structured and being administered, I am not optimistic about its ACTUAL projected outcomes for the fall of 2001.

*I am certain that I can make significant contributions to the under-served, and to the needs of this Project, based upon the human suffering, deprivation and absence of medical organizational skills that I've witnessed. However, unless a reassessment is shortly forthcoming, regarding the present 3 member/ director "team", I must, in all honesty to the Mission, and as importantly, to my sense of propriety, plus personal and professional stature, withdraw my name from this ongoing burlesque – posing as a useful U.S./J.S.I. financed rural family planning project.

Very truly yours,

Robert A. Lederer, M.D., M.P.H.
RAL/b

# EXHIBIT H

THE JOHNS HOPKINS UNIVERSITY
CENTER FOR COMMUNICATION PROGRAMS
POPULATION COMMUNICATION SERVICES/POPULATION INFORMATION PROGRAM

## Consultant Fees Support Form

NAME OF CONSULTANT: _ROBERT LEDERER, M.A._

MAILING ADDRESS: _POB 110521_
(do not use P.O. Box) _NAPLES FL, 34108-0129_

SOCIAL SECURITY NO: _082340230_ CITIZEN OF _U.S._
(COUNTRY)

DATE(s) OF SERVICE: _18-3 / 12.17._

COUNTRY OF ASSIGNMENT: _ROMANIA_

| | | | |
|---|---|---|---|
| Preparation | _____ | Debriefing | _1_ |
| Report Writing | _____ | Travel Days | _3_ |
| Field Work | _12_ | Total # of Days | _16_ @ $ _490_ Per Day |
| | | Total Amount | $ _7520.00_ |
| | | Less Advance | $ _0_ |
| | | Total Amount Due | $ _7520.00_ |

SERVICES RENDERED: <u>Technical Assistance</u> BRIEF DESCRIPTION: _MEDICAL_
_ADVISOR_

I herein certify that I am not being compensated or receiving salary from other U.S. government funding sources for the time spent on JHU business, and thereby in accepting this fee, I am not receiving dual compensation from U.S. funds.

Signature: _____ Date: _12.21.00_

Return this form to your CCP staff contact at the following address:

The Johns Hopkins University
Center for Communication Programs
111 Market Place, Suite 310
Baltimore, MD 21202

FOR INTERNAL USE ONLY:

Approval of Service: _Karen Angelici_ Date: _1/16/01_
(CCP Contact)

Budget to be Charged: _____

<u>Sponsored Projects/Finance Unit</u> Okay to Pay

Authorized Signature: _____ Date: _____

x:\wp\forms\cfsf.wpd 12/97

000034

# JOHNS HOPKINS
U N I V E R S I T Y
BALTIMORE, MARYLAND 21215-2694

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  P
B206124

ALLFIRST FINANCIAL CENTER, N.A
MILLSBORO, DELAWARE

B 206124

62-17
311

DATE. 01/16/2001

******** DOLLARS AND 00 CENTS    $7,520.00#

E
R OF   ROBERT LEDERER
       PO BOX 110521
       NAPLES, FL

VOID AFTER 180 DAYS

⑈" 206124⑈"  ⑆:031100173⑆:      353000⑈⑈⑈"

# JOHNS HOPKINS
U N I V E R S I T Y

316 Garland Hall
3400 N. Charles Streets
Baltimore, Maryland 21218-2694

B 206124

| DICE DATE | INVOICE NUMBER | DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| | | | |

000037

From:        Erika Wagner
To:          abul_hashem@jsi.com
Date:        1/26/01 8:11AM
Subject:     Bob Lederer's Payment

Hello Hashem, I received your voicemail and a voicemail from Ken Olivia (JSI Boston) regarding Bob.
I Fed Ex'ed Bob's check last week (1/19) and confirmed with Fed Ex that the envelope was delivered on
Jan. 22, 2001. I sent it to: 2181 Palm Tree Drive, Punta Gorda, FL 33950 - this is the address he told me
to send it too.
As for the expense report, it was my understanding that JSI reimburses him for his expenses and that
Misun had sent Bob the necessary forms so basically it is up to Bob to submit his expense report and
receipts to JSI.  JHU has done nothing with his expenses.
I hope that helps.
Thanks,
Erika


CC:          Kangelic

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DR. ROBERT LEDERER,           )
     Plaintiff             )
                    )
                    )
VS.                           )          CIVIL ACTION NO.:
                    )          04-CV-10284-NG
                    )
JOHN SNOW, INC. AND THE       )
JOHN HOPKINS UNIVERSITY/      )
CENTER FOR COMMUNICATION      )
PROGRAM,                      )
     Defendants            )

## PLAINTIFF, ROBERT LEDERER'S ANSWER TO THE DEFENDANT JOHN HOPKINS UNIVERSITY/CENTER FOR COMMUNICATION PROGRAM'S FIRST SET OF INTERROGATORIES

1.    Please identify yourself fully, stating your full name, date of birth, social security number, residential address, business address and occupation.

*Answer*

     *Name:*
     **Robert Lederer, M.D.**
     **2181 Palm Tree Drive**
     **Punta Gorda, FL 33950**

     *Social Security No.* **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**

2.    What assurances were you given by any representative of John Hopkins University/Center for Communication Program ("JHU") that you were to receive a contract for employment/consulting for a period of time beyond December 19, 2000, as referenced in your Complaint, including in your answer:

    a.    who from JHU made those assurances;
    b.    when and where those assurances were made; and
    c.    were these assurances reduced to writing.

*Answer*

    **Assurances, with respect to my employment/consulting, from JHU/CCP, were provided primarily by Eric Rebberd and Karen Angelici. The assurances were**

made during my visit to Baltimore in October, 2000. Notes were taken by the various individuals mentioned.

