UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DR. ROBERT LEDERER, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 04-CV-10284-NG |
| v. | ) ) | |
| JOHN SNOW, INC. AND THE JOHNS HOPKINS UNIVERSITY CENTER FOR COMMUNICATION PROGRAMS, | ) ) ) ) ) ) | |
| Defendants | ) ) | |

**DEFENDANT JOHN SNOW, INC.'S STATEMENT OF MATERIAL UNDISPUTED FACTS AND LEGAL ELEMENTS**

In accordance with LR 56.1, Defendant John Snow, Inc. submits this statement of material facts as to which there is no genuine issue to be tried and legal elements ("Statement of Facts" or "Statement") in support of its motion for summary judgment as to liability on all claims of Dr. Robert Lederer.

**UNDISPUTED MATERIAL FACTS**

**The Parties**

1. At all times relevant to this case, John Snow, Inc. ("John Snow") served as the prime contractor on the Women's Reproductive Health Initiative, a reproductive health services project in Romania funded by, and under the auspices of, the United States Agency for International Development ("USAID"). (Deposition of John Snow, by its Rule 30(b)(6) designee Kenneth Olivola ("Olivola Depo") p. 94, true copy attached to the Affidavit of Counsel Andrew F. Caplan as Exhibit A; Olivola Depo Exh 2, p. 2,

Section B, true copy attached to the Affidavit of Counsel Andrew F. Caplan as <u>Exhibit</u> B; Deposition of Johns Hopkins University, by its Rule 30(b)(6) designee Karen Angelici (Angelici Depo") p. 74, true copy attached to the Affidavit of Counsel Andrew F. Caplan as <u>Exhibit</u> C; see also Deposition of Robert Lederer, volume 2 ("Lederer Depo v2") pp. 116-18, true copy attached to the Affidavit of Counsel Andrew F. Caplan as <u>Exhibit</u> D) (Lederer understood project was under auspices of USAID, John Snow was the prime contractor for USAID, and both John Snow and Johns Hopkins both ultimately worked for USAID).

  2. The Johns Hopkins University Center for Communication Programs ("Johns Hopkins") served as a subcontractor to John Snow on the Women's Reproductive Health Initiative. (Angelici Depo p. 74, <u>see</u> Exhibit C to the Affidavit of Andrew F. Caplan; Olivola Depo Exh 2, p. 2, Section B, <u>see</u> Exhibit B to the Affidavit of Andrew F. Caplan).

  3. Johns Hopkins hired Lederer as a consultant and subcontractor to Johns Hopkins on the Women's Reproductive Health Initiative. (Angelici Depo pp. 76-77, <u>see</u> <u>Exhibit</u> C to the Affidavit of Andrew F. Caplan; Lederer Exh. 29 v2, true copy attached to the Affidavit of Andrew F. Caplan as part of <u>Exhibit</u> E).

**Negotiations**

  4. Starting in or about Autumn of 2000, Lederer had communications with defendants about a <u>potential</u> long-term position with the Women's Reproductive Health Initiative. Lederer Depo v1 pp. 69-70, 72-76, true copy attached to the Affidavit of Counsel Andrew F. Caplan as <u>Exhibit</u> F; Lederer Depo v2 pp. 20-22, <u>see</u> Exhibit D attached to the Affidavit of Andrew F. Caplan; & Exh 4 & 5 v2, true copy attached as part of <u>Exhibit</u> E to the Affidavit of Andrew F. Caplan.

  5. In early October 2000, Lederer was clearly advised, in writing, that the consulting position for which he was under consideration was with Johns Hopkins (not John Snow). (Lederer Depo v2 pp.179-81, <u>see</u> Exhibit D to the Affidavit of Andrew F.

2

Caplan; Lederer Depo Exh 19 v2, true copy attached as part of <u>Exhibit</u> E to the Affidavit of Andrew F. Caplan.

6. Lederer raised numerous issues during negotiations that his counterparts at Johns Hopkins and John Snow needed to consider and get back to him. (Caplan Aff Exh F: Lederer Depo v2 pp. 136-38). Lederer requested a written contract once the parties reached agreement on terms. (<u>Id.</u>).

7. It was important to Lederer to have the negotiations reduced to writing. (Lederer Depo v2 pp. 135-38, <u>see</u> Exhibit D to the Affidavit of Andrew F. Caplan; see also <u>id.</u> pp. 169-70). Lederer wanted a writing to establish that his laundry list of requests was met. (<u>Id.</u> pp. 136-38). Lederer "wanted a comprehensive looking contract, a legal looking-contract with content that [he] had requested. (<u>Id.</u> pp. 169-70). He "made it clear again and again and again" that he wanted a written contract so he could count on having the assignment and be sure of the terms. (<u>Id.</u> pp. 135-38, 169-70, 215-16).

8. Based on his prior experience working as a subcontractor to USAID contractors, Lederer understood that USAID <u>required</u> that agreements to hire subcontractors to work for USAID subcontractors <u>had to be</u> reduced to written agreements. (<u>Id.</u> pp. 135-38; see also <u>id.</u> pp. 169-70).

9. More specifically, Lederer understood that his alleged oral agreement for an assignment on the Romania project <u>had to be</u> reduced to a written contract. (<u>Id.</u> pp. 135-38; see also <u>id.</u> pp. 169-70).

10. Lederer expected that the written contract would govern the terms and conditions of his assignment. (<u>Id.</u> p. 138; see also <u>id.</u> pp. 169-70).

