UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. ROBERT LEDERER,<br>    Plaintiff | )<br>)<br>) |
| VS. | )<br>)<br>) CIVIL ACTION NO.:<br>) 04-CV-10284-NG |
| JOHN SNOW, INC. AND THE<br>JOHN HOPKINS UNIVERSITY/<br>CENTER FOR COMMUNICATION<br>PROGRAM,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOHN HOPKINS
UNIVERSITY/CENTER FOR COMMUNICATION PROGRAM AND JOHN SNOW, INC
MOTIONS FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Dr. Robert Lederer, who respectfully submits following as his Opposition to Defendants' John Hopkins University/Center Communication Program and John Snow, Inc.'s Motions for Summary Judgment a request that this Honorable Court deny Defendants' Motions for Summary Judgment.

**INTRODUCTION**

The basis of Plaintiff's claims against Defendants John Hopk University/Center for Communication Program (hereinafter "John Hopkins") and Jc Snow, Inc. (hereinafter "John Snow") is simply Defendants' failure to follow through w their agreement and contractual obligations. Both Defendants base their Motions Summary Judgment on the parol evidence rule, which would prohibit the introduction any evidence beyond the written Agreement. However, since the facts a circumstances surrounding the signing of the document are in question, this dispute not subject to the parol evidence rule. Furthermore, as set forth below, Plaintiff clai that the written Agreement in question is a partially integrated agreement and may

supplemented by evidence of consistent additional terms. In other words, [the] Agreement dated November 27, 2000, attached hereto as Exhibit A, did not contain [all] of the terms of the Agreement between the Parties.

Therefore, Summary Judgment in favor of the Defendants is inappropriate a[s a] matter of law.

Because of the fact that both Defendants rely essentially on the parol evide[nce] rule as the basis of their respective Motions, Plaintiff has included both Defenda[nts] within this Opposition.

## FACTS

Defendants, John Snow, Inc. (hereinafter "JSI") and John Hopk[ins] University/Center for Communication Program (hereinafter "John Hopkins") pro[vide] research and consulting services in the health care and service sectors. JSI condu[cts] projects in many countries throughout the world.

At all times pertinent hereto, JSI was involved with a project entitled, "Roma[nia] Family Health Initiative", whose objectives were to increase access and use [of] reproductive health services and to develop and improve the availability of services [at] the community level in Romania.

The Romania Family Health Initiative was a US AID – FUNDED PROGRAM [in] conjunction with Defendant John Hopkins.

In or about May, 1999, Plaintiff received a letter from Mr. Eric Rebbert, Hum[an] Resources Manager for Defendant John Hopkins, requesting that Plaintiff submit [a] curriculum vitae concerning his involvement with the Romanian project. See Affidavi[t of] Dr. Robert Lederer, attached hereto as Exhibit A and incorporated herein by referenc[e.]

In or about September, 2000, Plaintiff was again contacted by an employee [of] Defendant John Hopkins, Laurie Liskin, concerning said health care project alread[y in] progress in Romania. Ms. Liskin informed Plaintiff that they would require an obligat[ion] from him of approximately one year. Plaintiff informed Ms. Liskin that he was interes[ted] in serving on the Team in Romania. Lederer Affidavit, ¶2.

On October 2, 2000, Plaintiff was informed by Mr. Rebbert that both Defenda[nts] John Hopkins and JSI were interested in opening discussions with him relating to [

involvement in the Romanian project. Soon thereafter, Plaintiff was informed that US Mission in Bucharest, was extremely pleased with Plaintiff's experience credentials and would proceed with negotiations and an interview for the posit Lederer Affidavit, ¶3.

Subsequently, in October, 2000, Plaintiff met with John Hopkins and JS Baltimore, Maryland. Negotiations between the parties resulted in an Agreement was agreed that Plaintiff would initially go to Romania until the Christmas holidays, t return to the United States to gather his personal belongings, including his dog, return to Bucharest in early January for the duration of the project, i.e. October, 2C Lederer Affidavit, ¶4.

