UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. ROBERT LEDERER, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 04-10284-JGD |
| JOHN SNOW, INC. and ) | |
| THE JOHNS HOPKINS ) | |
| UNIVERSITY/CENTER FOR ) | |
| COMMUNICATION PROGRAM, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF DECISION AND ORDER
ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

January 19, 2006

DEIN, U.S.M.J.

## I. INTRODUCTION

The defendant, John Snow, Inc. ("John Snow" or "JSI"), was the prime contractor on the Women's Reproductive Health Initiative, a reproductive health services project in Romania funded by the United States Agency for International Development ("USAID"). The defendant, Johns Hopkins University/Center for Communication Program ("Johns Hopkins" or "JHU/CCP"), was a subcontractor to John Snow on the project. The plaintiff, Dr. Robert Lederer ("Dr. Lederer"), was hired as a consultant in connection with the Romanian Women's Reproductive Health Initiative.

Dr. Lederer has brought this action alleging that the defendants are liable for breach of contract for not allowing him to work for the full eight-months of the project,

but, rather, limiting his involvement to the 14 day period specified in a written letter agreement which he signed. This matter is presently before the court on Johns Hopkins' Motion for Summary Judgment (Docket No. 33) and John Snow's Motion for Summary Judgment (Docket No. 34). This court finds that the language of the written agreement is clear and unambiguous, that the document is a fully integrated agreement, and that the plaintiff may not alter its terms by way of parol evidence. Therefore, and for all the reasons detailed herein, both motions for summary judgment are ALLOWED.

## II.  STATEMENT OF MATERIAL FACTS[1]

John Snow was the prime contractor on the Women's Reproductive Health Initiative, a reproductive health services project in Romania which was funded by USAID. (Snow SF ¶ 1). The objectives of the Initiative "were to increase access and use of reproductive health services and to develop and improve the availability of services at the community level in Romania." (Complaint ¶ 5). Johns Hopkins was a subcontractor on the project pursuant to the terms of a written subcontract agreement. (Hopkins Ex. B). As detailed in the subcontract, Johns Hopkins was "to provide technical services to JSI in support of the Women's Reproductive Health Initiative. The overall objective of the

---

[1] The facts are derived generally from "Defendant John Snow, Inc.'s Statement of Material Undisputed Facts and Legal Elements" (Docket No. 38) ("Snow SF"), as well as the Exhibits attached to the Affidavit of Counsel Andrew F. Caplan (Docket No. 36) ("Snow Ex."); the Statement of Undisputed Facts contained in the "Memorandum of Law in Support of the Defendant, Johns Hopkins University's, Motion for Summary Judgment" (Docket No. 33-2) ("Hopkins SF") and attached exhibits ("Hopkins Ex."); and plaintiff's Facts as set forth in "Plaintiff's Opposition to Defendants' John Hopkins University/Center for Communication Program and John Snow, Inc. Motions for Summary Judgment" (Docket No. 40) ("PF") and attached exhibits ("Pl. Ex.").

prime task order is to provide technical assistance and training in developing a redesigned, integrated and effectively managed reproductive health services system in Romania." (Id. at p. 2). The period of the subcontract was from approximately November 8, 1999 through September 28, 2001. (Id. at p. 1; Bates Nos. JA 10000000101-102).

According to Dr. Lederer, he was contacted by employees of Johns Hopkins, first in about May, 1999 and then again in about September and October, 2000, to discuss his potential involvement with a project that was already in progress in Romania. (Pl. Ex. A (Dr. Lederer Affidavit) at ¶¶ 1-3). Prior to any substantive discussions, Dr. Lederer was told that Johns Hopkins would require an obligation of approximately one year. (Id. ¶ 2). In October, 2000, Dr. Lederer traveled to Baltimore, Maryland, and met with representatives of Johns Hopkins and John Snow. (Id. ¶ 4; Hopkins SF ¶ 2). The purpose of the meeting, as described in an e-mail to Dr. Lederer from Johns Hopkins, was to "discuss the possibility of a position/consultancy with [Johns Hopkins]." (Snow SF ¶ 5; Snow Ex. D (Lederer Dep. Vol. II) at 180). Dr. Lederer describes the relevant events as follows in his affidavit:

> Subsequently, in October, 2000, I met with representatives of both John (sic) Hopkins and JSI in Baltimore, Maryland. Following our meetings and negotiations, it was agreed that I would initially go to Romania until the Christmas holidays, and then return to the United States to gather my personal belongings, including my dog, and return to Bucharest in early January for the duration of the project, i.e. October 2001. I accepted this arrangement.

(Pl. Ex. A ¶ 4). At his deposition, Dr. Lederer had testified that he understood that any agreement to work for USAID had to be in writing, and that he expected that his agreement would be reduced to writing. (Snow Ex. D at 135-36). He testified further that at the meeting in October he brought up "a laundry list" of items which John Snow and Johns Hopkins had to discuss and check into, and that they were supposed to be getting back to him. (Id. at 136).[2] Dr. Lederer expected and required a written agreement which would include all of the terms of his agreement. (Id. at 136-38). As Dr. Lederer testified, he "wanted a comprehensive contract, a legal-looking contract with content that I had requested. I wanted all and every item that had been discussed during the Baltimore summit to materialize in a written form on the sheets of a contract." (Id. at 169-70).

After the Baltimore meeting, Dr. Lederer made several inquiries about the status of the written contract, and was told that it would be forthcoming. (Pl. Ex. A ¶ 5). On November 29, 2000, he received an e-mail which stated that "JSI has received USAID concurrence so we are ready to go with your contract. Please call Hashem ASAP to arrange your travel and logistics." (Pl. Ex. A ¶6; Pl. Ex. B). On December 1, 2000, Dr. Lederer received a letter agreement dated November 27, 2000, which "covered the

---

[2] Among the items which were discussed and which Dr. Lederer wanted included in a written document were who was to pay for vaccinations, who was responsible for adjunct payments for flying and taking care of his dog, house stipends, and his work schedule (i.e., "six six-day work weeks, or in a month, will there be seven and three six days."). (Id. at 170). The housing arrangement "was very important" to Dr. Lederer and he wanted it in the written contract, as well as a resolution of the issue of how to deal with a family emergency if one arose. (Id. at 171-72). There is no evidence in the record that any of these items were resolved.

period in Romania from December 4, 2000 to December 17, 2000." (Pl. Ex. A ¶ 7). He was told that the document had to be signed and returned immediately, or he would not be able to leave. (Id.). The Agreement, which Dr. Lederer did sign, provided in relevant part as follows:

> We are happy to confirm your short-term appointment as a consultant for The Johns Hopkins University/Center for Communication Programs (JHU/CCP).
>
> The assignment is to provide professional services in Romania for the period from December 4, 2000 to December 17, 2000 for a maximum of 14 working days, based on an eight-hour day, and a six-day work week, excluding travel time.
>
> Please review your scope of work carefully to ensure that you can complete the assignment within the specified time frame(s).
>
> Your assignment is to assist JHU/CCP and John Snow Inc. (JSI) with the Women's Reproductive Health Initiative in Romania:
>
> Specifically, you will:
>
> 1.  Do a needs assessment of the current service delivery systems at family planning clinics in 3 judets.
> 2.  Meet with JSI and USAID Romania to discuss scope of work for year 2001.
>
> Please submit a printed report of your trip to Karen Angelici at JHU/CCP. The report should adhere to the enclosed trip report format instructions. This report should be received two weeks after you return from this assignment, in a form suitable for external distribution.
>
> . . . .
>
> Your fee for services will be paid at the rate of US $470 gross per day. This fee is payable upon completion and submission of an acceptable report on the assignment. Enclosed is a "Consultant Fees

> Support Form," which you are to complete at the end of the
> assignment and submit to the attention of your CCP staff contact.

(Pl. Ex. C).