I was told, on various occasions that I would receive the 'Agreement -hard copy' contract for employment/ consulting after my departure from the U.S., and shortly after my arrival in Romania. The essential elements of the agreement were discussed in great detail and finalized during my visit to Maryland in October, 2000. The following individuals were directly involved in the negotiations for the agreement from JHU: Abdul Hashem, Karen Angelici, and Eric Rebberd.

I directly discussed the details of the agreement for employment with Eric Rebberd and Karen Angelici, initially, AND with another staff female employee of JHU, who I believe formerly held the Position occupied by Ms. Angelici.

During my visit to Baltimore in October, 2000, the persons present at a very detailed discussion of the Project and Agreement were Abdul Hashem and Karen Angelici. At a separate meeting, during same visit, Eric Rebberd was present as well. The details of the negotiations were covered, as discussed in my Complaint. Notes were taken and again I was told that everything would be formalized in the documents that I would receive shortly after my arrival in Romania.

I discussed the generalized purpose and duration of my initial visit to Romania with Karen Angelici, Eric Rebberd and Abdul Hashem. Essentially, I was told that the the first trip to Romania was of an *introductory* nature: meeting with U.S. Mission Personnel in Bucharest, Project Team Members and pre-scheduled informal visits to various Romanian healthcare facilities. I was informed that due to an abbreviated stay, initially, little was expected in the form of substantive outcomes. Of great relevance, I was to be allowed *adequate* time in to secure long-term housing for myself and my companion/ dog.

A brief Scope of Work was shown to me, accompanied by the remarks that the projected goals were overly ambitious, 'possibly unattainable in its entirety' and that the prescribed amount of months remaining until the end of the Project, would require *my* adherence to a noticeably demanding schedule of six or seven day work- weeks until the Project's completion in October of 2001.

Following my return to the U.S. I had discussions with Kenneth Alveoli (JSI), Karen Angelici, Abdul Hashem and Erika Waggner. The topic of my 'continuing employment' was never questioned. I had an Agreement with JHU/CCP, JSI and I intended to honor this Agreement- completely. At this time, I do not have recall of the exact dates of conversations.

It was explained to me, unequivocally, by Ms. Angelici's predecessor, Karen Angelici, Abdul Hashem and Eric Rebbard that my services would be required for the duration of the RFHI Project Term, and that I would need to commit for the entire length of time, 2000 through 2001, *all* of it to be spent within the assigned Host Country- Romania.

3.      If you are alleging that you entered into a contract and/or agreement with JHU to

perform services for them in conjunction with the Romania Family Health Initiative for a period of time beyond December 19, 2000, please answer the following:

a.   was this agreement in writing;
b.   who participated in the negotiations for this agreement from JHU;
c.   when did these negotiations take place; and
d.   when and where were these agreements finalized.

*Answer*

**Please See Answer to Interrogatory No. 2.**

4.   With whom from JHU did you discuss, negotiate, or agree that your employment with the Romania Family Health Initiative/JHU was to be for a period of one year beginning in December of 2000.

*Answer*

**Please See Answer to Interrogatory No. 2.**

5.   With respect to the meeting you attended in Baltimore, Maryland in October 2000, please state the following:

a.   the parties present for such meeting;
b.   what type of negotiations took place as you allege in your Complaint; and
c.   was the substance of the negotiations ever reduced to writing.

*Answer*

**Please See Answer to Interrogatory No. 2.**

6.   Please state with which employees of JHU did you discuss the scope and duration of your employment with the Romania Family Health Initiative/JHU while you were in Romania in December 2000, including in your answer the substance of those discussions.

*Answer*

**Please See Answer to Interrogatory No. 2.**

7.   Please state fully and completely the substance of any and all conversations and/or negotiations you had with any JHU employees upon your return from Romania in December 2000 about your continuing employment with Romania Family Health Initiative/JHU, including in your answer the following:

a.   the name and employment title of the person(s); and
b.   the date(s) of such conversations/negotiations.

*Answer*

> Please See Answer to Interrogatory No. 2.

8.    Please state fully and in complete detail how you induced or were led to believe that you had a consulting contract with JHU to perform services in Romania in conjunction with the Romania Family Health Initiative for a period beyond December 19, 2000.

*Answer*

> Please See Answer to Interrogatory No. 2.

9.    Please describe fully and in complete detail all your damages which you claim to have received as a result of the events alleged in your Complaint.

*Answer*

> As a result of JHU's Breach of Contract, I lost approximately ten (10) months of income.  Plaintiff will supplement this interrogatory.

10.    Please state how you feel your report dated January 2, 2001 complies with the requirements of your short-term appointment as a consultant for JHU to draft a needs assessment of the current service delivery and management systems at family planning clinics in 3 judets as set forth in the November 27, 2000 agreement between you and JHU.

*Answer*

> As requested, I submitted an informal report, for the *introductory* leg of my pre-planned *two-* staged visits to Romania. The first stage, starting in December and the second stage to commence shortly after Jan. 1, 2001.  This report was delivered in the prescribed time period, as previously discussed.   At NO TIME was I led to believe that I was hired as a *short-term* consultant.

11.    If you feel that JHU intended to enter into a subsequent agreement with you for your services in Romania other than the one dated November 27, 2000, please state your basis for that belief.

*Answer*

> The basis for my understanding that JHU/CCP, JSI intended to enter into a long-term agreement with me is founded upon our detailed oral agreements and commitments that I provided to them *and* their responses to me.  Additionally, with their knowledge and assistance, I engaged in a series of preparatory steps for a long-term agreement: including immunizations, financial and personal transactions.

Signed under the pains and penalties of perjury this _14th_ day of February, 2005.


_____

DR. ROBERT LEDERER



## CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand.

Dated: 2/11/05    _____