3

## The Written Contract

11.     On or about December 1, 2000, Lederer received a letter agreement from Johns Hopkins which stated, in pertinent part:

> We are pleased to confirm your short-term appointment as a consultant for The Johns Hopkins University/Center for Communication Programs (JHU/CCP).
>
> The assignment is to provide professional services in Romania for the period from December 4, 2000 to December 17, 2000 for a maximum of 14 working days…

(Complaint ¶14 and Exh. B, true copies attached to the Affidavit of Andrew F. Caplan as <u>Exhibit</u> G).

12.     Lederer read and understood the contract that Johns Hopkins furnished to him. (Lederer Depo v2 pp. 149-50, <u>see</u> Exhibit D to the Affidavit of Andrew F. Caplan; see also <u>id.</u> p. 107).

13.     Lederer signed the short term agreement and returned it to Johns Hopkins on or about December 1. (<u>Id.</u> pp. 167-69).

14.     John Snow is not a party to the written contract between Lederer and Johns Hopkins. (<u>See</u> Complaint Exh. B). Rather, Lederer and Hopkins were the parties to the contract. (<u>Id.</u>; see also Angelici Depo pp. 76-77, <u>see</u> Exhibit C to the Affidavit of Andrew F. Caplan).

15.     There is no written agreement for a long term position. (<u>See</u> Lederer Depo v2 p 124) (Lederer does not recall any document expressing an agreement or commitment for anything other than a two-week commitment) (<u>See</u> Exhibit D to the Affidavit of Andrew F. Caplan).

**Payments to Lederer**

16.  Lederer was paid in full all salary due and owing for his short term consultancy.  (See "Consultant Fees Support Form" signed by Lederer on December 21, 2000 reflecting a "total amount due" of $7520.00 (bates 000034); Johns Hopkins University check dated January 16, 2001 in the amount of $7520.00 payable to Lederer (bates 000037); and email dated January 26, 2001 stating that Johns Hopkins confirmed with FedEx that Lederer's check was delivered to him (bates 000038), true copies of these documents produced by Johns Hopkins in this action are attached to the Affidavit of Counsel Andrew F. Caplan as Exhibit H; Olivola Depo pp. 53-56, see Exhibit A to the Affidavit of Andrew F. Caplan).

17.  Lederer was fully reimbursed for all expenses he incurred on his consultancy.  (See Affidavit of Kenneth J. Olivola).  Despite claiming that his out-of-pocket expenses have not been fully reimbursed, Lederer is unable to state -- or even approximate -- the amount of unpaid expenses he is owed, other than to say the amount is "trivial" compared to his salary claim.  (Lederer Depo v2 pp. 250-257, 308-09, see Exhibit D to the Affidavit of Andrew F. Caplan; see also *Plaintiff Robert Lederer's Answer To The Defendant Johns Hopkins University/Center For Communication Program's First Set Of Interrogatories*, Response No. 9 (Q: "Please describe fully and in complete detail all your damages which you claim to have received as a result of the events alleged in your complaint."  A: As a result of JHU's Breach of contract, I lost approximately ten (10) months of income.  Plaintiff will supplement this interrogatory."), true copy attached to the Affidavit of Counsel Andrew F. Caplan as Exhibit I).

18.     In any event, Johns Hopkins, not John Snow, was responsible to pay Lederer's salary for the consultancy. (Angelici Depo pp. 21, 75-76, <u>see</u> Exhibit C to the Affidavit of Andrew F. Caplan; Olivola Depo pp. 37-38, <u>see</u> Exhibit A to the Affidavit of Andrew F. Caplan; see also Lederer Depo v2 p. 144) (Lederer was never told that John Snow would pay his salary), <u>see</u> Exhibit D to the Affidavit of Andrew F. Caplan.)

## **STATEMENT OF LEGAL ELEMENTS**

1.     In order to recover on a breach of contract claim, a plaintiff must prove that two or more parties formed a contract, that the defendant breached the contract, and that the plaintiff suffered actual damages as a result of the breach.  <u>Parlette v. Parlette</u>, 596 A.2d 665, 640 (Md. App. 1991), and cases cited.

2.     "It is an elementary substantive rule of the common law that parol evidence is inadmissible to vary or contradict the terms of a written instrument." <u>Housing Auth. of College Park v. Macro Housing, Inc.</u>, 340 A.2d 216, 218 (Md. 1975) (quoting <u>Freeman v. Stanbern Constr. Co.</u>, 106 A.2d 50 (Md. 1954)).  "Under the parol evidence rule, a written agreement 'discharges prior agreements,' thereby rendering legally inoperative communications and negotiations leading up to the written contract." <u>Calomiris v. Woods</u>, 727 A.2d 358, 36162 (Md. 1999) (citing Restatement (2d) Contracts §213 (1979).

|  |  |
|---|---|
|  | Respectfully submitted, <br> JOHN SNOW, INC. <br> By their Attorneys, |
|  | s/ Andrew F. Caplan <br> Andrew F. Caplan, BBO #564127 <br> Perkins Smith & Cohen LLP <br> One Beacon Street, 30th Floor <br> Boston, MA  02108 <br> (617) 854-4000 |
| Dated:  August 15, 2005 |  |
|  | s/ Andrew F. Caplan <br> Andrew F. Caplan |

7409-1-SJ FactsVr3.doc