Thereafter, Plaintiff made several inquiries concerning the status of his wri contract. On each occasion, Plaintiff was informed that Defendants were working said contract, and that he would receive it shortly. Lederer Affidavit, ¶5.

By email dated November 29, 2000, Plaintiff was informed that Defendants w ready with his contract and that he should arrange his travel and logistics to Romani copy of said email is attached as Exhibit B and incorporated herein by reference).

Furthermore, Plaintiff arranged for, and received several vaccinations anticipation of his many months in Romania. He also made arrangements for his to return with him to Romania. Lederer Affidavit, ¶9.

On December 1, 2000, the day before Plaintiff was leaving for Romania, Plai received what appeared to be a letter agreement dated November 27, 2000, wh covered the period in Romania from December 4, 2000 to December 17, 2000. Plai was informed that he would receive a contract while in Romania, to cover his scope work for year 2001. Furthermore, Dr. Lederer was instructed to meet v representatives of JSI and USAID to discuss his scope of work for 2001. Lede Affidavit, ¶7. A true and correct copy of the November 27, 2000 letter agreemen attached hereto as Exhibit C and incorporated herein by reference.

Plaintiff left for Bucharest, Romania on or about December 4, 2000. completed the initial phase of the project and returned to the United States for holidays on or about December 19, 2000. Lederer Affidavit, ¶11.

Despite various assurances, Plaintiff did not receive a copy of the contract r the remaining period of the project through October, 2001. Lederer Affidavit, ¶11.

Subsequently, Defendants failed and/or refused to allow Plaintiff to return Romania and complete the project.

### ARGUMENT

### I.   THE STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is a 'device to make possible the prompt disposition f controversies on their merits without a trial if, in essence, there is no real dispute a the salient facts or if only a question of law is involved.'" *Cassesso v. Commissione Correction*, 390 Mass. 419, 422 (1984) (quoting *Community National Bank v. Dav* 369 Mass. 550, 553 (1976)). If questions of material fact remain, then summ judgment is inappropriate and must be denied.

If a motion for summary judgment is supported by pleadings, affida depositions or other admissible materials, the opposing party must submit of admissible materials setting forth facts showing that there is a genuine issue for t See *Godbout v. Cousens*, 396 Mass. 254, 261-262 (1985); *Madsen v. Erwin*, 395 Ma 715, 719 (1985). A motion for summary judgment that is unsupported, or is oppo with admissible materials showing that the movant is not entitled to summary judgm must be denied. See *id.*

"Moreover, '[t]he evidence is 'considered with an indulgence in the [oppos party's] favor.' ' [citations omitted] " *Wilton Properties II, Inc. v. 99 West, Inc.*, 2000 33170832 (pg. 2) (Mass. Super. 2000).

### II.   CONFLICT OF LAWS

Plaintiff is in agreement with Defendants that the Substantive Law Massachusetts, Florida and Maryland are consistent with respect to issues relating contract interpretation and parol evidence, and therefore no conflict of laws exist.

### III. THE FACTS AND CIRCUMSTANCES SURROUNDING THE SIGNING OF T[HE] CONTRACT REFLECT THE PARTIES' TRUE INTENTIONS AND THEREFORE, THE PAROL EVIDENCE RULE DOES NOT APPLY

#### A. The Agreement in Question is a Partially Integrated Agreement

The parol evidence rule is inapplicable to the facts of this case.

Prior to any consideration of the parol evidence rule, the Trial Judge m[ust] determine first whether the contract is a totally integrated agreement, or parti[ally] integrated. *Antonellis v. Northgate Construction Corp.*, 362 Mass. 847, 849, [292] N.E.2d 626, 627 (1973). A totally integrated agreement is most likely to exist when [the] contract in question contains a "merger clause", which essentially states that the wri[ting] is the entire agreement of the parties. *See* Restatement, 2d, Contracts, §209. [The] contract in question here has no such merger clause.