Dr. Lederer understood that the term of the contract he was signing was for a limited, 14-day, period. (Pl. Ex. A ¶ 7; Hopkins SF ¶ 7). However, he contends, he was informed (by an unspecified person) that he "would receive a contract while in Romania to cover [his] scope of work for year 2001." (Pl. Ex. A ¶ 7). Dr. Lederer further asserts in support of his claim that "the letter Agreement [he] received instructed [him] to meet with representatives of JSI and USAID Romania to discuss [his] scope of work for [his] return trip to Romania in January, 2001." (Id.). As detailed, below, however, this court finds this interpretation of the contract to be without merit. Rather, the clear language of the Agreement provided that Dr. Lederer would meet with JSI and USAID to discuss the scope of the Initiative for the upcoming year, not Dr. Lederer's work in particular.

Dr. Lederer signed the Agreement on December 1, 2001, under the phrase "ACCEPTED AND AGREED" and went to Romania for the period covered by the Agreement. (Pl. Ex. C; Pl. Ex. A ¶ 11). Before leaving, he made several arrangements for an extended trip to Romania, including getting vaccinations, making arrangements with his bank and the post office, and making plans to bring his dog back with him after Christmas. (Pl. Ex. A ¶ 9). He also gave up a house he was renting in Florida, and, while in Romania, looked for a long-term living arrangement there. (Id. ¶¶ 9-10). Dr. Lederer

never received a "second contract" while in Romania, and he returned home on or about December 19, 2000.  (Id. ¶ 11).

In accordance with the Agreement, Dr. Lederer submitted a report dated January 2, 2001.  (Hopkins Ex. D).  Therein, he confirmed that he "was asked to visit Romania for nearly two weeks as Medical TA for thirty-six model service delivery sites in three judgets at three service delivery levels."  (Id.).  He provided his assessment of the project, which was extremely unfavorable.  He found that his time had not been utilized efficiently both "due to the pre-Holiday activities in Romania" as well as due to "organizational snafus."  (Id.).  As Dr. Lederer characterized the situation, "[t]o say that need for competent TA exists within this target group of Judets, represents a gross understatement of existing problems that I have ALREADY assessed."  (Id.).  He expressed "concerns about the competence of the team presently assembled in Bucuresti" and reported that given the existing structure and administration of the project, he was "not optimistic about its ACTUAL projected outcomes for the fall of 2001."  (Id.).  Finally, Dr. Lederer did not indicate that he had a firm commitment and/or obligation to return to Romania in January.  Rather, he reported as follows:

> I am certain that I can make significant contributions to the under-served, and to the needs of this Project, based upon the human suffering, deprivation and absence of medical organizational skills that I've witnessed.  However, unless a reassessment is shortly forthcoming, regarding the present 3 member/director "team", I must, in all honesty to the Mission, and as importantly, to my sense of propriety, plus personal and professional stature, withdraw my name from this ongoing burlesque – posing as a useful U.S./J.S.I. financed rural family planning project.

(Id.).  On January 16, 2001, Johns Hopkins paid the plaintiff the full amount under the Agreement, $7,520.00.  (Hopkins SF ¶ 10).

### III.  ANALYSIS

#### A.  Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal citations omitted).  A material fact is one which has the "potential to affect the outcome of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  See id. at 324, 106 S. Ct. at 2553.  In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation."  Galloza v. Foy, 389 F.3d 26, 28

(1st Cir. 2004) (internal citation omitted).  Applying these principles to the instant case mandates that the defendants' motions for summary judgment be allowed.