"In order to determine whether the oral agreement is to be given effect, the court must first determine" whether an agreement is "the entire agreement of [the] parties." *Alexander v. Snell*, 12 Mass. App. Ct. 323, 324 (1981). The question [of] whether or not a written agreement reflects the entire agreement is an issue of fact [for] the decision of the Trial Judge, entirely preliminary to any application of the p[arol] evidence rule. *Id.* at 324. Therefore, evidence of negotiations, discussion and deali[ngs] are admissible in order to determine whether or not the written agreement reflects [the] entire agreement. *Id.* A judge may hear evidence beyond the writing for the purpos[e of] discovering the intention of the parties and determining whether the formal cont[ract] contained the entire agreement of the parties. *Antonellis v. Northgate Construc[tion] Corp.*, 362 Mass. 847, 849 (1973).

As the evidence will demonstrate, there was clearly a great deal of discussi[on] and negotiation above and beyond the written Agreement dated November 27, 20[01]. As set forth above, the evidence will clearly demonstrate that all discussions a[nd] negotiations between the parties leading up to the presentation of the Agreement to Lederer, focused on the fact that Dr. Lederer's involvement would extend until [the] completion of the project. Lederer Affidavit, ¶4. Any consideration of a short-te[rm] assignment was never discussed with Dr. Lederer. Lederer Affidavit, ¶8. Furtherm[ore,] Dr. Lederer's actions, including, but not limited to, receiving immunizations, mak[ing]

arrangements with his bank and receiving clearance to return to Romania with his c, lends credence to Plaintiff's position of a long-term commitment.

The evidence also clearly indicates that leading up to the receipt of Agreement by Dr. Lederer, Defendants were considering other candidates. In f Plaintiff received the Agreement only a few days prior to his scheduled depart Nevertheless, Dr. Lederer was expecting to receive a long-term Agreement while was in Romania. Lederer Affidavit, ¶7.

The fact that the Agreement references that Dr. Lederer was to return Romania following the holidays supports Plaintiff's argument that the writing wa partially integrated Agreement. Specifically, one of the two scopes of work outline the November 27, 2000 Agreement refers to Dr. Lederer's obligation to discuss scope of work in Romania following the holidays. It states that Dr. Lederer will "2. M with JSI and USAID Romania to discuss scope of work for year 2001."

As argued by the Defendants, the language in the Agreement concerning Lederer's scope of work for 2001, is also unambiguous and unequivocal. The langu contained in said document, clearly demonstrates the intention of the Defendants have Dr. Lederer return to Romania following the holidays.

Quite simply, there is sufficient evidence to create, at the very least, a ques of fact as to whether the Agreement dated November 27, 2000 contained the er agreement of the parties. It is nonsensical that fifty-percent of Dr. Lederer's assignm as outlined in the Agreement, would concern his scope of work for 2001, if Defenda argument is to be accepted that the Agreement between the parties, was nothing m than a two-week assignment.

Furthermore, as argued by the Defendants, Plaintiff is not attempting to var contradict the terms of the November 27, 2000 Agreement. Rather, as set forth abc Plaintiff argues that the November 27, 2000 Agreement is a partially integra agreement, or one which does not state all of the terms agreed upon. Therefore, Court can consider other facts and circumstances surrounding the signing of s document. *Antonellis v. Northgate Construction Corp.*, 362 Mass at 849.

Furthermore, significant pressure was placed upon Dr. Lederer to induce him sign the initial agreement reflecting the shorter time frame in Romania. Dr. Lederer informed that the contract was needed back immediately or else he would not allowed to leave for Romania. Lederer Affidavit, ¶7. These facts and circumstan surrounding the execution of the document are important facts at issue.

The parol evidence rule does not bar the showing of facts and circumstances surrounding the signing of the document. *Robert Industries, Inc. v. Spence*, 362 Mas 751, 753 (1973).

### CONCLUSION

For the reasons set forth above, the Plaintiff respectfully requests that this Co deny Defendants' Motion for Summary Judgment.

DR. ROBERT LEDERER
By His Attorneys,
RUBIN, WEISMAN, COLASANTI,
KAJKO & STEIN, LLP

_____
David B. Stein, BBO# 556456
430 Bedford Street
Lexington, MA 02420
Tel.: (781) 860-9500
Fax: (781) 863-0046

Dated: September 23, 2005

### CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand.

Dated: 9/23/05  _____