    **B.**    **The Breach of Contract Claim**[3]

        **1.**    **General Principles of Contract Interpretation**

It is an "elementary" principle of contract interpretation that "an unambiguous agreement must be enforced according to its terms."  Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706, 592 N.E.2d 1289, 1292 (1992).  Moreover, the interpretation of an unambiguous contract is a question of law to be decided by the court.  Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779, 761 N.E.2d 946, 951 (2002).  Where an agreement is fully integrated, i.e., "includes the whole agreement of the parties and comprises all that is necessary to constitute a contract," then parol evidence of any antecedent agreement offered to "modify, enlarge, or vary the terms of an integrated document" is inadmissible.  Charles A. Wright, Inc. v. F.D. Rich Co., 354 F.2d 710, 714 (1st Cir. 1966) (internal quotations omitted).  It is only where the language is ambiguous that "preliminary negotiations, the conduct of the parties, and interviews between them after the contract is executed are relevant matters and are admissible in evidence, not to vary or enlarge the agreement, but to define the meaning of the terms the parties employ."  Rizzo

---

[3] The parties all agree that there is an issue as to which state's law applies — Maryland (where the contract was negotiated and Johns Hopkins is located), Florida (where the contract was signed by Dr. Lederer), and Massachusetts (where John Snow is based).  However, they further agree that the relevant law of these jurisdictions is the same, so the conflicts issue does not need to be resolved.  See Kaufman v. Richmond, 442 Mass. 1010, 1012, 811 N.E.2d 987, 989 (2004).  For convenience, the court will cite to Massachusetts law.

v. Cunningham, 303 Mass. 16, 21, 20 N.E.2d 471, 474 (1939). While Dr. Lederer does not dispute these fundamental principles, he argues that the parties' Agreement is only a "partially integrated" document, and that, consequently, the parol evidence rule has no application to the instant case. This court disagrees.

### 2. The Agreement is Fully Integrated

It is a question for the trial judge to determine whether a document is the entire agreement of the parties. Alexander v. Snell, 12 Mass. App. Ct. 323, 324, 424 N.E.2d 262, 264 (1981). "For this purpose evidence of the negotiations is admissible as bearing upon the extent to which the [document] was intended as an integration of the prior undertakings of the parties." Id. See also Antonellis v. Northgate Constr. Corp., 362 Mass. 847, 849, 291 N.E.2d 626, 627 (1973) (integration determined by evidence other than the writing).

Here the written document contains all the relevant terms of the parties' agreement. It details, inter alia, the duration, price and obligations of the parties.[4] Thus, "the written agreement demonstrate[s] on its face that it included the whole agreement of the parties and all that was necessary to constitute a contract." Carlo Bianchi & Co. v. Builders' Equip. & Supplies Co., 347 Mass. 636, 643-44, 199 N.E.2d 519, 524 (1964). "Where a writing shows on its face that it includes the whole agreement of the parties and

---

[4] While not considered by the court in determining whether the contract was intended by the parties to be a fully integrated document, this court notes that Dr. Lederer confirmed in his report following his trip that he had been sent to Romania for "nearly two weeks." (Hopkins Ex. D).

comprises all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction.  And all their stipulations relating to its subject matter are to be found within the written instrument." Berman v. Geller, 325 Mass. 377, 379-80, 90 N.E.2d 843, 845 (1950) (internal citations omitted).  Accord Commerce Bank & Trust Co. v. Hayeck, 46 Mass. App. Ct. 687, 691, 709 N.E.2d 1122, 1126 (1999) (finding the notes were integrated documents because documents were unambiguous and apparently complete).

Dr. Lederer points to his assignment as defined in the Agreement as evidence that the parties intended to have another contract governing his continued involvement in the Initiative, and that the Agreement was only a partially integrated document.  Specifically, he relies on the language that he "[m]eet with JSI and USAID Romania to discuss scope of work for year 2001."  (Pl. Ex. C).  This language, however, does not indicate any agreement to have Dr. Lederer continue to participate in the Initiative in 2001.

The purpose of the Initiative was to help develop a "redesigned, integrated and effectively managed reproductive health services system in Romania."  (Hopkins Ex. B at 2).  Dr. Lederer was to join an already ongoing project.  The period of his contract – December 4-17, 2000 – was clearly set out in the Agreement, and was defined as being a "short-term appointment."  (Pl. Ex. C).  By the terms of the Agreement, Dr. Lederer had to be able to complete his "assignment," as defined by the Agreement, within the specified time frame and he had to file a report within two weeks after his return from the

assignment. (Pl. Ex. C).[5] Reading the relevant contract phrase either alone or in the context of the entire agreement, it is clear that Dr. Lederer's task to "[m]eet with JSI and USAID Romania to discuss scope of work for year 2001" related to defining the work of the Initiative, and not Dr. Lederer's work in particular. His "assignment" was a limited evaluation of existing conditions, and there is nothing in the Agreement which in any way indicated that Dr. Lederer had to be involved beyond the two week period to complete his "assignment." There is nothing in the language of the Agreement that creates an ambiguity as to whether the Agreement was intended to be fully integrated.

Nor does a review of the evidence relating to the negotiation of the Agreement create an ambiguity as to the completeness of the document Dr. Lederer actually signed. Even a generous reading of the record in Dr. Lederer's favor shows that he had a "laundry list" of subjects which he expected to be included in any long-term arrangement, and that no resolution was ever reached on any of these critical issues. See note 2, supra. The negotiations make it clear that Dr. Lederer understood, and, in fact, demanded, that a written document be executed if and when the parties reached agreement on a longer term arrangement. There is nothing in the negotiations which casts doubt on the completeness of the short term consultancy agreement which was detailed in the signed written agreement.

---

[5] Again, Dr. Lederer's post-assignment conduct in delivering a report in January, 2001, shows that he understood the term of the assignment to end in December, 2000.

Dr. Lederer, in fact, is not seeking to challenge the defendants' conduct under the signed Agreement, but, rather, is attempting to create a new, long-term contract. However, parol evidence "is not received for the purpose of constructing a new contract or varying the old one," just to help explain any "doubtful or ambiguous terms[.]" Rizzo, 303 Mass. at 21, 20 N.E.2d at 474.[6] The duration of the short term consultancy is not ambiguous and the defendants' motion for summary judgment will be allowed. "A judge uses summary judgment for the purpose for which it was intended when, as in this case, a party seeks to alter what the agreement provides by saying, in effect, 'that was not what we meant at all.'" USTrust v. Henley & Warren Mgmt., Inc., 40 Mass. App. Ct. 337, 343, 663 N.E.2d 1238, 1242 (1996).

### 3. Duress

Dr. Lederer notes in passing that there was significant pressure placed on him to sign "the initial agreement reflecting the shorter time frame in Romania" or he would not be able to leave. (See Pl.'s Opposition (Docket No. 40) at 7). This argument is not sufficiently developed to warrant consideration by the court. In any event, in order to avoid an agreement due to duress, Dr. Lederer has to establish "that the conduct by the other party caused him to enter the contract under the influence of such fear as

---

[6] While not argued by any of the parties, Dr. Lederer cannot establish that the parties had reached an agreement as to the terms of a second contract to be delivered to him in Romania. The terms of any long-term agreement were too indefinite to be enforceable since there was no agreement as to duration, duties, work schedule or payments. See Schwanbeck, 412 Mass. at 709-10, 592 N.E.2d at 1293-94.

preclude[d] him from exercising free will and judgment." See <u>Delaney v. Chief of Police of Wareham</u>, 27 Mass. App. Ct. 398, 407, 539 N.E.2d 65, 70 (1989) (internal quotations omitted). Dr. Lederer has not met this burden. Therefore, any claim of duress must fail.

### 4. John Snow, Inc.

Finally, John Snow has moved for summary judgment on the grounds that it had no contractual relationship with the plaintiff. Since the record does establish that Dr. Lederer's contract was with Johns Hopkins, summary judgment in favor of John Snow, Inc. is appropriate for this reason as well.

### IV. CONCLUSION

For all the reasons detailed herein, the motions of Johns Hopkins and John Snow for summary judgment (Docket Nos. 33 and 34) are ALLOWED.

                                    / s / Judith Gail Dein  
                                    Judith Gail Dein  
                                    United States Magistrate Judge